**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**


Civil Action No. _____

WENDELL ROSE, Individually and on behalf of all others similarly situated,

      Plaintiff,

v.

ARRAY BIOPHARMA INC.,
RON SQUARER,
DAVID HORIN,
JASON HADDOCK,

      Defendants.

---

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL**
**SECURITIES LAWS**

---

Plaintiff Wendell Rose ("Plaintiff"), by his attorneys, except for his own acts, which are based on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Array Biopharma, Inc. ("Array" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Array common stock between December 16, 2015, and March 17, 2017, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Array is a biopharmaceutical company focused on the discovery, development, and commercialization of targeted small molecule drugs to treat patients afflicted with cancer. The Company's lead cancer drug *binimetinib* (MEK162) was evaluated in multiple trials and combinations, including a Phase 3 "NEMO" study versus *dacarbazine* in unresectable or metastatic NRAS-mutant melanoma patients.

3.      Array made materially false and misleading statements as well as failed to disclose material adverse facts about the Company's lead product *binimetinib* monotherapy for the treatment of *NRAS*-mutant melanoma.

4.      As the truth was revealed, over the course of two trading days, the share price fell *over 13%* from a close of $10.56 per share on March 17, 2017 to close at $9.13 per share on March 21, 2017.

5.      As a result of the fraudulent conduct alleged herein, Plaintiff and other members of the Class purchased Array securities at artificially inflated prices and suffered significant losses and damages once the truth emerged.

## JURISDICTION AND VENUE

6.      The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is properly laid in this Judicial District pursuant to §27 of the Exchange Act and 28. U.S.C. §1391(b). The acts and conduct complained of herein occurred in substantial part in this Judicial District.

9.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10.     Plaintiff purchased Array common stock within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

11.     Defendant Array is incorporated in the state of Delaware. The Company's principal executive offices are located at 3200 Walnut Street, Boulder, Colorado 80301.

12.     Defendant Ron Squarer ("Squarer") was the Company's Chief Executive Officer ("CEO") and a member of the Array's Board of Directors at all relevant times.

13.     Defendant David Horin ("Horin") was the Company's Chief Financial Officer ("CFO") the beginning of the Class Period until July 28, 2016.

14.     Defendant Jason Haddock ("Haddock") has been the Company's CFO from July 28, 2016, to date.

15.     Defendants in paragraphs 12-14 are collectively referred to herein as the "Individual Defendants."

16.     Each of the Individual Defendants:

    (a)     directly participated in the management of the Company;

    (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

> (e)      was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or
>
> (f)      approved or ratified these statements in violation of the federal securities laws.

17.      Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Array's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

18.      As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.      The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Array's reports to the SEC, press releases, and

presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

20. Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Array securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Array's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase Array securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.     Company Background

21. Array is a biopharmaceutical company focused on the discovery, development, and commercialization of targeted small molecule drugs to treat patients afflicted with cancer.

22. The Company's lead cancer drug *binimetinib* (MEK162) was evaluated in multiple trials and combinations, including a Phase 3 "NEMO" study versus *dacarbazine* in unresectable or metastatic NRAS-mutant melanoma patients.

6

**B.** **Material Misstatements and Omissions during the Class Period**

23.     The Class Period begins on December 16, 2015, when Array issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing that the results of the Phase 3 NEMO trial ("December 2015 Press Release"). The Company made material misrepresentations in the press release, including in pertinent part:

### Array BioPharma Announces Phase 3 Binimetinib Trial Meets Primary Endpoint For NRAS-Mutant Melanoma

-- Binimetinib achieves statistically significant progression free survival compared to chemotherapy --

-- Regulatory submissions planned for the first half of 2016 --

BOULDER, Colo., Dec. 16, 2015 /PRNewswire/ -- Array BioPharma (Nasdaq: ARRY) today reported top-line results from the ongoing Phase 3 clinical trial of binimetinib in patients with advanced NRAS-mutant melanoma, known as the NEMO trial. ***The study met its primary endpoint of improving progression-free survival (PFS) compared with dacarbazine treatment.*** The median PFS on the binimetinib arm was 2.8 months versus 1.5 months on the dacarbazine arm; hazard ratio (HR) 0.62, [95% CI 0.47-0.80], p < 0.001.

