**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-02789-KLM (Consolidated with Civil Action No. 17-cv-02848-STV)

PETER VOULGARIS,
WENDELL ROSE, and
ROBERT NAUMAN,

      Plaintiffs,

v.

ARRAY BIOPHARMA INC.,
RON SQUARER,
VICTOR SANDOR, and
JASON HADDOCK,

      Defendants.

---

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS AND JURY TRIAL DEMAND

---

**BERENS LAW LLC**
Jeffrey A. Berens
2373 Central Park Boulevard,
Suite 100
Denver, Colorado 80238
Telephone: (303) 861-1764
Facsimile: (303) 395-0393
jeff@jberenslaw.com


Dated: April 26, 2018

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Michelle Gruesbeck
1101 30th Street N.W.
Washington, D.C. 20007
Telephone: (202) 524-4290
Facsimile: (212) 333-2121
nporritt@zlk.com
mgruesbeck@zlk.com

*Attorneys for Plaintiffs*

Plaintiff Wendell Rose and Lead Plaintiff Peter Voulgaris ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Amended Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, *inter alia*: (a) review and analysis of relevant filings made by Array Biopharma, Inc. ("Array") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, press releases, and television interviews; (c) review and analysis of securities analysts' reports and advisories concerning Array; and (d) information obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons who acquired Array securities between June 30, 2016 and March 17, 2017, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class"). Defendants in this case include Ron Squarer ("Squarer"), Victor Sandor ("Sandor"), and Jason Haddock ("Haddock") (collectively, the "Individual Defendants") (the Individual Defendants together with Array, "Defendants"). Squarer, Sandor, and Haddock served as Array's Chief Executive Officer, Chief Medical Officer, Chief Operating Officer, and Chief Financial Officer during the Class Period, respectively.

2. Array is a biopharmaceutical company focused on the discovery, development, and commercialization of targeted small molecule drugs to treat patients afflicted with melanoma skin cancer. This case focuses on one of Array's drug candidates and, importantly, Defendants'

statements about the clinical trial Array conducted in support of Array's New Drug Application ("NDA") for the drug candidate. The particular drug candidate at issue is binimetinib (MEK162). The clinical trial that Defendants discussed during the Class Period was a Phase 3 trial referred to as "NEMO".

3.     By way of background, the U.S. Food and Drug Administration ("FDA") oversees all biopharmaceutical development and commercialization in the United States. A company must provide a significant amount of data to the FDA in order to receive approval to market a drug to the general population. The data provided to the FDA is most often generated from pre-clinical and clinical trials. This data is submitted to the FDA along with a NDA. A company may market its drug only if the FDA accepts and approves the NDA. Given that many biopharmaceutical companies do not generate revenue unless and until they can market their drugs, the NDA-approval process represents one of the most important moments in the life of a biopharmaceutical company.

4.     Array submitted an NDA to the FDA for binimetinib on June 30, 2016. In support of the NDA, Array relied upon data obtained from its NEMO Phase 3 clinical trial. Array publicly described this data as being positive in terms of the prospects for FDA approval. The "primary endpoint" for the NEMO trial (which is the key measure by which the company measures the effectiveness of the drug) was "progression-free survival" or "PFS" (the number of months a patient survived without progression of their melanoma). Following the completion of the NEMO study, Array repeatedly told investors that binimetinib had shown an improvement in PFS as compared with NEMO's control arm, dacarbazine (an approved, traditional chemotherapy medication).

5.     Unbeknownst to investors, however, Defendants knew that the NEMO trial data posed a significant and grave risk that the FDA would not approve the NDA (despite meeting the study's primary endpoint). Evidence acquired from the European Medicines Agency shows that binimetinib was barely more effective versus approved drugs already on the market. Moreover,

evidence shows that the quality of life during the brief period of "progression free survival" was drastically poor.

6.      Evidence also shows that binimetinib proved far more beneficial to patients who had received prior treatment with an immunotherapy ("IO") as opposed to those who had not (or were "treatment naïve," as Array referred to them). The following chart, which originates from a presentation by Reinhard Dummer, M.D. (one of Array's clinical investigators), shows the differences in PFS across the two patient populations (or stratum):



7.      For patients with prior immunotherapy treatment, binimetinib resulted in a median PFS of 5.5 months, compared with 2.8 months for patients without prior immunotherapy. In other words, ***binimetinib worked almost twice as well for patients with prior immunotherapy than without***.

8.      Defendants knew that the NEMO data presented an obstacle for FDA approval of binimetinib, at least when considering the entire patient population data. Consequently,

Defendants decided to pursue approval from the FDA based upon a subgroup of patient data comprised of data from patients who had previously received treatment with immunotherapy only, *i.e.*, Defendants attempted to informally change the indication of binimetinib from a broad patient population to a more narrow one defined by prior immunotherapy treatment.

9. This was a significant problem. Section 314.60 of Title 21 of the Code of Federal Regulations is titled "Amendments to an unapproved NDA, supplement, or resubmission." In pertinent part, the regulation states that the "FDA generally assumes that when an original NDA . . . is submitted to the Agency for review, the applicant believes that the Agency can approve the NDA . . . as submitted." And, while an applicant "may submit an amendment to an NDA . . . that has been filed . . . but is not yet approved," ***amendments are not permitted to change the intended indication for a drug after submission of the NDA***.

10. The implication of what Defendants did was that Array's NDA for binimetinib was that the probability of the FDA approving Array's NDA was exceedingly low. ***Indeed, after meeting with the FDA to discuss the NDA on March 17, 2017, Array announced that they were withdrawing the NDA on March 19, 2017***.

11. In light of the truth behind the NEMO data and the binimetinib NDA, Defendants' statements during the Class Period were materially misleading. For example, on June 30, 2016, when Array announced that it filed the binimetinib NDA, Defendant Squarer addressed the results from the "pre-specified sub-group of patients who had received prior treatment with immunotherapy." Squarer told investors that, while the results for this subgroup were "of interest, interpretation beyond overall consistency with the primary result should be made with care" and that "Array anticipate[d] that the primary consideration for marketing approval [would] be the results for the primary endpoint of the trial." This was not true. In fact, the data from the NEMO trial suggested that binimetinib was not suitable for approval, except when considering the data from the prior-immunotherapy subgroup. In light of this, Defendants were attempting to obtain

approval of binimetinib for a patient indication different than what was initially stated; specifically, Defendants attempted to obtain approval of binimetinib for use by prior-immunotherapy patients only. This tactic was highly improper under FDA regulation and all but guaranteed that the FDA would reject the NDA.

12.     Not only do FDA regulations prohibit changing the indication of a drug after submission of an NDA, but the FDA has never approved a drug on the basis of a subgroup analysis. To obtain approval for this modified indication, Array would have had to resubmit the application with new data from a standalone post-IO trial. ***Accordingly, by concealing their intentions with respect to the binimetinib NDA, Defendants hid from investors that the NDA was in all likelihood not going to be approved by the FDA***.

13.     Plaintiffs' lawsuit seeks to recover damages caused by what Defendants did. Throughout the Class Period, Defendants told the public that the NDA for binimetinib had been submitted with the support of complete NEMO data for both the treatment naïve and post-IO subgroups. However, these statements concealed the truth that Defendants either: (i) did not intend for the NDA to be approved when they submitted it to the FDA; or (ii) they were hoping that the FDA would approve the NDA for an indication that was different than the one initially stated (based upon a review of the prior immunotherapy subgroup). ***In either event, Defendants' statements about the binimetinib NDA were materially misleading because they concealed from investors a number of then-existing facts that all suggested that the risk of FDA disapproval was much greater than they let on***. Given the implications of this strategy, Plaintiffs had a right to know this information so that they could have accurately evaluated the risks associated with Array's NDA and buying Array's stock in general.

14.     On Sunday, March 19, 2017, the public discovered what Array had attempted to do and, importantly, that Defendants had been lying to them over the course of the Class Period. Array disclosed in a press release that it had withdrawn its NDA for binimetinib.

15.     Array's press release was followed by an article published on *Endpoints News* on March 20, 2017, before the market opened (updated March 21, 2017), titled "Array walks back its FDA pitch on binimetinib, derailing plans for commercial launch." This article discussed how analysts from major investment banks were displeased with Array's announcement that the clinical benefits shown in the Phase 3 Nemo clinical trial would not be sufficient to support approval of the NDA for binimetinib. As emphasized in the article, the announcement was in stark contrast with Array's public statements during 2016.

16.     In response to the disclosures about Array's NDA for binimetinib, the price of Array's common stock fell precipitously from $10.56 per share to $9.13 per share over the course of two trading days (between March 17 and March 21, 2017). Array lost more than $240 million in market capitalization during this short period.

17.     Plaintiffs and other similarly situated investors in Array lost significant amounts of money by buying their shares at artificially inflated prices during the Class Period. Had the public known the truth about the NDA for binimetinib, the price of Array's stock would have been less and, as a result, these investors would not have overpaid for their shares.

18.     For the reasons set forth herein, Defendants are liable to Plaintiffs under the Securities Exchange Act of 1934, Sections 10(b) and 20(a) [15 U.S.C. §§78j, 78t], and SEC Rule 10b-5(b) [17 CFR 240.10b-5].

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

U.S.C. §1391(b), as Array's principal executive offices and wholly-owned subsidiary, Array LLC, are located in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

22.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

23.     Plaintiff Wendell Rose purchased Array common stock during the Class Period and has suffered damages as a result. Wendell Rose's certification was filed in connection with the initial complaint in this action and is incorporated herein by reference.

24.     Lead Plaintiff Peter Voulgaris purchased Array common stock during the Class Period and has suffered damages as a result. Peter Voulgaris' certification was filed in connection with his motion for lead plaintiff in this action and is incorporated herein by reference.

25.     Array is a Delaware corporation with its principal executive offices located at 3200 Walnut Street, Boulder, Colorado 80301. Array is headquartered in Boulder, Colorado and has 209 full-time employees. Array also maintains offices in Morrisville, North Carolina and Cambridge, Massachusetts. Array was founded in 1998 and became a public company in November 2000. Array is listed on the NASDAQ Global Market under the symbol "ARRY."

26.     Defendant Ron Squarer was Array's Chief Executive Officer ("CEO") and a member of the Array's Board of Directors at all relevant times

27.     Defendant Victor Sandor was Array's Chief Medical Officer ("CMO") at all relevant times

28.     Defendant Jason Haddock has been Array's CFO from July 28, 2016, to date.

29.     Squarer, Sandor, and Haddock (collectively, the "Individual Defendants"):

- directly or indirectly participated in the management of Array;

- was directly or indirectly involved in the day-to-day operations of Array at the highest levels;

- was privy to confidential proprietary information concerning Array and its business and operations;

- was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

- was directly or indirectly involved in the oversight or implementation of Array's internal controls;

- was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning Array; and/or

- approved or ratified these statements in violation of the federal securities laws.

30.     Array is liable for the acts of Squarer, Sandor, and Haddock, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

31.     The scienter of Squarer, Sandor, and Haddock, and other employees and agents of Array are similarly imputed to Array under respondeat superior and agency principles.

## **BACKGROUND**

### *Binimetinib and the Phase 3 "NEMO" Study*

32.     Array is a biopharmaceutical company focused on the discovery, development and commercialization of targeted small molecule drugs to treat patients afflicted with cancer; in particular, melanoma. Array's lead drug candidate during the Class Period was binimetinib. Array described binimetinib as a drug intended to fight melanoma.

33.     Binimetinib was integral to several of Array's clinical trials during the Class Period. Clinical trials involving binimetinib include MILO (binimetinib in low-grade serous ovarian cancer patients), COLUMBUS (encorafenib in combination with binimetinib in BRAF-mutant melanoma patients) and BEACON CRC (evaluating the triplet combination of encorafenib, binimetinib and cetuximab, an EGFR antagonist, in patients with BRAF-mutant Colorectal Cancer).

34.     At issue in this case is Array's Phase 3 clinical trial for binimetinib, referred to by Array as "NEMO" (**N**RAS M**E**LANOMA AND **M**EK INHIBIT**O**R). Array designed NEMO to compare the efficacy of binimetinib with dacarbazine in patients (either treatment-naïve or having received previous immunotherapy). The primary endpoint of the study, or the primary means by which binimetinib was to be evaluated, was the number of months a patient survived without progression of their melanoma (referred to as "progression-free survival").