In the trial, binimetinib was generally well-tolerated and the adverse events reported were consistent with previous results in NRAS melanoma patients.

Array plans to submit binimetinib to regulatory authorities for marketing approval in NRAS-mutant melanoma during the first half of 2016. Results from the NEMO trial including progression free survival, overall survival, objective response rate, safety and prespecified subgroup analyses including outcomes in patients who received prior treatment with immunotherapy will be presented at a medical meeting in 2016.

***"We are excited to announce positive results from the NEMO trial, which suggest binimetinib has the potential to provide an important new treatment option for patients with advanced NRAS melanoma," said Ron Squarer, Chief Executive Officer, Array BioPharma.*** "We look forward to discussing the data with the FDA and other regulatory agencies in the near future."

"The presence of an NRAS mutation is a poor prognostic indicator for patients with advanced melanoma," said Keith T. Flaherty, M.D., Associate Professor, Medicine, Harvard Medical School and Director of Developmental Therapeutics, Cancer Center, Massachusetts General Hospital. "***I am encouraged the NEMO trial met***

*its primary endpoint and look forward to sharing the full results soon.* As the first targeted therapy with positive results in NRAS melanoma, binimetinib will be a welcome addition in this high unmet need population, especially for patients whose disease has progressed following treatment with immunotherapy."

Binimetinib is also being studied in the Phase 3 COLUMBUS trial for patients with BRAF-mutant melanoma and the Phase 3 MILO trial for patients with low grade serous ovarian cancer, as well as in several other earlier stage clinical trials.

Emphasis added.

24.     On May 3, 2016, Array issued a press release, also attached as exhibit 99.1 to the

Form 8-K filed with the SEC announcing the Company's financial and operating results for the

third fiscal quarter and six months ended March 31, 2016 ("Q3 2016 Press Release"). The Q3 2016

Press Release stated in relevant part:

BOULDER, Colo., May 3, 2016 /PRNewswire/ -- Array BioPharma Inc. (NASDAQ: ARRY), a biopharmaceutical company focused on the discovery, development and commercialization of targeted small molecule cancer therapies, today reported results for its fiscal year third quarter ending March 31, 2016 and provided an update on the progress of its key clinical development programs.

"*We have a number of near-term value-drivers, highlighted by our planned NDA submission for binimetinib based on results from our Phase 3 trial in NRAS-mutant melanoma patients (NEMO)*," said Ron Squarer, Array's Chief Executive Officer. "At ASCO, we will present full results from the NEMO trial, as well as provide an update on our Phase 2 study of encorafenib plus cetuximab in BRAF-mutant colorectal cancer patients. Later this summer, we plan to share top-line results from COLUMBUS, our Phase 3 trial of binimetinib and encorafenib in BRAF melanoma patients. We also expect results from SELECT-1, a study of selumetinib in second line KRAS-mutant non-small cell lung cancer patients. Given our estimated cash runway, a series of strong partnerships and continued Novartis funding of ongoing binimetinib and encorafenib trials, we are well positioned to execute on our long-term strategy."

KEY PIPELINE UPDATES

*Binimetinib        (MEK162)        and        encorafenib        (LGX818)*
*Novartis                                                               Agreement*
Novartis continues to conduct and/or substantially fund all ongoing trials with binimetinib and encorafenib through their completion, including the NEMO and COLUMBUS trials. Reimbursement revenue from Novartis was approximately

$74 million for the previous 9 months, of which $64 million was recorded over the past two quarters.

**NEMO: Global Phase 3 trial of binimetinib versus dacarbazine in NRAS-mutant                                 melanoma                                 patients**

***Based on the results of the NEMO trial, Array plans to submit an NDA during the first half of 2016.*** Results from NEMO will be presented at the 2016 American Society of Clinical Oncology conference (ASCO), and will include progression free survival (PFS), overall survival (OS), objective response rate (ORR), safety and pre-specified sub-group analyses, including outcomes in patients who received prior treatment with immunotherapy.

Emphasis added.