35.     At the outset, the NEMO study allowed for either treatment-naïve (first-line) patients or patients who had undergone a single round of IO therapy (*i.e.*, second-line therapy). The trial protocol subsequently underwent two revisions to account for the rapid uptake of IO drugs: patients were originally allowed to enroll if they had undergone no more than one prior IO regimen and this had been at least 12 weeks earlier. Almost a year after the trial started, on December 18, 2013, this washout period was cut it half to six weeks. Six months later, on May 19, 2014, the eligibility requirements were changed to allow patients with any number of prior IO regimens to enter.

36.     Patients received binimetinib (45 mg orally twice daily) or dacarbazine (1000 mg/m² intravenously once every 3 weeks). Study visits occurred at 3-week intervals. Patients continued on study treatment until documented disease progression, intolerable toxicity, withdrawal of consent, death, physician decision, or early termination. One dose reduction of binimetinib to 30 mg orally twice daily was permitted; patients not able to tolerate binimetinib at

this lower dose were permanently discontinued. No re-escalation was allowed if the dose reduction was because of left ventricular ejection fraction dysfunction or prolonged heart rate-corrected QT interval, Fridericia's formula, of longer than 500 ms; otherwise, dose re-escalation of binimetinib to 45 mg orally twice daily was permitted if the adverse event improved to the baseline toxicity level and remained stable for at least 21 days.

37.     Patients unable to tolerate the dacarbazine dosing schedule were permitted a maximum of two dose reductions, first to 750 mg/m² and then to 500 mg/m². Any patient requiring further dose reduction of dacarbazine was removed from study treatment. Re-escalation of dacarbazine dose was not permitted. Dacarbazine could be held for up to 6 weeks; patients who had continued toxicity were discontinued from the study.

38.     Safety and tolerability were assessed by the incidence and severity of adverse events (monitored continuously through to 30 days after the end of treatment); assessments of hematology and chemistry values, vital signs, electrocardiograms, and physical examinations (done at every study visit); multigated acquisition scans or echocardiograms (done at weeks 4 and 7 and then every 9 weeks through to the end of treatment); and ocular examinations, including optical coherence tomography.

39.     The primary endpoint was progression-free survival (defined as time from randomization until progression according to blinded independent central review or death). Overall survival was a secondary endpoint (defined as time from randomization until death from any cause).

40.     Array reported the NEMO results in an article by doctors and scientists funded in part by Array entitled "Binimetinib versus dacarbazine in patients with advanced NRAS-mutant melanoma (NEMO): a multicentre, open-label, randomised, phase 3 trial" published in *Lancet Oncology* in April 2017. Array also presented its findings at the 2016 American Society of Clinical Oncology (ASCO) Annual meeting in Chicago in a presentation titled "Results of NEMO: A Phase

3 Trial of Binimetinib (BINI) vs Dacarbazine (DTIC) in NRAS-Mutant Cutaneous Melanoma."

41.     Array represented to the public that NEMO had proven binimetinib to be a success. According to Array, the study found binimetinib extended median progression-free survival, the study's primary endpoint, at 2.8 months, as compared with 1.5 months observed with dacarbazine. Array touted this result as "the first trial to ever meet a PFS endpoint in patients with advanced NRAS-mutant melanoma." Array also noted that, in a pre-specified subset of patients who received prior treatment with immunotherapy, patients who received binimetinib experienced 5.5 months of median PFS, compared with 1.6 months for those receiving treatment with dacarbazine.

42.     Based upon this data, Array announced to the public on December 16, 2015 that it would be proceeding with an NDA for binimetinib. In a press release announcing the decision, Defendant Squarer stated in pertinent part that: "We are excited to announce positive results from the NEMO trial, which suggest binimetinib has the potential to provide an important new treatment option for patients with advanced NRAS melanoma. . . . We look forward to discussing the data with the FDA and other regulatory agencies in the near future."

43.     Upon this announcement, the stock price jumped from $3.83 on December 15, 2015 to close at $4.62 on December 16, 2015 on exceptionally high trading. Array repeatedly touted the results of the NEMO trial and the anticipated NDA filing including: at a January 14, 2016 JPMorgan Healthcare Conference; in a February 2, 2016 press release; in a February 2, 2016 Second Quarter Earnings Conference Call; a May 3, 2016 press release; a May 3, 2016 Third Quarter Earnings Conference Call; and a June 9, 2016 Jefferies Healthcare Conference.

***The FDA New Drug Application Process***

44.     The NDA process is critical to most, if not all, biopharmaceutical companies. Biopharmaceuticals most often do not (indeed, cannot) generate revenue until their products are approved by the FDA. The NDA process is the process by which a biopharmaceutical company requests and potentially receives that approval. All drugs currently marketed within the United

States were, at some point, the subject of an approved NDA

45.     To submit an NDA, a company must be able to support the application with a large amount of data that, among other things, proves that the drug is safe and effective. Specifically, an NDA must show "substantial evidence" that the drug is safe and effective at treating the condition it purports to treat.

46.     A properly submitted NDA provides the FDA with all pertinent information about the drug, including data and statistical analyses sufficient to determine whether: (1) the drug is safe and provides the benefits it purports to; (2) the benefits of the drug outweigh its risks; (3) the drug's proposed labeling is appropriate and what it should contain; and (4) the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity. Although safety and efficacy are particular important in the FDA's assessment, each of these issues is independently critical to the agency's ultimate approval decision.

47.     In order to meet these standards, drug developers typically subject a drug candidate to a series of clinical trials designed to accumulate the data required to submit a successful NDA. Phase 1 clinical trials typically evaluate an investigational drug's safety and dosage tolerance. Phase 2 clinical trials: (1) usually involve larger patient populations; (2) evaluate dosage tolerance and appropriate dosage; (3) identify possible short-term adverse effects and safety risks; and (4) provide a preliminary evaluation of the efficacy of the drug for specific indications.

48.     Finally, Phase 3 clinical trials test for efficacy and safety in an even further expanded patient population. Phase 3 trials also usually involve comparison with placebo, and are intended to establish the overall risk-benefit profile of the product and provide an adequate basis for physician labeling.

49.     The FDA typically requires two successful clinical trials—which must be "adequate and well-controlled investigations"—in order to provide the FDA with "substantial

evidence" that a drug is safe and effective. The FDA has generally emphasized the plural in "investigations," meaning that most drug approvals are based on the results of at least two pivotal trials.

50.     FDA procedures make "submission" and "filing" distinct events. Specifically, a pharmaceutical company "submits" an NDA to the FDA. After a preliminary review for facial sufficiency, the FDA "files" the application into a dossier, where it remains until further action is taken by regulators for a complete substantive review.

51.     Title 21 CFR 314.60 "Amendments to an unapproved NDA, supplement, or resubmission," states that that while "FDA generally assumes that when an original NDA . . . is submitted to the Agency for review, the applicant believes that" it can be approved as submitted. While the FDA allows applicants to submit amendments to an NDA that has been filed but not yet approved, "[a] major amendment may not include data to support an indication or claim that was not included in the original NDA, supplement, or resubmission, but it may include data to support a minor modification of an indication or claim that was included in the original NDA, supplement, or resubmission." Under FDA SOPP 8402: Designation of Amendments as Major, Version: #6, Effective Date: October 1, 2017, a major amendment is "an amendment to an original application, efficacy supplement, manufacturing supplement or resubmission of any of these applications, including biosimilars, that extends the review clock."

52.     Broadly speaking, drug approval decisions hinge on assessment of the product's benefit-cost ratio. However, the threshold for approval changes along with the availability and quality of therapeutic alternatives: when promising alternatives are limited, regulators are more likely to approve products that would not be approved when other options are available. Additionally, treatments for more aggressive diseases or diseases that require unique treatment are more likely to be approved that treatments for more generic disease. Although Array claimed to the public that NRAS melanoma was a unique disease that was particularly aggressive and had

limited treatment alternatives, numerous studies show that NRAS melanoma is not more aggressive nor does it require specialized treatment.[1] Thus, the binimetinib NDA was subject to the FDA's routine evaluation process.

### The Truth about the NEMO Trial Data

53.     Unbeknownst to the public (and contrary to Defendants' public statements), the NEMO data was severely problematic in terms of binimetinib's prospects for NDA approval.

54.     Array had reported improved response rates for binimetinib treatment versus dacarbazine in patients with NRAS-mutant melanoma with a median PFS of 2.8 versus 1.5 months, respectively. Array had also reported that patients who had received previous IO treatment performed much better in the NEMO trial than patients that did not. Patients who had received binimetinib after prior IO had a median PFS of 5.49 months whereas the dacarbazine with prior IO had PFS of 1.64 months, thus representing an additional 4 months of PFS as compared to the 1.3 month advantage in the larger trial population. Other important secondary outcomes, such as quality of life and comparison of ECOG performance status, were not reported in those public reports.

55.     While Array did not report data about quality of life or a comparison of ECOG performance status, the European Medicines Agency (EMA)  addressed these issues in a detailed review of an application from one of Array's collaborators, a European company named Pierre Fabre. Pierre Fabre owned the European license for binimetinib. Pierre Fabre's application to the EMA was based on the NEMO data with an indication for melanoma with the NRAS mutation,

---

[1] See, e.g., N.E. Thomas et al. Association between NRAS and BRAF mutational status and melanoma-specific survival among patients with higher-risk primary melanoma, 1 JAMA Oncol. 359-68 (2015); M.S. Carlino et al., Differential activity of MEK and ERK inhibitors in BRAF inhibitor resistant melanoma, 8 Mol Oncol. 544-54 (2014); JA Ellerhorst et al., Clinical correlates of NRAS and BRAF mutations in primary human melanoma, 17 Clin Cancer Res. 229–35 (2011); E. Edlundh-Rose et al., NRAS and BRAF mutations in melanoma tumours in relation to clinical characteristics: a study based on mutation screening by pyrosequencing, 160 Melanoma Res. 471–78 (2006).

just like binimetinib.

56.     The processes to approve drugs in the EU are largely identical to those of the FDA. An investigator of a proposed pharmaceutical first obtains pre-authorization for use of the drug in clinical trials. The drug then progresses through sequential studies analogous to those in the United States: Phase I trials conducted in a small number of healthy subjects to clarify pharmacology and dose range, Phase II trials conducted in several hundred patients with the target condition to investigate the dose-response relationship, and Phase III confirmatory trials in several hundred to several thousand patients to substantiate safety and efficacy.

57.     A European public assessment report (EPAR) is published for every human medicine application that has been granted or refused a marketing authorisation. This follows an assessment by EMA of an application submitted by a pharmaceutical company in the framework of the Central authorisation of medicines. An EPAR provides public information on a medicine, including how it was assessed by EMA.

58.     Pierre Fabre withdrew the NRAS marketing authorization application (MAA) on January 4, 2018, after the EMA had conducted an extensive review but before Pierre Fabre had responded to a request for additional information. Unlike the FDA, which has not produced any binimetinib-NRAS related documents containing substantive opinions, the EMA has published detailed findings of its review. This November 9, 2017 Assessment Report, under the application name Mektovi, provides a thorough, objective regulatory perspective on the NRAS application. In the first section, titled "Recommendation," the EMA writes (emphasis added):

> Recommendation: Based on the review of the data on quality, safety and efficacy, the CHMP consider that the application for Mektovi, in the treatment of adult patients with unresectable or metastatic melanoma, with NRAS Q61 mutation*, is not approvable since "major objections" have been identified, which preclude a recommendation for marketing authorisation at the present time.* The details of these major objections are provided in the preliminary list of questions. ***The major objections precluding a recommendation of marketing authorisation pertain to the following principal deficiencies***:

15

*• The efficacy of binimetinib in the proposed patient population is questionable compared to dacarbazine* (1.3-month improvement in PFS along with an ORR of 15.2%). *The assessment of questionable efficacy applies both on treatment naïve as well as on patients treated with prior immunotherapy. In the absence of an OS the limited improvement in PFS not considered clinically relevant.* To further challenge the question whether improved PFS (and therefore, indirectly, higher ORR) constitutes actually a clinical benefit in the concrete context of the NEMO trial (a trial which allowed check point inhibitor/immunotherapy treatment once licensed after initiation of NEMO trial both prior to recruitment as well as post progression), two additional analyses/discussions are requested from the applicant.