25.     During the Q&A session of the conference call to discuss the Company's financial and operating results for the third fiscal quarter ended March 31, 2016 ("Q3 2016 Conference Call"), Array's executives made the following statements in response to Cantor Fitzgerald analyst Mara Goldstein's questions about the results of the Columbus trial, stating in relevant part:

**Mara Goldstein**

Thanks very much. Can you just maybe clarify something for me? On the NDA filing for binimetinib for NRAS melanoma, once you have completed the COLUMBUS trial and would have plans to submit that, does that become a redundant to the NDA or is that a supplemental? And can you just speak for the timing?

**Ron Squarer**

Sure. Mara, I think best answered by Dr. Sandor.

**Victor Sandor**

Yes. ***So the way that would normally work is that it would be supplemental NDA or COLUMBUS would represent a supplemental NDA for the binimetinib label and it would be a new NDA for encorafenib.*** Remember, it's a combination so it's essentially it is two separate NDA. One would be a labeling update hopefully and other one would be a new approval.

Emphasis added.

9

26.     With respect to the NRAS melanoma market and the commercial development of

NEMO, Array's executives responded to analyst Ted Tenthoff from Piper Jaffray in relevant part:

**Ted Tenthoff**

And if I may just recall because I do think there is really important if you don't mind, so back to competing with Novartis and Roche, ***how are you going to really field the sales force and target the sales force to get your component of that 850-ish plus the NRAS melanoma market***?

**Ron Squarer**

Just a point out here, Roche was just recently approved and I think Andy's forecast for the year of $850 million is sort of a flat line no growth forecast. So he could generalize how we reach the market exceed a billion and I think the total addressable market is probably close to $2 billion although it is unlikely that the entire market will be penetrated.

**Andy Robbins**

So, Ted it is a great question. I think that the first answer to question is assuming NEMO is approved by the FDA we will have an advantage to launch our sales force to the exact same call point and channel in indication where we won't have direct compensation. ***None of the other MEKs will have an indication in NRAS melanoma. So that is the first differentiator that we will go out and market that Binimetinib, it's a little bit special it is the only MEK that has demonstrated this effect in this disease. And then secondly and probably most importantly as you know oncologists and the prescribers are going to be influenced mainly by clinical data. And our drugs really differentiated and is there reason really to use them***. And for us that's where we come back to our tolerability advantage. For patients who are expected to take MEK and RAF in the BRAF melanoma setting for a median about a year, the side effects like pyrexia and photosensitivity that Ron walk through are not safety challenges. They are not going to lead to necessarily hospitalization or very significant safety challenges. But they are tolerability issues. And so when you are taking a drug for a year, to have a favorable 102, every couple weeks for three or four days or to have blisters when you are driving your car around and you are out in the sun, if there is another set of agents that has similar or potentially better efficacy and it does not have the side effects that's where we are going to spend our marketing muscle messaging and positioning our products.

**Ron Squarer**

Perhaps I'll just add one other thing. This point our position is that we expect to have similar activity in terms of duration of effect. We are the only MEK RAF

combination in which we are able to dose the RAF inhibitor above its single agent MTD and we are offering higher levels of the RAF in relatively to the competition. But we have no evidence yet of some differentiated activity that would certainly be a very, very powerful outcome although we mentioned today on the call today in MEK RAF phase 3 readout the data has matured over time so it will be seen dynamic to decide when to call our activity profile but that would be the ideal. And then the only thing I will remind everyone is that while several hundred million dollars in revenue may not be as meaningful to in Novartis or Roche, ***given our current valuation it would be highly transformative and would come after we essentially established our commercial effort on NRAS melanoma so it could be a really important value driver. So not to diminish the opportunity but even modest sales could be very important to us let alone taking significant share of this very large market***. Thanks for these questions, Ted.

Emphasis added.