*• An unmet medical need for binimetinib, specifically targeting NRAS mutations in melanoma, has not been justified. The limited efficacy of binimetinib demonstrated and considering the clinical practice of treating these patients with relatively effective treatments for BRAF wild type melanoma, including checkpoint inhibitors and PD-1 inhibitors, does not support the claim that binimetinib fulfils an unmet medical need.*

*• Safety in the studied population is a concern due to poorer safety, including quicker deterioration of ECOG PS (including deterioration free survival [DFS]) with binimetinib compared to dacarbazine chemotherapy. The observed deleterious effects on longer term OS may be attributable to the (very) poor efficacy of binimetinib* as compared to checkpoint inhibitors administered post progression to a relevant proportion of patients in the pivotal NEMO trial.

59.     In the Assessment Report, the EMA reinforced that there was not a demonstrated need for specific NRAS melanoma treatment, stating, "An unmet medical need for binimetinib, specifically targeting NRAS mutations in melanoma, has not been justified. The limited efficacy of binimetinib demonstrated and considering the clinical practice of treating these patients with relatively effective treatments for BRAF wild type melanoma, including checkpoint inhibitors and PD-1 inhibitors, does not support the claim that binimetinib fulfils an unmet medical need."

60.     The EMA dismissed the meager improvement in PFS and noted the lack of survival benefits. They stated, "The [1.3 month] PFS improvement does not, however, translate into an overall survival benefit." The EMA also notes that the Kaplan-Meier curve, which looked at long-

term survival, 'crosses over' around 12 months, suggesting a late detrimental effect of the initial treatment of binimetinib and thus meaning that the dacarbazine group actually has a better chance of survival than the binimetinib group. The EMA also noted concerns that more mature OS analysis would further confirm that long-term survival may be worse in the binimetinib arm than in the dacarbazine arm. This information would be a red flag for the FDA.

61.     The EMA also expressed concerns about quality of life (QoL) and performance status (PS), ultimately concluding that performance status and QoL was worse in the binimetinib arm of the study. In pertinent part, the EMA stated:

> If interpreted, the QoL data would show that treatment with binimetinib may have a negative impact on QoL. Using such an interpretation for a decision would be unfair but the result is mentioned here for the similar trend of QoL and ECOG PS data. The proportion of patients with definitive 1-point deterioration in ECOG PS…was higher in the binimetinib arm compared to the dacarbazine arm (30.9% vs. 11.4%). Since median for a definitive 1-point deterioration in ECOG PS was not reached (like the median of OS in both arms), and death constitutes an ECOG PS of 5, additional analysis of deterioration free survival…was requested by CHMP. Accordingly, patients in the dacarbazine arm have a by 0.9 months prolonged DFS…There are good reasons, deriving from the inadequate OS assessment, assuming that with more information and less censored OS events the result will be statistically significant.

62.     The EMA further pointed out concerns with binimetinib's toxicity, stating:

> Although an MEK inhibitor in principle is not cytotoxic, binimetinib's toxicity is more pronounced than that of standard chemotherapy. The sum of toxicities has a statistically significantly negative impact on deterioration of ECOG PS >1…. Additionally, it should be considered that binimetinib is intended for permanent daily administration, while chemotherapy with DTIC is administered in cycles, which allow the patients to recover between the treatment phases. The high rates of drug discontinuation, dose interruptions and reductions raises concerns regarding tolerability in the intended target population.

63.     In the "Balance of benefits and risks" section, which is particularly important as risks and benefits are something given great weight during FDA's approval process, the EMA writes, "The currently observed 1.32-month prolongation in median PFS over dacarbazine, without an improvement in overall survival is not considered sufficient evidence of benefit in the proposed

patient population. The observed benefit does not override concerns regarding the tolerability of binimetinib in the proposed patient population and the possible negative impact on the health (+/- quality of life) of these patients." This comment again reinforces the EMA's concerns about the meager benefit of the drug, especially when compared with the toxicity and QoL issues.

64.     Ultimately, the NEMO study proved that binimetineb had a very limited clinical benefit on the primary endpoint (*i.e.*, +1.3 months of PFS), possibly harmful effects on long-term overall survival and performance status. While Array did not publicize this performance status or QoL data, the FDA had access to this data.

## DEFENDANTS MADE MISLEADING STATEMENTS ABOUT THE BINIMETINIB NEW DRUG APPLICATION

65.     During the Class Period, Defendants made materially false and/or misleading statements and/or omissions by: (i) omitting to disclose material information about the results of the NEMO study showed, such as quality of life, performance status, and tolerability, which would be important considerations for regulators to consider in evaluating the NDA; (ii) misleading investors to believe that the NEMO study results showed sufficient clinical benefits of binimetinib for the purposes of obtaining FDA-approval; and (iii) concealing that Defendants intended to seek approval for a more narrow indication (post-immunotherapy only) given that the entirety of the NEMO data did support the indication initially stated on Array's NDA.

### *June 30, 2016 – Form 8-K*

66.     The Class Period begins on June 30, 2016, Array issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the filing of a NDA for binimetinib in patients with advanced *NRAS*-mutant melanoma to the FDA ("June 2016 Press Release"). Array made material misrepresentations in the press release, including in pertinent part (emphasis added):

Array BioPharma Submits Binimetinib New Drug Application to U.S. FDA

First-ever NDA filing for Array

BOULDER, Colo., June 30, 2016 /PRNewswire/ -- Array BioPharma (Nasdaq: ARRY) today announced the submission of a New Drug Application (NDA) for binimetinib in patients with advanced *NRAS*-mutant melanoma to the U.S. Food and Drug Administration (FDA). ***The submission is based on results of the pivotal Phase 3 NEMO (NRAS MELANOMA AND MEK INHBITOR) study, which found binimetinib significantly extended median progression-free survival (PFS), the study's primary endpoint, as compared with dacarbazine.***

"The new drug application for binimetinib represents Array's first – an important milestone for this promising compound and our Company," said Ron Squarer, Chief Executive Officer, Array BioPharma. "NRAS-mutant melanoma represents an often overlooked subset of advanced disease without meaningful treatment options beyond immunotherapy and NEMO is the first-ever trial to meet a PFS endpoint in this population. We look forward to working with the FDA as they evaluate our application and the potential for binimetinib as a treatment option for these patients."

In the NEMO study, binimetinib significantly extended median PFS at 2.8 months, as compared with 1.5 months observed with dacarbazine [hazard ratio (HR)=0.62 (95% CI 0.47-0.80), p<0.001] in patients with advanced NRAS mutant melanoma. In the pre-specified subset of patients who received prior treatment with immunotherapy, including ipilimumab, nivolumab or pembrolizumab, patients who received binimetinib experienced 5.5 months of median PFS (95% CI, 2.8–7.6), compared with 1.6 months for those receiving treatment with dacarbazine (95% CI, 1.5–2.8).

Mr. Squarer added, ***"While the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care. Array anticipates that the primary consideration for marketing approval will be the results for the primary endpoint of the trial."***

In addition to improving PFS, binimetinib also demonstrated significant improvement in overall response rate (ORR) and disease control rate (DCR). While there was no statistically significant difference demonstrated in overall survival, the median overall survival (mOS) favored the binimetinib arm.

- Confirmed ORR was 15 percent (95% CI, 11-20 percent) in patients receiving binimetinib vs. 7 percent (95% CI, 3-13 percent) in patients receiving dacarbazine.
- DCR for patients receiving binimetinib was 58 percent (95% CI, 52-64 percent)

vs. 25 percent (95% CI, 18-33 percent) for patients receiving dacarbazine.
- mOS was estimated at 11.0 months in patients receiving binimetinib vs. 10.1 months for patients treated with dacarbazine [(HR) = 1.0 (95% CI 0.75-1.33), p=0.499].

Under the NEMO protocol, and in accordance with accepted statistical practice, the subgroup analyses of OS are formally conducted only if the key secondary endpoint of OS reached statistical significance.

Binimetinib was generally well-tolerated and the adverse events (AEs) reported were consistent with previous results in NRAS-mutant melanoma patients. Grade 3/4 AEs reported in greater than or equal to 5 percent of patients receiving binimetinib included increased creatine phosphokinase (CPK) and hypertension.

The NEMO results were presented at the 2016 American Society of Clinical Oncology (ASCO) Annual Congress earlier in June.

About NEMO
The NEMO trial, (NCT01763164), is an international, randomized Phase 3 study evaluating the safety and efficacy of 45 mg BID binimetinib, compared to 1,000 mg/m$^2$ dacarbazine dosed every three weeks. Prior immunotherapy treatment was allowed.

The primary endpoint of the study is PFS, and secondary endpoints include overall survival (OS), ORR and DCR. Patients underwent radiographic assessment of disease status every six weeks, and assessment of progression was determined by blinded central review. Over 100 sites across North America, Europe, South America, Asia and Australia participated in the study.

67.     These statements were materially false and/or misleading because they concealed the true nature of the NEMO data from investors. While binimetinib met its primary endpoint, the entirety of the NEMO data showed decreases in quality of life and performance status and that long-term prognosis for binimetinib was worse than for dacarbazine. This information severely undermined (if not outweighed) the benefits associated with the slight increase in PFS (the primary endpoint). Additionally, Squarer's statements concealed the fact that Array was attempting to have the FDA approve binimetinib for a different indication than the one submitted on the company's NDA; in particular, an indication for post-immunotherapy patients only based upon the more

favorable data obtained from this patient stratum during the NEMO study. Unbeknownst to investors, this substantially increased the risk of the FDA rejecting the NDA.

### *July 12, 2016 – Cantor Fitzgerald Healthcare Conference*

68.     On July 12, 2016 at the Cantor Fitzgerald Healthcare Conference, Defendant Squarer again discussed the NEMO trial results and FDA filing. He stated, in relevant part (emphasis added):

> But, as I said, we were very pleased to present full results from our Phase III study in NRAS melanoma at ASCO and file last month; also to present some very important new data in BRAF colorectal and to announce the initiation of a new Phase III, which I will be discussing as well.
>
> …
>
> So, I am now for those on the webcast on slide 5, and I want to talk about our Phase III results in NRAS melanoma. ***And what we were able to show is that the primary endpoint of PFS, we did hit that primary endpoint with a roughly doubling of progression free survival.*** We did see in the data presented at ASCO a very interesting result that in specifically a subset of patients, predefined subset of patients who had received prior immunotherapy that, in fact, the PFS was quite a bit longer while the control arm DTIC remained similar.
>
> ***And, so, while it is important to note that this is a -- although predefined -- still is a subset analysis and should be reviewed with care, we do believe that the NDA filing will primarily -- process will primarily focus on the primary endpoint of PFS.*** Now while we did show a numerical difference in overall survival favoring binimetinib, this was not statistically significant.
>
> So, now I am on slide 6, and for folks in the room, I am now able to show you the results that were presented at ASCO. ***In fact, here you can see the overall PFS results. But, as I referred to earlier, we do have the -- on slide 7 -- the predefined subset of patients that have received prior immunotherapy. And here you can see that they did have a greater benefit,*** whether or not it was ipilimumab or PD-1, a PD-L1. And here on slide 8, we are able to share or were able to share -- this is Professor Dummer's presentation -- the results. The two Kaplan-Meier curves, which, of course, look substantially different here. Regarding overall survival, as I mentioned, a numerical benefit or a numerically higher number for binimetinib than dacarbazine, but not statistically significant.

Now I will note that at the ASCO meeting Professor Georgina Long did point out some features, which may be relevant to this OS analysis. Specifically a very substantial percentage of patients that were randomized to DTIC actually dropped out at the very -- towards the very beginning of the trial, and that this trial represents the greatest use of post-treatment immunotherapy or post-study immunotherapy of any melanoma trial that has been run.

So, these are some factors that may influence the OS result*. **I will repeat that the primary endpoint is PFS. We believe that the focus with regulators will be on the overall PFS result**, although we do share the subset information because it is interesting. The paradigm in the treatment of oncology is usually that later lines of therapies do less well. It appears that at least in this setting after immunotherapy it appears that there may be at least no worse results and potentially a better.