27.     On June 30, 2016, Array issued a press release, also attached as exhibit 99.1 to the

Form 8-K filed with the SEC announcing that the filing of a New Drug Application ("NDA") for

binimetinib in patients with advanced *NRAS*-mutant melanoma to the U.S. Food and Drug

Administration ("FDA") ("June 2016 Press Release"). The Company made material

misrepresentations in the press release, including in pertinent part:

### Array BioPharma Submits Binimetinib New Drug Application to U.S. FDA

First-ever NDA filing for Array

BOULDER, Colo., June 30, 2016 /PRNewswire/ -- Array BioPharma (Nasdaq: ARRY) today announced the submission of a New Drug Application (NDA) for binimetinib in patients with advanced *NRAS*-mutant melanoma to the U.S. Food and Drug Administration (FDA). ***The submission is based on results of the pivotal Phase 3 NEMO (NRAS MELANOMA AND MEK INHBITOR) study, which found binimetinib significantly extended median progression-free survival (PFS), the study's primary endpoint, as compared with dacarbazine.***

***"The new drug application for binimetinib represents Array's first – an important milestone for this promising compound and our Company,"*** said Ron Squarer, Chief Executive Officer, Array BioPharma. "NRAS-mutant melanoma represents an often overlooked subset of advanced disease without meaningful treatment options beyond immunotherapy and NEMO is the first-ever trial to meet a PFS endpoint in this population. We look forward to working with the FDA as they evaluate our application and the potential for binimetinib as a treatment option for these patients."

*In the NEMO study, binimetinib significantly extended median PFS at 2.8 months, as compared with 1.5 months observed with dacarbazine [hazard ratio (HR)=0.62 (95% CI 0.47-0.80), p<0.001] in patients with advanced NRAS-mutant melanoma.* In the pre-specified subset of patients who received prior treatment with immunotherapy, including ipilimumab, nivolumab or pembrolizumab, patients who received binimetinib experienced 5.5 months of median PFS (95% CI, 2.8–7.6), compared with 1.6 months for those receiving treatment with dacarbazine (95% CI, 1.5–2.8).

Emphasis added.

28.     On September 1, 2016, Array issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing that the FDA accepted the NDA for binimetinib in patients with advanced *NRAS*-mutant melanoma ("September 1, 2016 Press Release"). The Company stated in pertinent part:

### Array BioPharma Announces FDA Acceptance of Binimetinib NDA for Patients with Advanced NRAS-Mutant Melanoma

BOULDER, Colo., Sept. 1, 2016 /PRNewswire/ -- Array BioPharma (Nasdaq: ARRY) today announced that the FDA has accepted its New Drug Application (NDA) for binimetinib with a target action date under the Prescription Drug User Fee Act (PDUFA) of June 30, 2017. Array completed its NDA submission of binimetinib in late June 2016 based on findings from the pivotal Phase 3 NEMO (NRAS MELANOMA AND MEK INHIBITOR) trial in patients with NRAS-mutant melanoma. The FDA also indicated that it plans to hold an advisory committee meeting (ODAC) as part of the review process. As previously reported, Array is currently preparing for an Application Orientation Meeting (AOM) with the FDA in September 2016, which it expects will include a discussion of the NDA package including clinical risk / benefit.

"There are very few treatment advances beyond immunotherapy for this devastating disease, which impacts one out of five advanced melanoma patients," said Victor Sandor, M.D., Chief Medical Officer, Array BioPharma. *"Binimetinib is the first and only MEK inhibitor to demonstrate improvement on progression free survival in a Phase 3 trial for NRAS mutant melanoma patients."*

29.     On September 26, 2016, Array issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the results of another Phase 3 study of Binimetinib (COLOMBUS), this time for BRAF-Mutant Melanoma ("September 26, 2016 Press Release").

12

Throughout the September 26, 2016 Press Release, the Company used the opportunity to reapprove the previous statements about the NDA for binimetinib in patients with advanced *NRAS*-mutant melanoma, stating in pertinent part:

### Array BioPharma and Pierre Fabre Announce COLUMBUS Phase 3 Study of Encorafenib plus Binimetinib For BRAF-Mutant Melanoma Met Primary Endpoint

-   Demonstrated statistically significant results with median PFS on combination of encorafenib plus binimetinib 14.9 months versus 7.3 months on vemurafenib -

-   Generally well-tolerated and safety profile overall consistent with prior encorafenib plus binimetinib clinical trial results -