69.     These statements were materially false and/or misleading because they led investors to believe that meeting a primary endpoint of a slight increase of PFS alone would be sufficient to support FDA approval of the binimetinib NDA. Defendants concealed other data obtained from the NEMO study that undermined the benefits of meeting the primary endpoint. Moreover, although Squarer told investors that the focus of the regulators will be on NEMO's overall data as opposed to the prior-IO subset, he concealed from investors that Array was attempting to receive approval for a more narrow indication based upon the data from the prior-IO subset only.

### August 4, 2016 – Form 8-K

70.     On August 4, 2016, Array issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Fourth Quarter earnings call and again highlighting the filing of a NDA for binimetinib in patients with advanced *NRAS*-mutant melanoma to the FDA ("August 2016 Press Release"). Array made material misrepresentations in the press release, including in pertinent part (emphasis added):

– Binimetinib / NRAS-mutant melanoma New Drug Application (NDA) filed –

…

"The recent filing of an NDA for binimetinib in NRAS-mutant melanoma represents an important milestone for Array," said Ron Squarer, Array's Chief Executive Officer.

…

NEMO: Global Phase 3 trial of binimetinib versus dacarbazine in NRAS-mutant melanoma patients

Array submitted an NDA for binimetinib to the Food and Drug Administration (FDA) at the end of June 2016. Array is planning for an Oncologic Drugs Advisory Committee (ODAC) meeting as part of the regulatory review process. Array is also currently preparing for an Application Orientation Meeting (AOM) with the FDA in September 2016, which we expect will include a discussion of the NDA package including clinical risk / benefit.

Results from the NEMO trial were presented at the 2016 American Society of Clinical Oncology (ASCO) Annual Meeting. ***The study met its primary endpoint of improving progression-free survival (PFS) compared with dacarbazine treatment. The median PFS on the binimetinib arm was 2.8 months versus 1.5 months on the dacarbazine arm***; hazard ratio (HR) 0.62, [95% CI 0.47-0.80], p<0.001. In the pre-specified subset of patients who received prior treatment with immunotherapy, including ipilimumab, nivolumab or pembrolizumab, patients who received binimetinib experienced 5.5 months of median PFS (95% CI, 2.8–7.6), compared with 1.6 months for those receiving treatment with dacarbazine (95% CI, 1.5–2.8). ***While the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care.*** Array anticipates that the primary consideration for marketing approval will be the results for the primary endpoint of the trial.

In addition to improving PFS, binimetinib also demonstrated significant improvement in overall response rate (ORR) and disease control rate (DCR). While there was no statistically significant difference demonstrated in overall survival, the median overall survival (mOS) favored the binimetinib arm.

- Confirmed ORR was 15 percent (95% CI, 11-20 percent) in patients receiving binimetinib vs. 7 percent (95% CI, 3-13 percent) in patients receiving dacarbazine.
- DCR for patients receiving binimetinib was 58 percent (95% CI, 52-64 percent) vs. 25 percent (95% CI, 18-33 percent) for patients receiving dacarbazine.
- mOS was estimated at 11.0 months in patients receiving binimetinib vs. 10.1 months for patients treated with dacarbazine [(HR) = 1.0 (95% CI 0.75-1.33), p=0.499].

Under the NEMO protocol, and in accordance with accepted statistical practice, the subgroup analyses of overall survival (OS) are formally conducted only if the key secondary endpoint of OS reached statistical significance.

Binimetinib was generally well-tolerated and the adverse events (AEs) reported were consistent with previous results in NRAS-mutant melanoma patients. Grade 3/4 AEs reported in greater than or equal to 5 percent of patients receiving binimetinib included increased creatine phosphokinase (CPK) and hypertension. Activating NRAS mutations are present in up to 20 percent of patients with metastatic melanoma, and are a poor prognostic indicator for these patients. Treatment options for this population remain limited beyond immunotherapy, and these patients face poor clinical outcomes and high mortality.

71.    These statements were materially false and/or misleading because they led investors to believe that this clinical data showed that binimetinib was well-tolerated, when in fact, the study data showed decreases in Quality of life and performance status, and that, long-term prognosis for binimetinib was worse than for dacarbazine. It also led investors to believe that meeting a primary endpoint of a slight increase of PFS alone would be sufficient to support FDA approval of the binimetinib NDA for in use for patients with NRAS-mutant melanoma. These statements also led investors to believe that NRAS-mutant melanoma was a uniquely aggressive disease requiring unique treatment and that binimetinib would be meeting an unmet need, thus easing the path for NDA approval when in fact NRAS-mutant melanoma was not unique and many treatments were available. Further, these statements, and specifically the statement, "*While the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care. Array anticipates that the primary consideration for marketing approval will be the results for the primary endpoint of the trial,*" led investors to believe that the NDA would be based on the full dataset and failed to disclose that the application would be based on or modified to be based on a cherry-picked subpopulation of the study who had received prior treatment with IO.

24

### *August 4, 2016 – Fourth Quarter Earnings Conference Call*

72.     On August 4, 2016, Array had a Fourth Quarter Earnings Conference Call where

Defendant Squarer stated in pertinent part (emphasis added):

The recent filing of an NDA for binimetinib in NRAS-mutant melanoma represents an important milestone for Array.

…

Moving to slide 6, we show the NEMO results that were presented in ASCO at June. ***The study met its primary endpoint, demonstrating a significant increase in median progression-free survival for binimetinib when compared to dacarbazine in patients with NRAS-mutant melanoma.*** While there was no statistically significant difference demonstrated in overall survival, the median overall survival favored the binimetinib arm.

Binimetinib was generally well tolerated and the adverse events reported were consistent with previous results in NRAS-mutant melanoma patients. Grade 3/4 adverse events reported in greater than or equal to 5% of patients receiving binimetinib included increased CPK and hypertension.

Patients with metastatic NRAS-mutant melanoma have limited treatment options beyond immunotherapy and these patients face poor clinical outcomes and high mortality. Array submitted an NDA for binimetinib to the Food & Drug Administration at the end of June 2016 and we are planning for an Oncology Drug Advisory Committee, ODAC, meeting as part of the regulatory review process. Array is also currently preparing for an application orientation meeting with the FDA in September of 2016, which we expect will include a discussion of the NDA package including clinical risk and benefit.

Michael Schmidt - Leerink Partners - Analyst
Ron, I had one regarding the NEMO trial. Are there any additional overall survival analysis planned with longer-term follow-up in this study?

Ron Squarer - Array BioPharma, Inc. - CEO
I will turn that over to Victor. I think in the actual plan there may be; I don't know if we've disclosed that though.

Victor Sandor - Array BioPharma, Inc. - Chief Medical Officer
***I don't know if we've disclosed the specifics of it, but there is a final overall survival analysis included in the statistical analysis plan and in the design of the study, where it basically is defined as when a particular percentage of patients***

**have died on the study.**

Michael Schmidt - Leerink Partners - Analyst
Thanks. Then a question regarding this application orientation meeting with the FDA in September. Ron, can you just give us a sense of potential outcomes of that meeting? I'm a bit less familiar with that mechanism.

Ron Squarer - Array BioPharma, Inc. - CEO
Yes, Victor has quite a bit of experience with the steps of the regulatory process. I will have him address that.

Victor Sandor - Array BioPharma, Inc. - Chief Medical Officer
So the application orientation meeting is a standard meeting. It's routinely scheduled around the time of the completion of validation period for the NDA. And, as its name implies, the purpose is really to orient the Agency to the filing. Generally includes a discussion around the technical navigation around the file documents, but also it can include a discussion of preliminary key elements of the data, including the basis for risk-benefit assessment.

So there's generally not a specific outcome, but it's an opportunity for the Company and the FDA to engage on a number of different issues around the filing.

73.    These statements were materially false and/or misleading because they led investors to believe that this clinical data showed that binimetinib was well-tolerated, when in fact, the study data showed decreases in Quality of life and performance status, and that, long-term prognosis for binimetinib was worse than for dacarbazine. These statements were materially false and/or misleading because they led to believe that meeting a primary endpoint of a slight increase of PFS would be sufficient to support FDA approval of the binimetinib NDA for in use for patients with NRAS-mutant melanoma. Squarer and Sandor both stated that risk-benefit analysis that will take place at the FDA orientation meeting, but again fail to mention the quality of life and performance status issues which the FDA would undoubtedly address. Squarer and Sandor also both strategically dodge questions about overall survival analysis when directly asked by analysts. These statements led which led investors to believe that continued survival analysis was not important, that the NDA would be based on the full dataset and that that data would be sufficient. Instead, Array modified the indication so as to utilize the more promising cherry-picked

subpopulation of the study who had received prior treatment with IO, and accordingly, had better responses.

***August 19, 2016 – 10-K***

74.     In the 10-K for the fiscal year ending June 30, 2016, certified and signed by Defendant Squarer, Array reports the following (emphasis added):

> NEMO was a Phase 3 study that compared binimetinib versus dacarbazine in unresectable or metastatic NRAS-mutant melanoma patients. In June 2016, Array announced the submission of a New Drug Application (NDA) for binimetinib in patients with advanced *NRAS*-mutant melanoma to the U.S. Food and Drug Administration (FDA). We are planning for an Oncologic Drugs Advisory Committee (ODAC) meeting as part of the regulatory process. Array is also currently preparing for an Application Orientation Meeting (AOM) with the FDA in September 2016, which we expect will include a discussion of the NDA package including clinical risk / benefit.

> Activating NRAS mutations are present in approximately 20% of patients with metastatic melanoma, and have been a poor prognostic indicator for these patients. Treatment options for this population remain limited beyond immunotherapy (PD-1, CTLA4), therefore, if approved, binimetinib could represent an important additional therapy for these patients.

> ***The NDA submission is based on results of the NEMO study, which found binimetinib extended median PFS, the study's primary endpoint, as compared with dacarbazine.*** In the NEMO study, binimetinib extended median PFS at 2.8 months, as compared with 1.5 months observed with dacarbazine [hazard ratio (HR)=0.62 (95% CI 0.47-0.80), p<0.001] in patients with advanced NRAS-mutant melanoma. In the pre-specified subset of patients who received prior treatment with immunotherapy, including ipilimumab, nivolumab or pembrolizumab, patients who received binimetinib experienced 5.5 months of median PFS (95% CI, 2.8-7.6), compared with 1.6 months for those receiving treatment with dacarbazine (95% CI, 1.5-2.8). ***While the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care.*** Array anticipates that the primary consideration for marketing approval will be the results for the primary endpoint of the trial.

75.     These statements were materially false and/or misleading because they led investors to believe that approval will be based on the entire set of data, and not just the 'pre-

27

specified' sub-group. Array says that "interpretation beyond overall consistency with the primary result should be made with care" while in reality Array was basing the approval for the changed indication on this very group. These statements also led them to believe that the PFS, the primary endpoint, will be the primary consideration and that that will be enough for approval. These statements also led investors to believe that this clinical data showed that binimetinib was well-tolerated, when in fact, the study data showed decreases in quality of life and performance status , and that, long-term prognosis for binimetinib was worse than for dacarbazine. Finally, they also misled investors into believing that NRAS-mutant melanoma was a uniquely aggressive disease requiring unique treatment and that binimetinib would be meeting an unmet need, thus easing the path for NDA approval when in fact NRAS-mutant melanoma was not unique and many treatments were available.

### *September 1, 2016 – Form 8-K*

76.     On September 1, 2016, Array issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing that the FDA accepted the NDA for binimetinib in patients with advanced *NRAS*-mutant melanoma ("September 1, 2016 Press Release"). Array stated in pertinent part (emphasis added):

> Array BioPharma Announces FDA Acceptance of Binimetinib NDA for Patients with Advanced NRAS-Mutant Melanoma
>
> BOULDER, Colo., Sept. 1, 2016 /PRNewswire/ -- Array BioPharma (Nasdaq: ARRY) today announced that the FDA has accepted its New Drug Application (NDA) for binimetinib with a target action date under the Prescription Drug User Fee Act (PDUFA) of June 30, 2017. Array completed its NDA submission of binimetinib in late June 2016 based on findings from the pivotal Phase 3 NEMO (NRAS MELANOMA AND MEK INHIBITOR) trial in patients with NRASmutant melanoma. The FDA also indicated that it plans to hold an advisory committee meeting (ODAC) as part of the review process. As previously reported, Array is currently preparing for an Application Orientation Meeting (AOM) with the FDA in September 2016, which it expects will include a discussion of the NDA package including clinical risk / benefit.