-   Global regulatory submissions planned for 2017 -

BOULDER, Colo., Sept. 26, 2016 /PRNewswire/ -- Array BioPharma (Nasdaq: ARRY) and Pierre Fabre today jointly announced top-line results from Part 1 of the Phase 3 COLUMBUS (Combined LGX818 Used with MEK162 in BRAF Mutant Unresectable Skin Cancer) study evaluating LGX818 (encorafenib), a BRAF inhibitor, and MEK162 (binimetinib), a MEK inhibitor, in patients with BRAF-mutant advanced, unresectable or metastatic melanoma. The study met its primary endpoint, significantly improving progression free survival (PFS) compared with vemurafenib, a BRAF inhibitor, alone.

\*        \*        \*

**About Binimetinib & Encorafenib**

MEK and BRAF are key protein kinases in the MAPK signaling pathway (RAS-RAF-MEK-ERK). Research has shown this pathway regulates several key cellular activities including proliferation, differentiation, survival and angiogenesis. Inappropriate activation of proteins in this pathway has been shown to occur in many cancers, such as melanoma, colorectal and thyroid cancers. Binimetinib is a late-stage small molecule MEK inhibitor and encorafenib is a late-stage small molecule BRAF inhibitor, both of which target key enzymes in this pathway.

Binimetinib and encorafenib are being studied in clinical trials in advanced cancer patients, including the recently initiated Phase 3 BEACON CRC trial that will study encorafenib in combination with cetuximab with or without binimetinib in patients with *BRAF  V600E*-mutant colorectal cancer. Array submitted a New Drug Application (NDA) for binimetinib in NRAS-mutant melanoma to the FDA at the

end of June 2016. The FDA accepted the NDA with a target action date under the Prescription Drug User Fee Act (PDUFA) of June 30, 2017.

Array BioPharma retains exclusive rights to binimetinib and encorafenib in key markets including the U.S. and Japan.

Emphasis added.

30.     At the release of the news, the share price rose *over 80%* from a close of $3.66 on September 23, 2016 per share of Array's common stock to a close of $6.61 per share on September 26, 2016.

31.     The following day, on September 27, 2016, Array issued a press release announcing a proposed public offering of $100 million of shares of its common stock.

32.     On September 28, 2016, Array filed a Prospectus Supplement on Form 424B5 with the SEC announcing the pricing of the above-mentioned public offering of 18,400,000 shares of its common stock at a public offering price of $6.25 per share ("Prospectus Supplement"). The Prospectus Supplement stated in relevant part:

**NEMO**

NEMO is a Phase 3 study comparing binimetinib versus dacarbazine in unresectable or metastatic NRAS-mutant melanoma patients. On September 1, 2016, Array announced that the FDA had accepted Array's New Drug Application, or NDA, for binimetinib in patients with advanced NRAS-mutant melanoma with a target action date under the Prescription Drug User Fee Act (PDUFA) of June 30, 2017. The FDA also indicated that it plans to hold an Oncologic Drugs Advisory Committee (ODAC) meeting as part of the regulatory process.

Activating NRAS mutations are present in approximately 20% of patients with metastatic melanoma, and have been a poor prognostic indicator for these patients. Treatment options for this population remain limited beyond immunotherapy (PD-1, CTLA4). Therefore, if approved, binimetinib could represent an important additional therapy for these patients.

***The NDA submission is based on results of the NEMO study, which found binimetinib extended median PFS, the study's primary endpoint, as compared with dacarbazine. In the NEMO study, binimetinib extended median PFS at 2.8 months, as compared with 1.5 months observed with dacarbazine [hazard***

14

*ratio (HR)=0.62 (95% CI, 0.47-0.80), p<0.001] in patients with advanced NRAS-mutant melanoma. In the pre-specified subset of patients who received prior treatment with immunotherapy (n=85), including ipilimumab (n=54), and nivolumab or pembrolizumab (n=24), patients who received binimetinib experienced 5.5 months of median PFS (95% CI, 2.8-7.6), compared with 1.6 months for those receiving treatment with dacarbazine (95% CI, 1.5-2.8).* While the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care. ***Array anticipates that the primary consideration for marketing approval will be the results for the primary endpoint of the trial.***

In addition to improving PFS, binimetinib also demonstrated significant improvement in the secondary endpoints of ORR and disease control rate, or DCR. While there was no statistically significant difference demonstrated in overall survival, the numerical trend in median overall survival, or mOS, favored the binimetinib arm.