"There are very few treatment advances beyond immunotherapy for this devastating disease, which impacts one out of five advanced melanoma patients," said Victor Sandor, M.D., Chief Medical Officer, Array BioPharma. ***"Binimetinib is the first and only MEK inhibitor to demonstrate improvement on progression free survival in a Phase 3 trial for NRAS mutant melanoma patients."***

About the Phase 3 NEMO Study

The NEMO trial, (NCT01763164), is an international, randomized Phase 3 study evaluating the safety and efficacy of 45 mg BID binimetinib, compared to 1,000 mg/m$^2$ dacarbazine dosed every three weeks. Prior immunotherapy treatment was allowed, and patients underwent radiographic assessment of disease status every six weeks. Assessment of progression was determined by blinded central review. Over 100 sites across North America, Europe, South America, Asia and Australia participated in the study.

Results from the NEMO trial were presented at the 2016 ASCO Annual Meeting. ***The study met its primary endpoint of improving progression-free survival (PFS) compared with dacarbazine treatment. The median PFS on the binimetinib arm was 2.8 months, versus 1.5 months on the dacarbazine arm.*** In the pre-specified subset of patients who received prior treatment with immunotherapy, including ipilimumab, nivolumab or pembrolizumab, patients who received binimetinib experienced 5.5 months of median PFS, compared with 1.6 months for those receiving treatment with dacarbazine. ***While the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care. Array anticipates that the primary consideration for marketing approval will be the results for the primary endpoint of the trial.*** In addition to improving PFS, binimetinib also demonstrated improvement in overall response rate (ORR) and disease control rate. While there was no statistically significant difference demonstrated in overall survival (OS), the median overall survival (mOS) favored the binimetinib arm. Under the NEMO protocol, and in accordance with accepted statistical practice, the subgroup analyses of OS are formally conducted only if the key secondary endpoint of OS reached statistical significance. Binimetinib was generally well-tolerated and the adverse events reported were consistent with previous results in NRAS-mutant melanoma patients.

77.     These statements were materially false and/or misleading because they led investors to believe that this clinical data showed that binimetinib was well-tolerated, when in fact, the study data showed decreases in quality of life and performance status, and that, long-term prognosis for binimetinib was worse than for dacarbazine. It also led investors to believe that

meeting a primary endpoint of a slight increase of PFS alone would be sufficient to support FDA approval of the binimetinib NDA for in use for patients with NRAS-mutant melanoma. Further, these statements, and specifically the statement, "*While the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care. Array anticipates that the primary consideration for marketing approval will be the results for the primary endpoint of the trial,*" led investors to believe that the NDA would be based on the full dataset and failed to disclose that the application would be based on or modified to be based on a cherry-picked subpopulation of the study who had received prior treatment with IO.

### *September 7, 2016 – Wells Fargo Securities Healthcare Conference*

78.     On September 7, 2016, at the Wells Fargo Securities Healthcare Conference, Defendant Squarer again promoted the NEMO results and probability for binimeinib's NDA approval. He said, in pertinent part (emphasis added):

> So I'm on slide 3 here and what is clear is despite all that's going on in the Company, our number one priority is binimetinib, our MEK inhibitor, and encorafenib. And just by way of a little bit of background, we regained the rights to binimetinib from Novartis last year, secondary to their deal with GSK where they acquired the entire oncology business and swapped out their vaccine business.
>
> We also acquired the rights to a RAF inhibitor, encorafenib, and that deal came along with quite a bit of financial support, $100 million plus a net cash value at signing and a commitment to substantially fund all ongoing or planned trials as of the time of the deal.
>
> And so that includes trials like the NRAS melanoma pivotal, NEMO, which we're very pleased not only to have filed over the summer but just last week we got our day 60 letter, so essentially it did not get a refuse to file. And we have a PDUFA date now in the middle of next year.
>
> …
>
> Then, as I mentioned, we have our past days 60 with the NEMO filing, looking forward to a PDUFA date next year. We do expect an ODAC as well; in fact, we've

been informed we'll have an ODAC and we also have some other interactions with the FDA. It's an orientation meeting coming up where we believe we'll be talking about risk-benefit trade-off with that. But you're in a population there where after immunotherapy and after a MEK if approved, there really is no good alternative treatment for these patients and we live in a world now where in a lot of tumors you have many, many options and lines of therapy. So certainly a very high unmet need.

Jim Birchenough - Wells Fargo Securities LLC

Great, and thanks for that, Ron. So maybe starting with binimetinib, when you look at that ODAC panel that will be convened before your July 30 -- or June 30 PDUFA, what do you expect the issues to be? And maybe for context, just remind us of the data that you've shown -- the magnitude of benefit and whether that might be one of the areas of focus is just the clinical relevance of the data you've shown. But what do you expect the ODAC focus to be on?

Ron Squarer - Array BioPharma Inc. - CEO

Yes, so typically ODACs are all about the risk benefit so they are going to be looking in our view at both sides of it. So we took a single agent approach in this devastating disease so if you go back to when we initiated or began thinking about this study, NRAS melanoma, which is about 20% of melanoma, you could describe the prospects as a roughly 8.5 month median overall survival from time of diagnosis with essentially no useful therapies.

Now we compared ourselves to DTIC, and while in our study it had a PFS of 1.5 months, a lot of thought leaders would tell you that it's an artifact of when you do your first scan and that it's probably less than 1.5 months. ***Now, binimetinib, the binimetinib arm did have a statistically significant improvement over that by just under three months and so we're going into the FDA with a positive trial on an important endpoint in a disease where there's very few options.***

Now what has evolved is that immunotherapy has shown itself to be relatively agnostic to mutational driver, so it works roughly as well in NRAS melanoma as in the more common BRAF, BRAF being about half of patients.

***And so what we would assume is that many patients are going to receive prior immunotherapy before considering using a MEK and this isn't necessarily going to be driven by a label but by practice. So we'll negotiate the label that's perfect for the drug with the FDA, but we think that in practice a lot of patients are going to try immunotherapy first.***

Now the good news is that in our study we allowed for prior immunotherapy and roughly 20% of patients received immunotherapy. ***We had a predefined subset***

*analysis of those patients. But we view it with caution because it is a subset, but interestingly enough, patients who had received prior immunotherapy actually did better.* And so now we're talking roughly 5.5 months of PFS versus 1.5 or I think it was 1.6 for the DTIC arm.

*Now again, subsets, we think the FDA is going to focus on the overall population but it is an interesting guide.* In general, our hypothesis about immunotherapy in targeted agents is that if you go after immunotherapy it's not the same paradigm as with cytotoxic regimens or historic regimens where later lines of therapy are necessarily worse.

Here we would like to assume it's not going to be worse. In this case, it could be better, although with all the caveats I just described. And we've seen this phenomenon also with Exelixis's RCC dated in the METEOR study and they actually showed better activity after immunotherapy than prior.

And so there you have it -- oh, I will say it's important to note, on OS, while we had a numerical median overall survival advantage to binimetinib, it was not statistically significant and so that's also going to be an area of discussion with the FDA. But many of our patients did receive immunotherapy post treatment and generally the view amongst thought leaders is the use of OS in these types of studies is very challenging because many patients are going to get immunotherapy afterwards in NRAS melanoma which could easily be a compounding effect.

So I think that will be the crux of the discussion, high unmet need, positive on the primary endpoint versus OS score.

Now, it's not the primary value driver for our franchise but it is an important differentiation. We would be the only MEK that has ever been successful in a pivotal trial. It's a great way to get introduced or to introduce ourselves to the prescribing population, same population that prescribes for BRAF, but it's not the value driver. The value driver is really the much, much larger BRAF marketplace where the current sales are on a run rate, even assuming no growth of $1 billion globally. So that's really the key.

79.    These statements were materially false and/or misleading because they led investors to believe that meeting a primary endpoint of a slight increase of PFS alone would be sufficient to support FDA approval of the binimetinib NDA for in use for patients with NRAS-mutant melanoma. These statements also led investors to believe that NRAS-mutant melanoma was a uniquely aggressive disease requiring unique treatment and that binimetinib would be

meeting an unmet need, thus easing the path for NDA approval when in fact NRAS-mutant melanoma was not unique and many treatments were available. Squarer mentioned that the ODAC meeting would address risk-benefits but omits to address any of the substantial risks related to treatment the study data showed decreases in quality of life and performance status, and that, long-term prognosis for binimetinib was worse than for dacarbazine. Further, these statements, and specifically the statement, *"**We had a predefined subset analysis of those patients. But we view it with caution because it is a subset, but interestingly enough, patients who had received prior immunotherapy actually did better. . . Now again, subsets, we think the FDA is going to focus on the overall population but it is an interesting guide,**"* led investors to believe that the NDA would be based on the full dataset and failed to disclose that the application would be based on or modified to be based on a cherry-picked subpopulation of the study who had received prior treatment with IO. In fact, Squarer goes so far as to say that Array will *"**negotiate the label that's perfect for the drug with the FDA**"* when in fact Array basing the FDA upon an indication solely for prior treatment with IO.

### *September 14, 2016 – Morgan Stanley Global Healthcare Conference*

80.     At the September 14, 2016 Morgan Stanley Global Healthcare Conference, defendant Squarer again promoted binimetinib's prospects for NDA approval. During the Q&A session of the conference call, Array's executives made the following statements in response to an Unidentified Participant's questions about the results of the NEMO trial, stating in relevant part (emphasis added):

> Unidentified Participant:
> So you recently presented data from Phase 3 NEMO. Could you tell us about it on binimetinib and run through what happened there?
>
> Ron Squarer - Array BioPharma Inc. - CEO
> Right. So with binimetinib hit our primary endpoint, improving progression free survival in what is a very, very challenging disease. So you go back a couple years, from time of diagnosis the median overall survival is about 8.5 months. Now during

the course of our study, immunotherapy fortunately has shown quite a bit of promise and is now approved and used commonly in that disease offering some benefit.

*But once you have exhausted immunotherapy there is really no other good treatment, which is why we think it would be important if we have the FDA's support to offer a new therapy. And while the majority of our patients were studied prior to immunotherapy, we did have a predefined subset of patients that received binimetinib after immunotherapy.*

*And there the effect size was quite a bit longer in terms of PFS. Now with all the caution that it is a subset, although predefined, and that we believe the FDA will consider the overall population in assessing provability*. It is another example where the use of a targeted agent after immunotherapy appears to not be worse.

Now maybe better; we have seen this also in the METEOR trial with Exelixis and renal cell carcinoma. But it is a new paradigm because historically later lines of therapy typically offered less activity, less durability. And yet here in a couple of large recent trials we see that they may not be true post immunotherapy, even if patients don't respond or respond and then their disease returns.

So we will keep an eye out to see if this trend continues. But it supports our contention that whether we get used -- whether our assets, meaning binimetinib or encorafenib get used before immunotherapy or after immunotherapy, it may not matter. And in both BRAF melanoma and NRAS melanoma, as I said, aside from immunotherapy there is really no good choices. So we think they will be used -- they will all be used.

Unidentified Participant

So mechanistically why would the drug have a better result in patients who had IO therapy previously versus those who have not?

Ron Squarer - Array BioPharma Inc. - CEO

So it is really empiric results at this point. There are certainly hypotheses that suggest that the immune system is stimulated and that even if the disease returns you still have an enhanced immune function. There is also just the realization that [cytotoxis] can be quite damaging to the body systems, can be damaging to the immune system. And so, you would expect perhaps less of that in later -- after immunotherapy than you would after severe sort of cytotoxic regimens.

Again speculation, but we will keep looking to see how these data emerge. Even in our combination study, the one that we are waiting on this month, we did allow for

prior immunotherapy and expect to have some patients that receive prior immunotherapy who will have a nice additional look, granted it will be small. And so it will have to be viewed carefully. But it would at least offer another point of view on that. ***And we would be the only MEK/RAF that has allowed for prior immunotherapy in a pivotal trial. So it could be a point of differentiation if helpful.***

81.     These statements were materially false and/or misleading because they concealed from investors Defendants' true intention with respect to the binimetinib NDA. Although Squarer discussed the more favorable study data from the prior-immunotherapy subgroup, he concealed that Defendants had effectively modified the indication for binimetinib on Array's NDA. This, in turn, severely jeopardized Array's ability to receive FDA-approval under applicable FDA regulations and FDA customs and practice.