Emphasis added.

33.     On October 3, 2016, Array announced the closing of its underwritten public offering of 21,160,000 shares of its common stock, which included 2,760,000 shares of common stock issued upon the exercise in full of the option to purchase additional shares granted to the underwriters, at a public offering price of $6.25 per share. The total gross proceeds from the offering were $132.25 million, before underwriting discounts and commissions and offering expenses.

34.     The statements in paragraphs 23-33 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made materially false and/or misleading statements and/or failed to disclose that: (i) Array's NEMO study failed to show sufficient clinical benefit of the binimetinib NDA in use for patients with NRAS-mutant melanoma, (ii) that it was aware that this lack of supporting clinical data would not be sufficient to received FDA approval of

binimetinib in use for patients with NRAS-mutant melanoma, and (iii) as a result of the foregoing,

Array's public statements were materially false and misleading at all relevant times.

C.    **The Truth Emerges**

35.    On Sunday, March 19, 2017, Array issued a press release announcing the

withdrawal of the binimetinib NDA in use for patients with NRAS-mutant melanoma ("March

2017 Press Release"), stating in relevant part:

> BOULDER, Colo., March 19, 2017 /PRNewswire/ -- Array BioPharma Inc.
> (ARRY) *today announced that it has withdrawn from the U.S. Food and Drug*
> *Administration's (FDA) Division of Oncology Products 2 its new drug*
> *application (NDA) for binimetinib monotherapy for the treatment of NRAS-*
> *mutant melanoma, a rare, mutationally-driven subset of skin cancer*.
>
> This action was based on thorough discussions and communications with the FDA,
> including exploration of various paths to approval, and followed the late cycle
> review meeting held with the FDA on Friday, March 17, 2017.  Based on feedback
> from the agency, Array concluded that the clinical benefit demonstrated in the
> Phase 3 NEMO clinical trial would not be found sufficient to support approval of
> the NRAS-mutant melanoma NDA.
>
> Ongoing clinical trials for binimetinib will continue. This action will not impact the
> planned Phase 3 COLUMBUS trial NDA of binimetinib, in combination with
> encorafenib, for the treatment of BRAF-mutant melanoma, which remains on track
> for mid-2017.

Emphasis added.

36.    On March 20, 2017, before the market opened, biotech analyst John Carroll from

Endpoints News published an article entitled "Array walks back its FDA pitch on binimetinib,

derailing plans for commercial launch." The article was updated the following day, stated in

relevant part:

> *Array BioPharma has some explaining to do. Fifteen months after the Boulder,*
> *CO-based biotech said that it had the data needed for its first approval of*
> *binimetinib for NRAS-positive melanoma, execs are walking back the application*
> *and its plans for a launch.*

16

In a statement out Sunday evening, Array $ARRY said that after getting feedback from the FDA, execs "concluded that the clinical benefit demonstrated in the Phase 3 NEMO clinical trial would not be found sufficient to support approval of the NRAS-mutant melanoma NDA."

Shares of Array dropped 26% in pre-market trading Monday.

Michael Schmidt at Leerink was not pleased. He noted:

> While NRAS+ melanoma was only a small value driver for the company, *we think this comes as a surprise to investors and is a clear setback for the company and mgmt.'s regulatory and commercial strategy. Recall, management planned to build a commercial infrastructure and visibility with customers this year around the launch in NRAS+ melanoma, which would also be in preparation for the planned launch in 2018 of binimetinib/encorafenib in more competitive BRAF+ melanoma, which is ARRY's main value driver.*

> *It was a much different story back in late 2015 when CEO Ron Squarer said that their MEK blocker hit the primary endpoint on progression-free survival, with the drug arm registering 2.8 months compared to 1.5 months for a group on dacarbazine. It didn't look like much, but Array said it was plenty to take to the FDA.*

> In the summer of 2016, though, the biotech also conceded that the drug had not significantly improved overall survival.