### *September 28, 2016 – Form 424B5*

82.     On September 28, 2016, Array filed a Prospectus Supplement on Form 424B5 with the SEC announcing the pricing of the above-mentioned public offering of 18,400,000 shares of its common stock at a public offering price of $6.25 per share ("Prospectus Supplement"). The Prospectus Supplement stated in relevant part (emphasis added):

NEMO

NEMO is a Phase 3 study comparing binimetinib versus dacarbazine in unresectable or metastatic NRAS-mutant melanoma patients. On September 1, 2016, Array announced that the FDA had accepted Array's New Drug Application, or NDA, for binimetinib in patients with advanced NRAS-mutant melanoma with a target action date under the Prescription Drug User Fee Act (PDUFA) of June 30, 2017. The FDA also indicated that it plans to hold an Oncologic Drugs Advisory Committee (ODAC) meeting as part of the regulatory process.

Activating NRAS mutations are present in approximately 20% of patients with metastatic melanoma, and have been a poor prognostic indicator for these patients. Treatment options for this population remain limited beyond immunotherapy (PD-1, CTLA4). Therefore, if approved, binimetinib could represent an important additional therapy for these patients.

***The NDA submission is based on results of the NEMO study, which found binimetinib extended median PFS, the study's primary endpoint, as compared***

***with dacarbazine.*** In the NEMO study, binimetinib extended median PFS at 2.8 months, as compared with 1.5 months observed with dacarbazine [hazard ratio (HR)=0.62 (95% CI, 0.47-0.80), p<0.001] in patients with advanced NRASmutant melanoma. In the pre-specified subset of patients who received prior treatment with immunotherapy (n=85), including ipilimumab (n=54), and nivolumab or pembrolizumab (n=24), patients who received binimetinib experienced 5.5 months of median PFS (95% CI, 2.8-7.6), compared with 1.6 months for those receiving treatment with dacarbazine (95% CI, 1.5-2.8). ***While the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care. Array anticipates that the primary consideration for marketing approval will be the results for the primary endpoint of the trial.***

In addition to improving PFS, binimetinib also demonstrated significant improvement in the secondary endpoints of ORR and disease control rate, or DCR. While there was no statistically significant difference demonstrated in overall survival, the numerical trend in median overall survival, or mOS, favored the binimetinib arm.

Confirmed ORR was 15 percent (95% CI, 11-20 percent) in patients receiving binimetinib vs. 7 percent (95% CI, 3-13 percent) in patients receiving dacarbazine.

- Confirmed ORR for patients who received prior treatment with immunotherapy was 16 percent, with a median duration of response of 11.1 months, versus an overall response rate for all patients receiving binimetinib of 15 percent, with a median duration of response of 6.9 months.

- DCR for patients receiving binimetinib was 58 percent (95% CI, 52-64) vs. 25 percent (95% CI, 18-33 percent) for patients receiving dacarbazine.

- mOS was estimated at 11.0 months in patients receiving binimetinib vs. 10.1 months for patients treated with dacarbazine [(HR) = 1.0 (95% CI 0.75-1.33), p=0.499].

Binimetinib was generally well-tolerated and the adverse events reported were consistent with previous results in NRAS-mutant melanoma patients. Grade 3/4 adverse events reported in at least 5 percent of patients receiving binimetinib included increased creatine phosphokinase (CPK) and hypertension.

Following discontinuation of the study treatment, a substantial portion of the patients in the study were treated with immunotherapy, including 46% of the patients who had received binimetinib in the study and 44% of the patients who had received dacarbazine. Specifically, 33% of the former binimetinib patients received

ipilimumab, 13% of such patients received nivolumab and 12% of such patients received pembrolizumab. Of the former patients who received dacarbazine, 36% of such patients received ipilimumab, 9% received nivolumab and 7% received pembrolizumab.

83.     These statements were materially false and/or misleading because they concealed the true nature of the NEMO data from investors. While binimetinib met its primary endpoint, the entirety of the NEMO data showed decreases in quality of life and performance status and that long-term prognosis for binimetinib was worse than for dacarbazine. This information severely undermined (if not outweighed) the benefits associated with the slight increase in PFS (the primary endpoint). Additionally, Squarer's statements concealed the fact that Array was attempting to have the FDA approve binimetinib for a different indication than the one submitted on the company's NDA; in particular, an indication for post-immunotherapy patients only based upon the more favorable data obtained from this patient stratum during the NEMO study. Unbeknownst to investors, this substantially increased the risk of the FDA rejecting the NDA.

84.     On October 3, 2016, Array announced the closing of its underwritten public offering of 21,160,000 shares of its common stock, which included 2,760,000 shares of common stock issued upon the exercise in full of the option to purchase additional shares granted to the underwriters, at a public offering price of $6.25 per share. The total gross proceeds from the offering were $132.25 million, before underwriting discounts and commissions and offering expenses.

### *November 1, 2016 – First Quarter Earnings Conference Call*

85.     On November 1, 2016, Array had a First Quarter Earnings Conference Call where Defendant Squarer stated in pertinent part (emphasis added):

Now moving on to slide 11, we show the NEMO results that were presented at ASCO in June. ***The study met its primary endpoint, demonstrating a near doubling in median progression-free survival for binimetinib when compared to dacarbazine in patients with NRAS mutant melanoma. While there was no statistically significant difference demonstrated in overall survival, the median***

37

*overall survival favored the binimetinib arm. Binimetinib was generally well-tolerated*, and the adverse events reported were consistent with previous binimetinib results in NRAS mutant melanoma patients. The grade 3/4 adverse events reported in greater than or equal to 5% of patients included increased CPK and hypertension. Patients with a metastatic NRAS mutant melanoma have limited treatment options beyond immunotherapy, and these patients face poor clinical outcomes and high mortality.

Array was informed in late August that the FDA had accepted the bini new drug application for review with a PDUFA date of June 30, 2017. The bini MAA was validated and is currently under evaluation by CHMP in Europe.

86.    With respect to the NRAS melanoma market and the commercial development of

NEMO, Array's executives responded to analyst Ted Tenthoff from Piper Jaffray in relevant part

(emphasis added):

Ted Tenthoff - Piper Jaffray - Analyst

Appreciate this update. A lot of things going here. I guess just with respect to NEMO and the NRAS melanoma opportunity, presentation in Boston next week, what steps are you taking sort of to educate the market ahead of potential approval next year? And maybe you can lay out a little bit about how these patients are treated today and what preliminary educational efforts have amounted to. Is this an area where docs are looking for new therapies for NRAS patients? Or how well-known is binimetinib at this point?

Ron Squarer - Array Biopharma Inc. - CEO

Great, Ted. Good morning. Thanks for the question. There will be presentations on NEMO in NRAS melanoma. But I would say that the much -- perhaps the much more important presentation will be in BRAF (multiple speakers) information there. But there will be presentations on NRAS as well.

But the question, of course, is still quite relevant, as we do expect to introduce to enter the market with NEMO. First, begin building relationships with key prescribers as we await the approval of BRAF melanoma with both the MEK and the RAF, and it would be the same prescribing population.

*What I would say about NEMO, which was, as I said, the initial launch, is that following immunotherapy, which is emerging now as the current standard of care, there are really no good options. And if our filing were to be approved, I think that the option of using a MEK would be an important addition to the*

*armamentarium there. And we were pleased, as you are aware, to have studied a subset of patients through a prior prescribed subset analysis that had received prior immunotherapy. And while we believe that the regulators will be looking at our primary endpoint and looking at the totality of the data, it's at least nice to have some guidance there.*

87.     These statements were materially false and/or misleading because they led investors to believe that meeting a primary endpoint of a slight increase of PFS alone would be sufficient to support FDA approval of the binimetinib NDA. Defendants concealed other data obtained from the NEMO study that undermined the benefits of meeting the primary endpoint. Moreover, although Squarer told investors that the focus of the regulators will be on NEMO's overall data as opposed to the prior-IO subset, he concealed from investors that Array was attempting to receive approval for a more narrow indication based upon the data from the prior-IO subset only.

### *November 3, 2016 – 10-Q*

88.     In the 10-Q for the First Quarter ending September 30, 2016, certified and signed by Defendants Haddock and Squarer, Array reports the following (emphasis added):

NEMO

In September 2016, Array announced that the FDA has accepted its NDA for binimetinib in NRAS-mutant melanoma with a target action date under the Prescription Drug User Fee Act (PDUFA) of June 30, 2017. Also, the Marketing Authorization Application (MAA) for binimetinib submitted by Pierre Fabre was validated and is currently under evaluation by the Committee for Medicinal Products for Human Use (CHMP). The FDA indicated that it plans to hold an advisory committee meeting (ODAC) in the first half of 2017 as part of the review process.

Results from the NEMO trial were presented at the 2016 ASCO Annual Meeting. ***The study met its primary endpoint of improving progression-free survival (PFS) compared with dacarbazine treatment.*** The median PFS on the binimetinib arm was 2.8 months, versus 1.5 months on the dacarbazine arm. In the pre-specified subset of patients who received prior treatment with immunotherapy, including ipilimumab, nivolumab or pembrolizumab, patients who received binimetinib experienced 5.5 months of median PFS, compared with 1.6 months for

those receiving treatment with dacarbazine. ***While the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care. Array anticipates that the primary consideration for marketing approval will be the results for the primary endpoint of the trial.*** In addition to improving PFS, binimetinib also demonstrated improvement in overall response rate (ORR) and disease control rate. While there was no statistically significant difference demonstrated in overall survival (OS), the median overall survival (mOS) favored the binimetinib arm. Under the NEMO protocol, and in accordance with accepted statistical practice, the subgroup analyses of OS are formally conducted only if the key secondary endpoint of OS reached statistical significance. Binimetinib was generally well-tolerated and the adverse events reported were consistent with previous results in NRAS-mutant melanoma patients.

Activating NRAS mutations are present in up to 20 percent of patients with metastatic melanoma, and are a poor prognostic indicator for these patients. Treatment options for this population remain limited beyond immunotherapy, and these patients face poor clinical outcomes and high mortality.

89.     These statements were materially false and/or misleading because they again led investors to believe that approval will be based on the entire set of data, and not just the 'pre-specified' sub-group. Array again repeats that "interpretation beyond overall consistency with the primary result should be made with care" while in reality Array was basing the approval for the changed indication on this very group. These statements also led them to believe that the PFS, the primary endpoint, will be the primary consideration and that that will be enough for approval, despite the fact that the NEMO trial had generated data that showed decreases in quality of life and performance status, and that, long-term prognosis for binimetinib was worse than for dacarbazine.

### *February 9, 2017– First Quarter Earnings Conference Call*

90.     On February 9, 2017, Array had a First Quarter Earnings Conference Call where Defendant Squarer stated in pertinent part:

> Now, moving to slide 4, I'd like to provide more detail on our top priority programs, binimetinib and encorafenib. It's been a very exciting period for these programs and just over the past 12 months we read out top-line results for NEMO in NRAS melanoma and filed an NDA. We're preparing for an ODAC meeting as we

continue to build our commercial organization so that we're prepared to potentially launch binimetinib as soon as possible after our PDUFA date of June 30.

. . .

On slide 16 we show the NEMO results that were presented at ASCO in June. *The study met its primary endpoint, demonstrating a near doubling of median progression-free survival for bini when compared to dacarbazine in patients with NRAS mutant melanoma.* Binimetinib was generally well tolerated and the adverse events reported were consistent with previous binimetinib results in NRAS mutant melanoma.

Now patients with metastatic NRAS mutant melanoma have limited treatment options beyond immunotherapy and these patients face poor clinical outcomes and high mortality. The FDA has accepted the binimetinib NDA for review with a PDUFA date of June 30th. Array is expecting an ODAC to discuss the risk benefit associated with the program during the first half of 2017. The binimetinib MAA was validated and is currently under evaluation by CHMP in Europe.