> Array has had plenty of ups and downs with the drug. Novartis had partnered with the company, but punted the program when they executed a big asset swap with GlaxoSmithKline. Pierre Fabry then took their spot, but Array held on to US commercial rights.

Emphasis added.

37.     On this, over the course of two trading days, Array's common stock price fell from $10.56 to $9.13 per share between March 17 and March 21, 2017.

38.     On May 10, 2017, during a conference call to discuss the Company's financial and operating results for the third fiscal quarter ended March 31, 2017 ("Q3 2017 Conference Call"), analyst Michael Schmidt from Leerink asked about the reasons of the withdrawal of the

binimetinib NDA in use for patients with NRAS-mutant melanoma. Ultimately, while attempting to blur the truth, Array's CEO and Individual Defendant Squarer admitted that: (i) Array lacked sufficient data to support approval of the binimetinib NDA in use for patients with NRAS-mutant melanoma, (ii) as a result, Array was aware it would not be able to launch binimetinib in use for patients with NRAS-mutant melanoma. In relevant part:

**Michael Schmidt**

***And then I guess just a question going back to NRAS melanoma, just curious to the reasons why you put the NDA ahead of the outcome actually***?

**Ron Squarer**

Yes Michael, it's Ron. I think did what we could to explain the situation. We know that history, we feel we've always been transparent with the present cons of the data published and shared them and give and we always gave, we considered to be the appropriate attention meaning we never suggested that it was slam dunk and didn't also suggest it was key to our evaluation, it was a very small population which would have yielded very low revenues. The reason we did what we did which was everything that could be done to pursue potential approval over a long period of time, an extensive conversation with the FDA was in an attempt to make the product available to patients who have really so few choices, so after you progress in NRAS melanoma, therapy, you really have no reasonable choice available. ***And so we believe that working with the FDA we would find a way but when it became clear that was not going to occur, we made the decision that we made and clearly we and they need to be focused now regarding the Array portfolio on Columbus and then later BECON***.

**Michael Schmidt**

***But was it basically a function of the changing treatment paradigm in the context of those patients or was it related to the data itself?***

**Ron Squarer**
***Those two are tightly linked***, and so clearly the majority of our patients were in first line and in NRAS specifically IO is a clear first line therapy. And so then you're sure that is a component of the calculation. ***Without months of deliberation and creative work to find a path forward, it's impossible to sort of explain it is leading to one thing.*** The FDA has a job to do and they consider a lot of factors in doing it and the best we can do is present our best case and we feel we did that and that's all the insight I have on it.

Emphasis added.

## ADDITIONAL SCIENTER ALLEGATIONS

39.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Array, their control over, and/or receipt and/or modification of Array's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Array, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

40.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about Arrays' misconduct and its lack of operational and financial controls was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Arrays' share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants'

fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

41.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Arrays' business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Array's securities to be artificially inflated. Plaintiff and other Class members purchased Array's' securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

42.     At all relevant times, the market for Array securities was an efficient market for the following reasons, among others:

   (a) Array securities met the requirements for listing, and were listed and actively traded on the NASDAQ Global Market;

   (b) During the Class Period, Array securities were actively traded, demonstrating a strong presumption of an efficient market;

   (c) As a regulated issuer, Array filed with the SEC periodic public reports during the Class Period;

   (d) Array regularly communicated with public investors via established market

20

communication mechanisms;

(e) Array was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Array was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

43.     As a result of the foregoing, the market for Array securities promptly digested current information regarding Array from all publicly available sources and reflected such information in Array's stock price. Under these circumstances, all purchasers of Array securities during the Class Period suffered similar injury through their purchase of Array's securities at artificially inflated prices, and a presumption of reliance applies.

44.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's true net losses and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Array.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

45.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this

Complaint.

46.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

47.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Array who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Array common stock on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

49.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Array securities were actively traded on the

NASDAQ Global Market. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Array or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

51.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)     whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)     whether the price of Array securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Array securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, each of the Defendants took the actions set forth herein.