91.    These statements were materially false and/or misleading because they led investors to believe that this clinical data showed that binimetinib was well-tolerated, when in fact, the study data showed decreases in quality of life and performance status, and that, long-term prognosis for binimetinib was worse than for dacarbazine. They also led investors to believe that meeting a primary endpoint of a slight increase of PFS alone would be sufficient to support FDA approval of the binimetinib NDA for in use for patients with NRAS-mutant melanoma. Further, these statements led investors to believe that the NDA would be based on the full dataset and failed to disclose that Defendants were attempting to obtain approval for a narrow indication based upon the post-immunotherapy subgroup.

### *March 8, 2017 – Cowen Health Care Conference Call*

92.    At the Cowen Health Care Conference on March 8, 2017, Array acknowledges that changes in the market necessitate moving to a post-IO indication and that this approach might prove controversial at the ODAC meeting when Squarer states(emphasis added):

NRAS is a little simpler. First line is clearly immunotherapy. We'd expect targeted agents to be used afterwards, potentially in combination as Roche is exploring right

now. *And that's one of the topics of course that we expect to cover at our ODAC, is the line of therapy, given that we studied most patients in first-line, and since then, I/O has become standard of care*.

93.     These statements were materially false and/or misleading because, despite acknowledging changes in standard of care, they failed to disclose that the application would be based on or modified to be based on a cherry-picked subpopulation of the study who had received prior treatment with IO and that Defendants were seeking approval for a modified patient indication.

## THE TRUTH REGARDING ARRAY'S MATERIAL FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS ARE REVEALED TO THE MARKET

### *March 19, 2017 – Press Release*

94.     On Sunday, March 19, 2017, Array issued a press release announcing the withdrawal of the binimetinib NDA in use for patients with NRAS-mutant melanoma ("March 2017 Press Release"), stating in relevant part:

> Array BioPharma Inc. (ARRY) today announced that it has withdrawn from the U.S. Food and Drug Administration's (FDA) Division of Oncology Products 2 its new drug application (NDA) for binimetinib monotherapy for the treatment of NRASmutant melanoma, a rare, mutationally-driven subset of skin cancer.
>
> This action was based on thorough discussions and communications with the FDA, *including exploration of various paths to approval*, and followed the late cycle review meeting held with the FDA on Friday, March 17, 2017. Based on feedback from the agency, Array concluded that the clinical benefit demonstrated in the Phase 3 NEMO clinical trial would not be found sufficient to support approval of the NRAS-mutant melanoma NDA.
>
> Ongoing clinical trials for binimetinib will continue. This action will not impact the planned Phase 3 COLUMBUS trial NDA of binimetinib, in combination with encorafenib, for the treatment of BRAF-mutant melanoma, which remains on track for mid-2017.

95.     Despite maintaining a "Buy" rating for Array, Suntrust Robinson Humphrey Analyst Peter Lawson noted after the press release:

42

While we cannot be sure of the FDA's reasons *we take note of the label change, and sample size: The NEMO trial's endpoint was mPFS in the overall population, and the proposed label was for patients with prior checkpoint inhibitor therapy.* The prior checkpoint subgroup had 57 patients in the binimetinib arm and 28 in the dacarbazine control arm, about 20% of the overall trial.

. . .

While we cannot be sure of the FDA's reasons we take note of the label change, and sample size: The label under consideration was for patients with prior checkpoint therapy. The NEMO trial's primary endpoint was mPFS in the overall patient group. The prior checkpoint therapy subgroup in the NEMO trial showed directionally positive data (see below) with a median PFS in the binimetinib arm (n=57) of 5.5 (95% CI: 2.8-7.6) months compared to the dacarbazine arm (n=28) with 1.6 (95% CI: 1.5-2.8). We believe that the issue may have been with trial design and proposed label and may not be indicative of an underlying issue with the drug.

### *March 20, 2017 – Analyst Article*

96.      This press release was also shortly followed by an article published on *Endpoints News* on March 20, 2017 before the market opened (updated March 21, 2017) entitled "Array walks back its FDA pitch on binimetinib, derailing plans for commercial launch." This article discussed how analyst were displeased with Array's announcement that the clinical benefits shown in the Phase 3 Nemo clinical trial would not be sufficient to support approval of Array's NRAS-mutant melanoma NDA, binimetinib. The author pointed out how this announcement was in stark contrast with announcements in late 2015 through 2016. The article stated in relevant part:

Array BioPharma has some explaining to do. Fifteen months after the Boulder, CO-based biotech said that it had the data needed for its first approval of binimetinib for NRAS-positive melanoma, execs are walking back the application and its plans for a launch.

Michael Schmidt at Leerink was not pleased. He noted:

While NRAS+ melanoma was only a small value driver for the company, we think this comes as a surprise to investors and is a clear setback for the company and mgmt.'s regulatory and commercial strategy. Recall, management planned to build a commercial infrastructure and visibility with customers this year around the launch in NRAS+ melanoma, which would also be in preparation for the planned

launch in 2018 of binimetinib/encorafenib in more competitive BRAF+ melanoma, which is ARRY's main value driver.

It was a much different story back in late 2015 when CEO Ron Squarer said that their MEK blocker hit the primary endpoint on progression-free survival, with the drug arm registering 2.8 months compared to 1.5 months for a group on dacarbazine. It didn't look like much, but Array said it was plenty to take to the FDA.

In the summer of 2016, though, the biotech also conceded that the drug had not significantly improved overall survival. Array has had plenty of ups and downs with the drug. Novartis had partnered with the company, but punted the program when they executed a big asset swap with GlaxoSmithKline. Pierre Fabry then took their spot, but Array held on to US commercial rights.

97.     PiperJaffray Analyst Edward A. Tenthoff was similarly displeased and in his March 20, 2017 report wrote, "Following a late cycle review meeting with the FDA on Friday, Array has withdrawn the binimetinib NDA in NRAS-mutant melanoma due to efficacy. In the Phase III NEMO trial, binimetinib only showed a mPFS benefit of 2.8 months vs. 1.5 months on dacarbazine (HR 0.62, p<0.001). Removing binimetinib in NRAS-mutant takes our price target to $12 from $15."

98.     J.P.Morgan Analyst Anupam Ramawrote in his March 20, 2017 report that on his Array valuation he was, "Decreasing our FY17 price target to $9 from $10, on the eliminating NRAS melanoma from the model."

99.     On this, over the course of two trading days, Array's common stock price fell from $10.56 to $9.13 per share between March 17 and March 21, 2017 on heavy trading.

## DEFENDANTS ACTED WITH SCIENTER

100.     Defendants acted with intent to defraud or recklessness when making the above statements about the NEMO trial and binimetinib NDA to the public. The following allegations demonstrate that Defendants concealed from investors a number of then-existing facts that all suggested that the risk of FDA disapproval was far more significant than they portrayed.

101.     First, Defendants had access to the NEMO trial data. Indeed, Defendants presented

the NEMO trial data on no less than three occasions, beginning first with an announcement of "top-line" results on December 16, 2015 in a press release, then again on January 14, 2016 at the JPMorgan Healthcare Conference, on February 2, 2016 in a press release, on February 2, 2016 in the Second Quarter Earnings Conference Call, on February 2, 2016 in the 10-Q, on May 3, 2016 in press release, on May 4, 2016 in the 10-Q, on June 6, 2016 in a presentation at the ASCO Conference, September 26, 2016 in a press release, and a February 9, 2017 First Quarter Earnings Conference Call. Defendants discussed the NEMO trial data in great detail on each occasion, including in particular Defendant Squarer who discussed the NEMO data during conference calls on January 14, 2016, February 2, 2016, June 6, 2016, and February 9, 2017, as well as discussing the NEMO results in many other conference calls and press releases. Defendants' statements to the public imply that they had first-hand knowledge of the NEMO data.

102.   Second, given the fact that Defendants had access to the NEMO trial data, Defendants therefore had access to ***all of the*** NEMO data—the good data and the bad data. This bad data, as evidenced by the European Medicines Agency, created significant problems in terms of obtaining approval from the FDA. Defendants knew this based upon their review of the NEMO data.To be precise, while the NEMO study met its primary endpoint, binimetinib provided only 1.3 months of progression-free survival over dacarbazine. And, at that, the 1.3 months of progression-free survival provided patients with an extremely poor quality of life. As the EMA discussed in the "Balance of benefits and risks" section, "The currently observed 1.32-month prolongation in median PFS over dacarbazine, without an improvement in overall survival is not considered sufficient evidence of benefit in the proposed patient population. ***The observed benefit does not override concerns regarding the tolerability of binimetinib in the proposed patient population and the possible negative impact on the health (+/- quality of life) of these patients***." Further, the EMA concluded in the "Recommendation" section that, "Based on the review of the data on quality, safety and efficacy, the CHMP consider that the application for Mektovi, in the

treatment of adult patients with unresectable or metastatic melanoma, with NRAS Q61 mutation, is not approvable since *"major objections" have been identified, which preclude a recommendation for marketing authorisation at the present time."*

103. Approval from the FDA, based upon the NEMO data, was exceedingly unlikely. This was so especially given the fact multiple safe and effective immunotherapies were available when the NDA was submitted in 2016 (*e.g.*, ipilimumab, approved March 25, 2011; pembrolizumab, approved September 4, 2014; nivolumab, approved December 22, 2014; and atezolizumab, approved May 18, 2016), thus largely eliminating a clinical rational for approving the binimetinib NDA. Moreover, progression-free survival in the NEMO trial was lower (2.8 months) than in the Phase 2 trial for binimetineb (3.65 months) and, according to a Wells Fargo analyst report, the NEMO trial was designed "to demonstrate an approximate doubling of PFS (4 months) vs. dacarbazine's historical ~2 months."

104. Third, Defendants not only had access to the NEMO data (good and bad), but were aware of its implications as well. Binimetinib was the single most important product for Array during the Class Period. The NEMO trial represented Array's most advanced clinical trial. Thus, binimetinib and the NEMO trial provided Array with its most immediate opportunity at obtaining FDA approval for commercialization and, in turn, sales revenue. Defendants, accordingly, were hyper-focused on the FDA-approval process for binimetinib and not, for instance, distracted by any other less advanced product trials. Proof of Defendants' knowledge of the NEMO data is evident from their frequent discussion of the data prior to and during the Class Period.

105. Fourth, with knowledge of the NEMO data, Defendants repeatedly told investors that the entirety of the NEMO data demonstrated binimetinib's ability to provide progression-free survival and yielded substantial evidence of effectiveness. At the time these statements were made, however, the NEMO data was unlikely to support approval by the FDA and that, if FDA approval was to be obtained, it would need to be based on a changed indication for binimetinib and

consideration of a subgroup of the patient data only, *i.e.*, prior immunotherapy treatment.

106.    Defendants knew that FDA-approval for an NDA is extremely unlikely when based upon a subgroup of patient data, and even more unlikely when the sponsor attempts to alter the drug's indication through a major amendment to the NDA. Indeed, FDA regulations state that "[a] major amendment may not include data to support an indication or claim that was not included in the original NDA, supplement, or resubmission . . . ." 21 CFR 314.60. Array may have argued that the relevant data was already included in the original NDA and therefore should not fall under the ban on including "new data to support an indication…not included in the NDA." However, past studies show that the FDA would reject any attempt to reframe the NDA around a post-IO indication. Further, even if the FDA were open to changing the revision under the originally submitted NDA, there remains the important fact that no drug has ever been approved by the FDA on the basis of a subgroup analysis.

107.    The fact that Defendants attempted to modify binimetinib's indication and/or rely on data from a subgroup for approval shows that they knowingly or recklessly violated FDA regulations and, therefore, indicates an intent to mislead. Accordingly, Defendants knew or recklessly disregarded the obvious risk that their statements would mislead the investing public as to whether the NEMO data would support FDA-approval; specifically, Defendants' statements concerning Array's reliance on the entirety of the overall NEMO data concealed from investors a number of then-existing facts that all suggested that the risk of FDA disapproval was much greater than they let on.