56.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Array securities in violation of Section 10(b) of the Exchange

Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

57.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Array as specified herein.

58.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Array's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Array and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Array securities during the Class Period.

59.     Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports

and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

60.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Array's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

61.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Array's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Array's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during

the Class Period, Plaintiff and the other members of the Class acquired Array's securities during the Class Period at artificially high prices and were or will be damaged thereby.

62.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Array's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Array securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

63.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

64.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

65.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.     The Individual Defendants acted as controlling persons of Array within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

68.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

69.     As set forth above, Array, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

70.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

71.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: November 20, 2017

/s/ Jeffrey A. Berens
Jeffrey A. Berens
BERENS LAW LLC
2373 Central Park Boulevard, Suite 100
Denver, Colorado 80238
Telephone: (303) 861-1764
Facsimile: (303) 395-0393
Email: jeff@jberenslaw.com

Local Counsel

Eduard Korsinsky
LEVI & KORSINSKY, LLP (Trial Counsel)
30 Broad Street, 24th Floor
New York, NY 10004
Telephone: (212) 363-7500 ext. 102

Facsimile: (212) 363-7171
Email: ek@zlk.com

*Counsel for Plaintiff and Proposed Lead Counsel for the Class*

EXHIBIT A

**CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS**

I, Wendell Rose , duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Array Biopharma, Inc. which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct. Executed this July 19, 2017.

Name: Wendell Rose

Signed:

**Wendell Rose**
**Transactions in Array Biopharma, Inc. (ARRY) Common Stock**
**Class Period: December 16, 2015, and March 17, 2017, inclusive**

| Date of Transaction | Buy (B) or Sell (S) | Quantity |
|---|---|---|
| 12/17/2015 | B | 500 |
| 12/18/2015 | B | 500 |
| 12/29/2015 | B | 1000 |
| 1/4/2016 | B | 1000 |
| 1/4/2016 | B | 2000 |
| 1/6/2016 | B | 2000 |
| 1/7/2016 | B | 1000 |
| 1/7/2016 | B | 1000 |
| 1/8/2016 | B | 1000 |
| 1/15/2016 | B | 1000 |
| 1/15/2016 | B | 2000 |
| 1/20/2016 | B | 2000 |
| 1/28/2016 | B | 2000 |
| 2/1/2016 | B | 1000 |
| 3/1/2016 | B | 1015 |
| 3/17/2016 | B | 985 |
| 4/29/2016* | B | 1000 |
| 4/29/2016 | B | 1000 |
| 5/9/2016* | B | 1000 |
| 5/11/2016* | B | 2000 |
| 5/17/2016* | B | 1000 |
| 6/17/2016* | B | 1,000 |
| 8/9/2016 | S | (24700) |
| 8/9/2016 | S | (2300) |
| 8/25/2016 | B | 1000 |
| 9/6/2016 | S | (1000) |
| 10/18/2016 | B | 1000 |
| 10/27/2016 | B | 1000 |
| 11/3/2016 | B | 1000 |
| 11/22/2016 | B | 1000 |
| 1/27/2017* | B | 1194 |
| 2/14/2017* | S | (5194) |
| 2/24/2017* | B | 5000 |
| 3/6/2017* | B | 2500 |

**\*Settlement Date**

| Price ($) |
|-----------|
| $ 4.55 |
| $ 4.50 |
| $ 4.25 |
| $ 4.07 |
| $ 4.08 |
| $ 4.00 |
| $ 3.85 |
| $ 3.70 |
| $ 3.65 |
| $ 3.20 |
| $ 3.15 |
| $ 3.04 |
| $ 3.03 |
| $ 3.00 |
| $ 2.53 |
| $ 2.55 |
| $ 3.20 |
| $ 3.15 |
| $ 3.10 |
| $ 2.94 |
| $ 2.75 |
| $ 3.25 |
| $ 3.50 |
| $ 3.51 |
| $ 3.15 |
| $ 3.56 |
| $ 6.30 |
| $ 6.00 |
| $ 5.50 |
| $ 7.75 |
| $ 11.00 |
| $ 12.00 |
| $ 10.95 |
| $ 11.50 |