108.    Proof that Defendants attempted to modify binimetinib's indication and/or rely on data from a subgroup for approval is evident from:

(a)    On September 7, 2016, at the Wells Fargo Securities Healthcare Conference Squarer states, "And so what we would assume is that ***many patients are going to receive prior immunotherapy before considering using a MEK and this isn't***

*necessarily going to be driven by a label but by practice. So we'll negotiate the label that's perfect for the drug with the FDA, but we think that in practice a lot of patients are going to try immunotherapy first.*" This showed that Defendants were aware that the full data would not be enough to support the original indications and that the market was moving towards IO therapy first, thus were preparing to use the market trend and the more optimistic data from the post-IO subgroup 'negotiate' for a 'label that's perfect for the drug.' Effectively, Defendants hoped to convince the FDA that a post-IO indication would be the 'label that's perfect for the drug.'

(b)     At the Cowen Health Care Conference on March 8, 2017, where Squarer states, "NRAS is a little simpler. First line is clearly immunotherapy. We'd expect targeted agents to be used afterwards, potentially in combination as Roche is exploring right now. *And that's one of the topics of course that we expect to cover at our ODAC, is the line of therapy, given that we studied most patients in first-line, and since then, I/O has become standard of care*." This again shows that Defendants were aware that the market had moved towards IO has a primary line of therapy and were attempting to use this movement to their benefit at the upcoming ODAC meeting where they hoped to 'negotiate' with the FDA for a post-IO indication based on the data from the post-IO subgroup.

(c)     In the March 19, 2017 Press Release by Array, Defendants state, "This action was based on thorough discussions and communications with the FDA, *including exploration of various paths to approval*, and followed the late cycle review meeting held with the FDA on Friday, March 17, 2017. Based on feedback from the agency, Array concluded that the clinical benefit demonstrated in the Phase 3 NEMO clinical trial would not be found sufficient to support approval of the

NRAS-mutant melanoma NDA." The statement "including exploration of various paths to approval" indicates that Defendants had tried a different approach that the one in the original NDA. These 'various paths' including altering the NDA to change the indication and focus on the post-IO subgroup data.

(d)   Suntrust Robinson Humphrey Analyst Peter Lawson noted after the March 19, 2017 press release by Array, "While we cannot be sure of the FDA's reasons *we take note of the label change, and sample size: The NEMO trial's endpoint was mPFS in the overall population, and the proposed label was for patients with prior checkpoint inhibitor therapy.*" This confirms that there was a change in the label, and thus indication, as well as the sample size, to focus on the post-IO subgroup data.

(e)   On March 29, 2017, the FDA's Notice of Meeting for the March 15, 2017 ODAC meeting reads as follows (emphasis added):During the afternoon session, the committee will discuss new drug application (NDA) 209099, for binimetinib, submitted by Array BioPharma Inc. The proposed indication (use) for this product is for the treatment of patients with unresectable or metastatic melanoma, with NRAS Q61 mutation as detected by an FDA-approved test, *who have received prior treatment with checkpoint inhibitor therapy*." This clearly states that the indication under consideration includes only patients "who have received prior treatment with checkpoint inhibitor therapy," meaning that the majority of NEMO patients, who received binimetinib as first-line therapy, would be ignored for purposes of the NDA. The FDA uses language very precisely and would be extremely unlikely to have carelessly omitted "or treatment-naïve patients" when discussing a potential indication in a public-facing announcement of an advisory committee meeting. This reinforces that Defendants were trying to change the NDA

indication.

109.     Given the weakness of the data and the fact that Defendants attempted to modify the indication while the NDA was pending, either Defendants did not intend for the NDA to be approved when they submitted it to the FDA or they hoped that the NDA would be approved based upon a review of the prior immunotherapy subgroup (which, as alleged above, was entirely unorthodox and exceedingly unlikely to occur). In either event, Defendants' statements about the binimetinib NDA were materially misleading because they concealed from investors a number of then-existing facts that all suggested that the risk of FDA disapproval was much greater than they let on.

110.     Fifth, Defendants were motivated to conceal the negative binimetinib data for as long as possible. Binimetinib was integral to several of Array's ongoing clinical trials, including its "COLUMBUS Phase 3 Study." Had Defendants disclosed the truth concerning the NEMO data, investor sentiment towards other binimetinib trials (including COLUMBUS) would have declined precipitously; indeed, investors would have been led to believe (rightly so) that binimetinib was not an effective compound and, therefore, a very risky proposition going forward.

111.     But, by concealing the truth about the NEMO data for as long as they did, Array was able to: (i) maintain investor interest in binimetinib; (ii) successfully announce on September 26, 2016 that the COLUMBUS trial met its primary endpoint amid much fanfare; and (iii) conduct a secondary public offering on September 27, 2016 in which it sold 18.4 million shares of common stock at $6.25 per share for total proceeds (before expenses) of $108 million. Significantly, during the six months prior to Array's secondary public offering, Array's stock had been trading between $3 per share and $4 per share. In other words, Defendants were able to profit by misleading the public in a unique, concrete manner.

112.     This is especially so considering Array's accumulated deficit and prospects for generating revenue from sales. By the time Array submitted the binimetinib NDA, Array had an

accumulated deficit of $801.4 million. Array's only near-term prospect for generating revenue was the commercialization of binimetinib (which, given the truth about the NEMO data, was exceedingly unlikely to happen). Second to that was Array's prospect for gaining approval of its combination therapeutic (binimetinib with encorafenib) which was the drug being tested in Array's COLUMBUS trial. While Array announced that COLUMBUS met its primary endpoint on September 26, 2016, FDA-approval of Array's combination therapeutic was still several months away (in fact, the NDA for the combination therapeutic was not "accepted for review" until the following year on September 12, 2017). Accordingly, to maintain funding for operations during the interim, Array conducted the secondary offering. Array would not have been able to conduct this offering (or at least at an offering price of $6.25 per share) had Defendants been truthful in their descriptions of the NEMO data and prospects for FDA-approval.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

113.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Array securities during the Class Period, and were damaged by the alleged corrective disclosures. Excluded from the Class are the Individual Defendants herein, the officers and directors of Array, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Individual Defendants have or had a controlling interest.

114.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Array securities were actively traded on over-the-counter market. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Array or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares are and/or were held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

115.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Individual Defendants' wrongful conduct in violation of federal law that is complained of herein.

116.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

117.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by the Individual Defendants' acts as alleged herein;

- whether statements made by the Individual Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Array;

- whether the Individual Defendants caused Array to issue false and misleading statements during the Class Period;

- whether the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Array securities during the Class Period were artificially inflated because of the Individual Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

118.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## RELIANCE PRESUMPTION: FRAUD-ON-THE-MARKET DOCTRINE

119.    At all relevant times, the market for Array's common stock was an efficient market for the following reasons, among others:

120.    During the Class Period, daily trading of Array's common stock generally ranged from just under 1 million shares to just over 3 million shares;

121.    Array regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

122.    Numerous firms were active market-makers in Array stock at all times during the Class Period;  and

123.    Array's statements concerning Array's NDA for binimetinib was rapidly reflected in and incorporated into Array's stock price during the Class Period. Furthermore, other unexpected material news about Array was rapidly reflected in and incorporated into Array's stock price during the Class Period.

124.    90.    As a result of the foregoing, the market for Array's securities promptly digested current information regarding Array from all publicly available sources and reflected such information in Array's securities price. Under these circumstances, all purchasers of Array's securities during the Class Period suffered similar injury through their purchase of Array's securities at artificially inflated prices, and a presumption of reliance applies.

# LOSS CAUSATION

125.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Array's securities and operated as a fraud or deceit on Class Period purchasers of Array's securities by materially misleading the investing public. Later, when Array and the Individual Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Array's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Array's securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

126.     Defendants' misrepresentations and omissions concealed material information about the NEMO trial data and the NDA for binimetinib. Specifically, Defendants hid from investors that the NEMO study had produced data that was substantially negative relative to the moderate benefit achieved in terms of progress-free survival. Additionally, Defendants concealed from investors that, in light of more favorable findings across the prior-immunotherapy subgroup, Array was attempting to receive approval for an indication different than the one initially stated. This information created a significant risk that the FDA would not approve the binimetinib NDA.

127.     When Array withdrew its NDA, investors discovered the truth about Defendants' statements and, in particular, what the company had attempted to do with respect to the label indication for binimetinib. Array's withdrawal of the NDA revealed to investors that the NEMO trial data was insufficient to support approval for the indication initially sought and that, as a result, Array had attempted to obtain approval for an alternate indication (the prior-immunotherapy subgroup). Had investors known that Array was attempting to secure approval for a modified indication, they would have known that the likelihood of FDA approval was exceedingly unlikely.

128.     The announcement that Array was withdrawing the NDA and consequent

revelation about Defendants' conduct prompted immediate reaction by investors and analysts. The price of Array's common stock dropped precipitously. On March 17, 2017, Array's stock price closed at $10.07 per share. On March 20, 2017, following the Press Release, Array's stock declined to open at $9.46 per share, on higher than usual volume of approximately 15 million shares on March 20, 2015 and then an addition 6.5 million on March 21, 2017 to close at $9.13.

## THE SAFE HARBOR AND BESPEAKS CAUTION DOCTRINES DO NOT APPLY

129.    The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Array who knew that those statements were false, misleading or omitted necessary information when they were made.

130.    The Individual Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Array and/or Array LLC who knew that the statement was false. Alternatively, none of the historic or present-tense statements made by the

Individual Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## FIRST CLAIM

### *Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants*

131.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

133.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Array securities; and (iii) cause Plaintiffs and other members of the Class to purchase Array securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

134.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the

Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Array securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Array's NEMO study and the prospects for the binimetinib NDA.

135.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

136.    Information showing that Defendant acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior officers and/or directors of Array, Defendants had knowledge of the details of Array's internal affairs.

137.    Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Array. As officers and/or directors of a publicly-held company, Defendants a duty to disseminate timely, accurate, and truthful information with respect to Array's businesses, operations, and financial condition. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Array securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Array's business and financial condition

which were concealed by Defendants, Plaintiffs and the other members of the Class purchased Array securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Defendants and were damaged thereby.

138.    During the Class Period, Array securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Array securities at prices artificially inflated by Defendants wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of Array securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Array securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

139.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

140.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of Array's securities during the Class Period, upon the disclosure that Array had been disseminating misrepresented financial statements to the investing public.

## SECOND CLAIM

### *Violation of Section 20(a) of The Exchange Act Against the Individual Defendants*

141.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

142.   During the Class Period, the Individual Defendants participated in the operation and management of Array, and conducted and participated, directly and indirectly, in the conduct of Array's business affairs. Because of their senior positions, they knew the adverse non-public information about Array's operations, finances, and Array's NEMO study and the prospects for the binimetinib NDA.

143.   As officers and/or directors of a publicly-owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Array's finances, operations and press releases, and to correct promptly any public statements issued by Array which had become materially false or misleading.

144.   Because of their positions of control and authority as senior officers and/or, directors, and/or controlling shareholders, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Array disseminated in the marketplace during the Class Period concerning Array's sources of revenues, products, finances, Array's NEMO study and the prospects for the binimetinib NDA. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Array to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Array within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Array securities.

145.   Each of the Individual Defendants, therefore, acted as a controlling person of Array. By reason of their senior management positions and/or being directors or controlling shareholders of Array, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Array to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Array and possessed the power to control the specific activities which comprise the primary violations about which

Plaintiffs and the other members of the Class complain.

146.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Array.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  April 26, 2018

BERENS LAW LLC

/s/ Jeffrey A. Berens
Jeffrey A. Berens
2373 Central Park Boulevard, Suite 100
Denver, Colorado 80238
Telephone: (303) 861-1764
Facsimile: (303) 395-0393
jeff@jberenslaw.com

*Liaison Counsel for Plaintiff Wendell Rose, Lead Plaintiff Peter Voulgaris, and the Class*

LEVI & KORSINSKY, LLP
Nicholas I. Porritt
Michelle Gruesbeck
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
nporritt@zlk.com
mgruesbeck@zlk.com

*Attorneys for Plaintiff Wendell Rose and Lead Plaintiff Peter Voulgaris and Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I, Jeffrey A. Berens, an attorney, hereby certify that on April 26, 2018, I caused a true and correct copy of the foregoing "CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY TRIAL DEMAND" to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury that the foregoing is true and correct. Executed on April 26, 2018.

/s/ Jeffrey A. Berens
Jeffrey A. Berens