IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02789-KLM (Consolidated with Civil Action No. 17-cv-02848-STV)

PETER VOULGARIS,
WENDELL ROSE, and
ROBERT NAUMAN,                                    ORAL ARGUMENT REQUESTED

     Plaintiffs,

v.

ARRAY BIOPHARMA INC.,
RON SQUARER,
VICTOR SANDOR, and
JASON HADDOCK,

     Defendants.

---

## DEFENDANTS' MOTION TO DISMISS
## THE CONSOLIDATED CLASS ACTION COMPLAINT

---

James R. Carroll                          Holly Stein Sollod
Michael S. Hines                          HOLLAND & HART LLP
Rene H. DuBois                            555 Seventeenth Street, Suite 3200
SKADDEN, ARPS, SLATE,                     Denver, Colorado 80202-3979
   MEAGHER & FLOM LLP                  Telephone: (303) 295-8085
500 Boylston Street                       Facsimile: (303) 975-5395
Boston, Massachusetts 02116               hsteinsollod@hollandhart.com
Telephone: (617) 573-4800
Facsimile: (617) 573-4822
james.carroll@skadden.com
michael.hines@skadden.com
rene.dubois@skadden.com


                                 Counsel for Defendants
                                 Array BioPharma, Inc., Ron Squarer,
Dated: June 11, 2018                      Victor Sandor and Jason Haddock

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iv

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND ........................................................................................6

    A.    Array Develops And Commercializes Drugs For The Treatment Of Cancer..........6

    B.    The Phase 3 "NEMO" Trial Meets Its Primary Endpoint Of PFS ...........................6

    C.    Array Submits NDA Based On Positive Phase 3 Nemo Trial Results ....................8

    D.    Following Discussions With The FDA,
           Array Withdraws The Binimetinib NDA................................................................9

    E.    Eight Months After Array Withdraws
           The Binimetinib NDA, The European Medicines Agency
           Issues An Inconclusive Assessment Report On Binimetinib.................................9

ARGUMENT .............................................................................................................11

I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT DOES NOT
      ALLEGE A MATERIAL MISSTATEMENT OR OMISSION.......................................11

    A.    Plaintiffs' Omission Allegations Are Not Actionable ...........................................12

           1.    Plaintiffs' Allegations About Secondary
                  Outcomes Observed In The Phase 3 NEMO Study Do Not
                  Make Any Putative Class Period Statement False Or Misleading.............13

           2.    Plaintiffs' Allegations About Array's Purported Attempt To Modify
                  Binimetinib's Indication Are Unsupported By Particularized Facts ..........17

                  (a)    There Are No Particularized
                          Allegations Supporting Plaintiffs' Conclusion That
                          Array Concealed An Attempt To Modify The Indication .............17

                  (b)    Defendants' Disclosures About The Use Of Binimetinib
                          In Patients Who Had Received Prior Immunotherapy
                          Undermines Any Claim That Investors Were Misled...................19

i

(c)     Plaintiffs Do Not Plausibly Allege
That The Likelihood Of FDA Approval Based
On A More Narrow Indication Was "Exceedingly Low" ..............21

B.    The Challenged Affirmative Statements
Are Not Actionable As A Matter Of Law...............................................23

1.    All Of The Challenged Statements About The Anticipated Basis
For FDA Approval Are Protected Forward-Looking Statements.............24

(a)    The Challenged Statements Are Forward Looking ......................24

(b)    Defendants' Statements Were
Accompanied By Specific Cautionary Language .........................26

(c)    Statements About Anticipated Basis For FDA Approval
Are Immaterial Expressions Of Corporate Optimism ..................28

2.    The Remaining Challenged Statements Are True Statements
Of Fact Or Not Adequately Alleged To Be False Or Misleading..............28

II.    THE COMPLAINT SHOULD BE
DISMISSED FOR THE INDEPENDENT
REASON THAT IT DOES NOT ALLEGE SPECIFIC FACTS
GIVING RISE TO A "STRONG INFERENCE" OF SCIENTER ....................................30

A.    Plaintiffs Fail To Plead A Strong Inference
That Defendants Acted With Actual Knowledge Or Recklessness ......................31

1.    Plaintiffs' Allegations That Defendants
Had Access To All Of The Trial Data Are
Conclusory And Non-Specific, And Thus
Fail To Support A Strong Inference Of Scienter .......................................32

2.    Plaintiffs' Allegations Of Purported Noncompliance
With FDA Regulations Are Insufficient To Plead Scienter......................33

3.    Plaintiffs' "Core Product" Allegations Are
Routinely Rejected As Insufficient To Plead Scienter ..............................34

4.    Plaintiffs' Allegations Of Motive Also
Fail To Support A Strong Inference Of Scienter .......................................34

B.    A Nonculpable Inference Under *Tellabs* Is More Compelling Than Fraud ..........37

III.    COUNT II ALLEGING CONTROL
        PERSON LIABILITY SHOULD BE DISMISSED
        BECAUSE THERE IS NO PREDICATE EXCHANGE ACT VIOLATION ..................38

CONCLUSION.................................................................................................................................38

## **TABLE OF AUTHORITIES**

**CASES**                                                                    **PAGE(S)**

*In re Amarin Corp. PLC Securities Litigation*,
  No. 13-6663 (FLW)(TJB), 2016 WL 1644623 (D.N.J. Apr. 26, 2016) ...........................18

*In re Amarin Corp. PLC Securities Litigation*,
  689 F. App'x 124 (3d Cir. 2017)...............................................................................18, 29

*Anderson v. Peregrine Pharmaceuticals, Inc.*,
  No. CV 12-CV-1647-PSG (FMOx), 2013 WL 12122423 (C.D. Cal. Aug. 23, 2013),
  *aff'd*, 654 F. App'x 281 (9th Cir. 2016)......................................................................35, 36

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
  827 F.3d 1229 (10th Cir. 2016) ...........................................................................34, 35, 36

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988)..........................................................................................................12

*Bauer v. Eagle Pharmaceuticals., Inc.*,
  No. 16-3091(JLL), 2017 WL 2213147 (D.N.J. May 19, 2017).............................18, 26, 34

*Chipman v. Aspenbio Pharma, Inc.*,
  No. 11-cv-00163-REB-KMT, 2012 WL 4069353 (D. Colo. Sept. 17, 2012) ...................19

*City of Philadelphia v. Fleming Co., Inc.*,
  264 F.3d 1245 (10th Cir. 2001) ..........................................................................31, 32, 35

*In re Columbia Laboratories, Inc. Securities Litigation*,
  No. 12-614 (FSH)(PS), 2013 WL 10914123 (D.N.J. June 11, 2013)................................33

*Corban v. Sarepta Therapeutics, Inc.*,
  868 F.3d 31 (1st Cir. 2017)...............................................................................................36

*Cozzarelli v. Inspire Pharmaceuticals Inc.*,
  549 F.3d 618 (4th Cir. 2008) ...........................................................................................35

*In re Dynavax Securities Litigation*,
  No. 4:16-cv-06690-YGR, 2017 WL 4005584 (N.D. Cal. Sept. 12, 2017).........................6

*Ellis v. Spectranetics Corp.*,
  No. 15-cv-01857-KLM, 2018 WL 1583837 (D. Colo. Apr. 2, 2018) .......11, 31, 35, 37, 38

*Employees' Retirement System of Rhode Island v. Williams Co., Inc.*,
    889 F.3d 1153 (10th Cir. 2018) ...................................................................6, 12

*In re Gold Resource Corp. Securities Litigation*,
    776 F.3d 1103 (10th Cir. 2015) ................................................................33, 36

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ....................................................11, 13, 26 28

*Harrington v. Tetraphase Pharmaceuticals Inc.*,
    No. 16-10133-LTS, 2017 WL 1946305 (D. Mass. May 9, 2017) ..............................27, 37

*Hoey v. Insmed, Inc.*,
    No. 16-4323 (FLW), 2018 WL 902266 (D.N.J. Feb. 15, 2018) .......................................16

*Kader v. Sarepta Therapeutics, Inc.*,
    887 F.3d 48 (1st Cir. 2018) ......................................................................19, 34

*Kleinman v. Elan Corp.*,
    706 F.3d 145 (2d Cir. 2013) ...............................................................15, 16, 17

*Maher v. Durango Metals, Inc.*,
    144 F.3d 1302 (10th Cir. 1998) ............................................................................38

*McDonald v. Kinder-Morgan, Inc.*,
    287 F.3d 992 (10th Cir. 2002) ...........................................................................12

*Noble Asset Management v. Allos Therapeutics, Inc.*,
    No. CIVA-04CV-1030-RPM, 2005 WL 4161977 (D. Colo. Oct. 20, 2005)............. *passim*

*Reed v. Pfizer, Inc.*,
    839 F. Supp. 2d 571 (E.D.N.Y. 2012) ..............................................................6

*In re Rigel Pharmaceuticals, Inc., Securities Litigation*,
    697 F.3d 869 (9th Cir. 2012) ...........................................................................15

*In re Rockwell Medical, Inc. Securities Litigation*,
    No. 16 Civ. 1691 (RJS), 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) .........................15

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .............................................................................37

*In re Sanofi Securities Litigation*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015) ............................................................26, 38

*Tellabs, Inc. v. Makor Issues and Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................6, 31, 37

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ...........................................................................26, 30

*TransEnterix Investor Group v. TransEnterix, Inc.*,
    272 F. Supp. 3d 740 (E.D.N.C. 2017) .........................................................25, 26

## STATUTES AND REGULATIONS

15 U.S.C. § 78a ..............................................................................................................2

15 U.S.C. § 78u-4 ..........................................................................1, 11, 12, 16, 31

15 U.S.C. § 78u-5 ..........................................................................................................1

17 C.F.R. § 240.10b-5 ........................................................................................2, 11, 13

21 C.F.R. § 314.60 .............................................................................................21, 22

## RULES

Fed. R. Civ. P. 9(b) ................................................................................1, 11, 18

## OTHER AUTHORITIES

*Considerations for Developing the INDICATIONS AND USAGE Section of Prescription Drug Labeling*, U.S. FOOD AND DRUG ADMIN. (Nov. 2017), *available at* https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/LawsActsandRules/UCM584737.pdf ...................................................................................22

*Good Review Practice: Clinical Review of Investigational New Drug Applications*, U.S. FOOD AND DRUG ADMIN. (Dec. 2013), *available at* https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/UCM377108.pdf ........................................30

*Guidance for Industry Clinical Trial Endpoints For the Approval of Cancer Drugs and Biologics*, U.S. FOOD AND DRUG ADMIN. (May 2007), *available at* https://www.fda.gov/downloads/Drugs/Guidances/ucm071590.pdf. ...........................7, 14

*Guidance for Industry Patient-Reported Outcome Measures:  Use in Medical Product Development to Support Labeling Claims*, U.S. FOOD AND DRUG ADMIN. (Dec. 2009), *available at* https://www.fda.gov/downloads/drugs/guidances/ucm193282.pdf ...............14

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4, 78u-5, defendants Array BioPharma, Inc., Ron Squarer, Victor Sandor and Jason Haddock ("Defendants"), hereby move this Court to dismiss the Consolidated Class Action Complaint (ECF No. 27) (the "Complaint" or "Compl.") with prejudice.  The grounds for this motion are set forth in Defendants' memorandum of law and Appendix of Public Records, which are submitted herewith and incorporated by reference.

## PRELIMINARY STATEMENT

This case involves an all too common scenario:  (i) a pharmaceutical company submits a New Drug Application ("NDA") seeking Food and Drug Administration ("FDA") approval of a promising drug to treat a debilitating disease, (ii) the drug does not get approved, (iii) the company's stock price declines following non-approval, and (iv) a plaintiff reflexively files a securities class action claiming "fraud" based on nothing more than speculation and hindsight.  In this case, just as in so many other similar cases, Plaintiffs merely assert that information that becomes available *later* in time somehow was known and understood *earlier* in time by company executives who somehow conspired to withhold that information from the market.  Just like the many other similarly baseless cases, this case too should be dismissed, with prejudice.

$$* \qquad\qquad * \qquad\qquad *$$

Defendant Array BioPharma Inc. ("Array") is based in Boulder, Colorado and for the past twenty years has been developing drugs to treat patients suffering from life-threatening cancers.  One of those drugs -- binimetinib -- was developed to treat a highly aggressive form of

skin cancer known as NRAS-mutant melanoma.  This form of skin cancer is particularly

devastating:  patients on average die within nine months of diagnosis.  In June 2016, Array

submitted an NDA for binimetinib based on positive results from a Phase 3 clinical trial.  That

trial demonstrated that binimetinib nearly doubled the number of months a patient would survive

without tumor progression as compared with an approved traditional chemotherapy medication,

and further demonstrated an even longer period without tumor progression in a predefined subset

of patients who had received certain types of cancer treatment before taking binimetinib.

Despite that positive data, in March 2017, Array announced that it had withdrawn its NDA

following discussions with the FDA.  In the days following that disclosure, Array's stock price

declined approximately 13%.

       Seeking to capitalize on this disappointing news, Plaintiffs purport to allege

violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a

*et seq.*) (the "Exchange Act") and Rule 10b-5 on the theory that Array intentionally misled

investors all along about the likelihood of binimetinib's FDA approval.[1]  Plaintiffs' allegations

principally rely on a report by the European Medicines Agency ("EMA") -- issued ***eight months***

***after*** Array withdrew its NDA and commenting only on the approvability of binimetinib in

Europe.  In the report, the EMA stated its ***in***conclusive views -- not Array's and not the

FDA's -- that secondary data from the trial, while uninterpretable, suggested that binimetinib had

adverse effects on a patient's overall quality of life and ability to perform daily living functions.

---

[1]     In addition to Array, the Complaint names as defendants Ron Squarer (Array's Chief Executive Officer), Victor Sandor (Array's Chief Medical Office) and Jason Haddock (Array's Chief Financial Officer).

Based solely on this long-after-the-putative class-period EMA report commenting on uninterpretable secondary data, Plaintiffs attempt to manufacture a theory that (1) Defendants must have known that this allegedly negative secondary data undermined the trial's primary positive trial data; and (2) as a result of this allegedly secondary negative data, Array secretly attempted to change the NDA's proposed indication for use to include only the subset of patients who had prior cancer therapy, making FDA approval virtually impossible.

Not surprisingly, this theory is not supported by any particularized factual pleadings.  Instead, Plaintiffs attempt to construct a nefarious tale out of what is no more than an unfortunate event common in the inherently risky and unpredictable business of drug development.  Plaintiffs' Complaint is precisely the sort of baseless "fraud by hindsight" case that the Private Securities Litigation Reform Act ("PSLRA") was enacted to preclude.  The Complaint should be dismissed for multiple, independently dispositive reasons.

*First*, Plaintiffs have not pled any particularized facts demonstrating that Defendants omitted any *material* facts about the binimetinib trial data or that such omissions undermined Defendants' optimism about FDA approval.  (*See infra* at Section I.A.1.)  Plaintiffs instead selectively rely on inconclusive statements made in the EMA report -- which was published long after Array withdrew its NDA -- while ignoring the EMA's unambiguous statements that the secondary outcomes data was unreliable and uninterpretable.  Plaintiffs also ignore publicly-available FDA guidance stating that such patient-reported secondary outcomes are too general and undefined for consideration in oncology product approvals in the United States.

Further, Plaintiffs have not provided any factual basis supporting their speculative theory that Array attempted to secretly and "informally" modify the patient population that would receive binimetinib treatment to be limited to a subset of patients who previously received cancer treatment.  (*See infra* at Section I.A.2.)  Indeed, entirely missing from the Complaint are allegations of *when* that purported change occurred, or *why* it occurred (if it did).  In any event, Array repeatedly disclosed to investors that the subgroup of patients who had received prior therapy demonstrated more favorable results than those patients who did not, and if approved, binimetinib would likely be primarily used as a second-line therapy for that subgroup consistent with the emergent standard of care.  Those disclosures undermine any claim that investors were misled.

Moreover, Plaintiffs' sweeping assertions that the FDA cannot -- and does not -- approve drug candidates based on patient subgroups is demonstrably wrong.  FDA guidance permits approval of drug candidates based on a patient population that is narrower than the population studied in the clinical trial.  Indeed, publicly-available information about past drug approvals demonstrates that the FDA approves NDAs with a narrower patient population than originally proposed where -- as here -- there are positive results in a predefined subgroup of patients demonstrating an enhanced benefit-risk profile.

*Second*, the Complaint does not adequately allege an actionable misstatement. (*See infra* at Section I.B.)  The challenged statements about the anticipated basis for FDA approval are forward-looking and protected by the PSLRA's safe harbor provision, and are also not actionable statements of corporate optimism.  The remaining statements interpreting the

clinical trial results are either true statements of fact or not adequately alleged to be false or misleading.

*Third*, the Complaint should be dismissed for the independent reason that Plaintiffs' allegations do not give rise to any inference of scienter, much less the requisite strong inference.  (*See infra* at Section II.)  Plaintiffs do no cite any contemporaneous fact, *i.e.*, document, email, communication with the FDA, or a confidential witness permitting a strong inference that Defendants knew or believed that the FDA was unlikely to approve binimetinib based on the positive data from the Phase 3 clinical trial.  Plaintiffs instead resort to making general allegations that Defendants intended to mislead investors because Defendants had access to all clinical trial data and they had a general motive to keep investor interest high in binimetinib.  But those sort of allegations of general motives shared by all companies are routinely rejected by courts as insufficient to plead scienter.

*Fourth*, Plaintiffs' Section 20(a) control person liability claim fails because there is no primary violation of the Exchange Act.  (*See infra* at Section III.)

## FACTUAL BACKGROUND[2]

### A.      Array Develops And Commercializes Drugs For The Treatment Of Cancer

Founded in 1998, Array is a biopharmaceutical company based in Boulder, Colorado focused on the discovery, development, and commercialization of targeted small molecule drugs to treat patients afflicted with cancer.  (Compl. ¶¶ 2, 25.)  Binimetinib is a late-stage small molecule inhibitor, designed to treat certain cancers by disrupting their cellular activities, including cancer cell proliferation.  (*See* Tab 9 (June 30, 2016 Form 8-K).) Binimetinib has been studied in several Array-sponsored trials, including a currently ongoing trial studying binimetinib in combination with another drug to treat patients with other types of melanoma.  (*Id.*)

### B.      The Phase 3 "NEMO" Trial Meets Its Primary Endpoint Of PFS

The Phase 3 NEMO ("NRAS MELANOMA AND MEK INHBITOR") trial was an international, randomized Phase 3 clinical trial to study the use of binimetinib in patients with NRAS-mutant melanoma -- a devastating advanced skin cancer that afflicts roughly 20% of

---

[2]      In cases governed by the PSLRA like this one, the Court may properly consider on a motion to dismiss documents referenced in a complaint, matters of which the Court may take judicial notice, including public records such as filings made with the Securities and Exchange Commission or documents published by the FDA, and documents incorporated by reference into a complaint.  *See Tellabs, Inc v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, No. CIVA-04CV-1030-RPM, 2005 WL 4161977, at *2 (D. Colo. Oct. 20, 2005) (taking judicial notice of FDA documents published on its website in dismissing securities fraud action); *In re Dynavax Sec. Litig.*, No. 4:16-CV-06690-YGR, 2017 WL 4005584, at *1 (N.D. Cal. Sept. 12, 2017) (same); *Reed v. Pfizer, Inc.*, 839 F. Supp. 2d 571, 576 (E.D.N.Y. 2012) (taking judicial notice of FDA drug label in granting motion to dismiss).  The Court may also look to the "contents of a referenced document itself rather than solely to what the complaint alleges the contents to be."  *Emps.' Ret. Sys. of Rhode Island v. Williams Cos., Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018).  Copies of such integral documents are included in the accompanying Appendix of Public Records (cited as "Tab __"), submitted herewith.

melanoma patients.  (Compl. ¶ 34; Tab 23 (April 2017 Lancet Article at 435).)  The NEMO trial

compared the efficacy of binimetinib with a previously approved chemotherapy treatment

(dacarbazine) in patients with advanced NRAS-mutant melanoma who either were "treatment-

naïve" (*i.e.*, patients who had not received any prior cancer treatment) or a subgroup of patients

who had previously received immunotherapy (*i.e.*, a treatment that uses a person's own immune

system to attack foreign cancer cells).  (Compl. ¶ 34.)  Although NRAS mutations are present in

about 20% of patients with melanoma, "[t]here are no established therapies specific for

NRAS-mutant melanoma despite the emergence of immunotherapy."  (Tab 23 (April 2017

Lancet Article at 435).)

   The primary endpoint of the NEMO study was "progression-free survival," which

is defined as the time from when a patient is enrolled in a clinical trial until objective tumor

progression or death.  (*Id.*; *see also* Tab 1 (FDA Guidance at 8).)[3]  The secondary endpoint of the

trial was overall survival ("OS"), which measures a patient's lifespan from the time they begin

treatment on the drug until death.  (Tab 23 (April 2017 Lancet Article at 437.)  On December 16,

2015, Array reported top-line results from the Phase 3 NEMO clinical trial.  (Tab 6 (Dec. 16,

2015 Form 8-K).)  The press release reported that "the study met its primary endpoint of

improving progression-free survival (PFS) compared with dacarbazine treatment -- the median

PFS on the binimetinib arm was 2.8 months versus 1.5 months on the dacarbazine arm."  (*Id.* at

5.)

---

[3] *See* Guidance for Industry Clinical Trial Endpoints For the Approval of Cancer Drugs
and Biologics,  May 2007 available at
https://www.fda.gov/downloads/Drugs/Guidances/ucm071590.pdf.  PFS serves as a primary
endpoint for cancer drug approvals.  (*Id.*)

On June 6, 2016, Array publicly disclosed the detailed NEMO results at the American Society of Clinical Oncology annual meeting in a presentation titled "Results of NEMO: A Phase 3 Trial of Binimetinib (BINI) vs Dacarbazine (DTIC) in NRAS-Mutant Cutaneous Melanoma."  (Compl. ¶ 40; *see also* Tab 7 (June 6, 2016 Presentation).)

### C.   Array Submits NDA Based On Positive Phase 3 Nemo Trial Results

On June 30, 2016, Array announced that it had submitted a New Drug Application to the FDA based on the NEMO trial results.  (See Tab 9 (June 30, 2016 Form 8-K).) The press release stated that the "submission is based on results of the pivotal Phase 3 NEMO (NRAS MELANOMA AND MEK INHBITOR) study, which found binimetinib significantly extended median progression-free survival (PFS), the study's primary endpoint, as compared with dacarbazine."  (*Id.* at 5.)  "[B]inimetinib significantly extended median PFS at 2.8 months, as compared with 1.5 months observed with dacarbazine."  (*Id.*)  The press release further disclosed the results observed in a pre-specified subgroup of patients who received prior treatment with immunotherapy.  That subset of patients who received binimetinib experienced 5.5 months of median PFS, compared with 1.6 months for those receiving treatment with dacarbazine.  (*Id.*; *see also* Compl. ¶ 41.)

Notwithstanding the positive patient subgroup results, Array cautioned investors that "[w]hile the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care."  (*See* Tab 9 (June 30, 2016 Form 8-K at 5).) Accordingly, Array informed investors that it "*anticipates* that the *primary* consideration for

8

marketing approval will be the results for the primary endpoint of the trial." (*Id.* (emphasis added).)  Array also informed investors about other critical outcomes observed during the trial: "[i]n addition to improving PFS, binimetinib also demonstrated significant improvement in overall response rate (ORR) and disease control rate (DCR).  While there was no statistically significant difference demonstrated in overall survival, the median overall survival (mOS) favored the binimetinib arm." (*Id.*)

### D.    Following Discussions With The FDA, Array Withdraws The Binimetinib NDA

On March 19, 2017, Array issued a press release announcing that it had withdrawn its NDA for binimetinib following discussions with the FDA two days earlier during a late-cycle review meeting.  ((Compl. ¶ 94; *see also* Tab 21 (Press Release at 2).)  Based on feedback from the FDA, Array concluded that the clinical benefit demonstrated by the Phase 3 NEMO clinical trial was not sufficient to support the approval of the NDA.  (*Id.*)  Array also announced that clinical trials for binimetinib would continue, and that the planned NDA for binimetinib in combination with another drug to treat a different form of melanoma remained on track.  (*Id.*)  In the days following this press release, Array's stock price declined approximately 13%.

### E.    Eight Months After Array Withdraws The Binimetinib NDA, The European Medicines Agency Issues An Inconclusive Assessment Report On Binimetinib

One of Array's collaborators, Pierre Fabre -- a European pharmaceutical company that owns the European license for binimetinib -- submitted an application for marketing approval of binimetinib to the EMA based on the NEMO trial results.  (Compl. ¶ 55.)

On November 9, 2017, *eight months* after Array withdrew its NDA for binimetinib, the EMA issued an assessment report evaluating the clinical benefits of binimetinib for use in Europe for the treatment of patients with NRAS-mutant melanoma (the "EMA Report").  (Compl. ¶ 57; *see also* Tab 25 (EMA Report).)  In interpreting the Phase 3 NEMO trial results, the EMA made certain inconclusive statements about observed secondary outcomes, including "quality of life" and "ECOG performance status."[4]  (Compl. ¶¶ 59-64).  The EMA stated, among other things, that "[o]verall the results presented show evidence of activity and a small prolongation in progression free survival in patients with the NRAS mutation positive melanoma."  (*See* Tab 25 (EMA Report at 46).)  The EMA Report also stated that although "[a] benefit is not seen for overall survival or the QoL results," "[p]atients in the open label dacarbazine arm were less compliant to report on patient-reported outcomes and therefore the QoL *data may be confounded and difficult to interpret*."  (*Id.* at 46 (emphasis added).)

The EMA publicly released this report on March 27, 2018, more than four months after Plaintiffs filed this lawsuit.[5]

---

[4]     The term "ECOG Performance Status" refers to standard criteria for measuring how a disease is progressing and affecting a patient's daily living abilities.  "It describes a patient's level of functioning in terms of their ability to care for themself, daily activity, and physical ability (walking, working, etc.)."  *See* ECOG-ACRIN Cancer Research Group, ECOG Performance Status *available at* http://ecog-acrin.org/resources/ecog-performance-status (last visited June 11, 2018).

[5]     *See*  http://www.ema.europa.eu/ema/index.jsp?curl=pages/medicines/human/medicines/004052/wapp/Initial_authorisation/human_wapp_000250.jsp&mid=WC0b01ac058001d128&source=homeMedSearch&category=human (follow "All documents" hyperlink) (last visited June 11, 2018).

## ARGUMENT

To state a claim under Section 10(b) of the Securities Exchange Act and Rule 10b-5, Plaintiffs must plead:  (1) a misrepresentation or omission of material fact; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; and (5) loss causation and economic loss. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997).

Securities fraud claims are also subject to the rigorous pleading requirements of both Rule 9(b) and the PSLRA.  Rule 9(b) requires that the circumstances constituting the fraud be stated "with particularity."  Fed. R. Civ. P. 9(b).  The PSLRA requires Plaintiffs to identify with particularity "each statement alleged to have been misleading" and "the reasons *why* the statement is misleading." 15 U.S.C. § 78u-4(b)(1) (emphasis added).  A complaint must also allege specific facts giving rise to a "strong inference" of scienter.  *Id.* § 78u-4(b)(2)(A); *see also Ellis v. Spectranetics Corp.*, No. 15-CV-01857-KLM, 2018 WL 1583837, at *7 (D. Colo. Apr. 2, 2018) (Mix, J.) (dismissing securities fraud complaint that failed to allege sufficient facts to create an inference of scienter that was at least as strong as any opposing inference).

Here, Plaintiffs' Complaint falls well short of meeting those exacting standards and should be dismissed for at least two independent reasons:  (1) Plaintiffs fail to allege an actionable material misstatement or omission and (2) the allegations do no raise a *strong* inference of fraudulent intent.

## I.  THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT DOES NOT ALLEGE A MATERIAL MISSTATEMENT OR OMISSION

Plaintiffs allege that Defendants made various false or misleading statements during the putative class period.  (*See* Compl. ¶¶ 66, 68, 70, 72, 74, 76, 78, 80, 82, 85, 88, 90, 92.)

Plaintiffs principally allege that each of those statements was false or misleading because Defendants did not disclose:  (1) secondary, patient-reported data from the NEMO trial that allegedly undermined the benefits associated with binimetinib; and (2) that Defendants "intended to seek approval for a more narrow indication (post-immunotherapy only)."  (*Id.* at 65.)  As discussed below, Plaintiffs' alleged omissions cannot support a claim of securities fraud because Plaintiffs' speculative and conclusory allegations are unaccompanied by particularized facts or are otherwise immaterial.  (*See infra* at Section I.A.)  In addition to that dispositive failure, each challenged statement is nonactionable as a matter of law.  (*See infra* at Section I.B.)

### A.     Plaintiffs' Omission Allegations Are Not Actionable

To state a claim of securities fraud based on purported omissions, Plaintiffs must allege an omission of a material fact that was necessary to make a particular statement not misleading in light of the circumstances in which it was made.  *See* 15 U.S.C. § 78u-4(b)(1).  "A duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information."  *Emps.' Ret. Sys. of Rhode Island*, 889 F.3d at 1164 (citation omitted).  A duty to disclose arises only where *both* the statement made is *material*, and the omitted fact is material to the statement in that it alters the meaning of the statement.  *McDonald v. Kinder–Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (emphasis added) (brackets and internal quotation marks omitted).  An omitted fact is material only if there is "a substantial likelihood that the disclosure of the omitted information would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quotations omitted).  Absent a duty to disclose, silence cannot serve as

the basis for liability under Rule 10b-5. *Novell,* 120 F.3d at 1125 (internal quotation marks omitted).

The gravamen of Plaintiffs' Complaint is that Defendants allegedly misled investors because they failed to disclose (1) secondary, patient-reported data from the NEMO trial that Plaintiffs claim "severely undermined (if not outweighed) the benefits associated with the statistically significant increase in PFS," (Compl. ¶ 67), and as a result of that data, (2) Array secretly attempted to change the indication on the NDA to a subset of patients who had previously received immunotherapy and who had observed a higher PFS outcome than the overall population. (*Id.*) Neither allegation supports a claim under Section 10(b). The alleged omitted secondary data is immaterial as a matter of law and otherwise did not render any statement made false or misleading. Further, Plaintiffs' allegations of a secret change in indication are unsupported by particularized facts and not plausible.

### 1. Plaintiffs' Allegations About Secondary Outcomes Observed In The Phase 3 NEMO Study Do Not Make Any Putative Class Period Statement False Or Misleading

Plaintiffs allege that Defendants' statements about the Phase 3 NEMO trial results were false or misleading because they failed to inform investors that "[w]hile binimetinib met its primary endpoint, the entirety of the NEMO data showed decreases in quality of life and performance status and that long-term prognosis for binimetinib was worse than for dacarbazine." (Compl. ¶ 67.) Plaintiffs allege that quality of life and performance status were "important secondary outcomes" and that this data "severely undermined (if not outweighed) the benefits associated with the slight increase in PFS (the primary endpoint)." (*Id.* ¶¶ 54, 67.) This claim fails for at least three independent reasons.

13

*First*, Plaintiffs fail to allege how any omitted information about "quality of life" or "performance status" was material.  Although Plaintiffs characterize these secondary outcomes as "important" (*id.* ¶ 54) and make the conclusory assertion that "the FDA would undoubtedly address" those issues when evaluating Array's NDA (*id.* ¶¶ 53, 73), missing from the Complaint are particularized *facts* supporting Plaintiffs' speculation.  For example, the Complaint does not say *why* that secondary data was "important" to the FDA or *how* that secondary data affected the FDA's views about the binimetinib NDA.  Indeed, the FDA's publicly-available guidance on the use of secondary outcomes to support drug approval confirms that the FDA would *not* have considered these secondary outcomes as "important" measures for approving binimetinib, as the FDA states that secondary outcomes such as "quality of life" have "not served as primary efficacy endpoints in oncology approvals"[6] (*see* Tab 1 (FDA Guidance at 10)), and are "too general and undefined to be considered appropriate for a medical product claim."  (*See* Tab 2 (FDA Guidance at 33).)[7]  Plaintiffs thus fail to demonstrate that "disclosure of the omitted [secondary outcomes] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Noble Asset Mgmt.*, 2005 WL 4161977, at *7 (citations omitted) (dismissing securities fraud claims and holding that a drug company's positive results observed in a subgroup were not rendered false or misleading

---

[6]     *See* FDA, Guidance for Industry Clinical Trial Endpoints For the Approval of Cancer Drugs and Biologics, May 2007 *available at* https://www.fda.gov/downloads/Drugs/Guidances/ucm071590.pdf

[7]     *See* FDA, Guidance for Industry Patient-Reported Outcome Measures:  Use in Medical Product Development to Support Labeling Claims, December 2009 *available at* https://www.fda.gov/downloads/drugs/guidances/ucm193282.pdf

because investors knew from publicly-available FDA guidance how the FDA viewed that information).[8]

*Second*, Plaintiffs' allegations about this omitted secondary data rely exclusively on selected portions of a report issued by the EMA (not the FDA) in November 2017 -- long after Array withdrew its NDA.  (Compl. ¶ 58; *see also* Tab 25 (EMA Report).)  Plaintiffs selectively reference statements made by the EMA about its interpretation of the "quality of life" and "ECOG performance status" outcomes to allege that the EMA "ultimately conclud[ed] that the performance status and QoL was worse in the binimetinib arm of the study." (Compl. ¶¶ 61-63.)  But Plaintiffs ignore the EMA's own statements in the report that repeatedly disclaim any reliance on this data as conclusive or interpretable.  For example, the EMA stated that:

- "The quality of life (QoL) results are ***difficult to interpret*** for methodological reasons.  ***If interpreted***, the QoL data would show that treatment with binimetinib may have a negative impact on QoL.  ***Using such an interpretation for a decision would be unfair*** . . . ."  (*See* Tab 25 (EMA Report at 46) (emphasis added).)

- "Patients in the open label dacarbazine arm were less compliant to report on patient-reported outcomes and therefore the QoL data may be ***confounded and difficult to interpret***."  (*Id.* at 47 (emphasis added).)

---

[8]    Even if these secondary outcomes of quality of life and performance status "may [have] be[en] relevant or of interest to a reasonable investor, [] that circumstance alone d[id] not necessitate its disclosure."  *Kleinman v. Elan Corp.*, 706 F.3d 145, 154 (2d Cir. 2013) (dismissing securities fraud claim); *see also In re Rigel Pharm., Inc., Secs. Litig*., 697 F.3d 869, 879 n.7 (9th Cir. 2012) (affirming dismissal of 10(b) action and reasoning that the company need not release "all the detailed data or break that data down by categories that may plausibly be of some interest to some investors"); *In re Rockwell Med., Inc. Sec. Litig*., No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *11 (S.D.N.Y. Mar. 30, 2018) (dismissing 10(b) action and reasoning that pharmaceutical company had no duty to disclose information that investors would find to be "interesting").

- "Due to inherent methodological problems in the collection of data, results of the *quality of life data should either not be regarded or only with caution* . . . ."  (*Id.* at 65 (emphasis added).)

Plaintiffs also ignore the EMA's finding that, although the performance status data was not positive, that data in terms of deterioration free survival did not "reach[] the formal criterion of statistical significance."  (*Id.* at 79.)  In short, the EMA's inconclusive language -- issued eight months after Array withdrew its NDA and which says nothing about the FDA's views -- does not render any putative class period statement false or misleading.  Indeed, earlier this year Judge Wolfson in the District of New Jersey rejected nearly identical allegations regarding a later-filed EMA report as insufficient to support a claim of securities fraud.  *Hoey v. Insmed, Inc.*, No. 16-4323 (FLW), 2018 WL 902266, at *15-17 (D.N.J. Feb. 15, 2018) (holding that the "EMA's inconclusive language" contained in a report issued months after any challenged statements were made did not establish that earlier positive statements about Phase 2 clinical trial results were false or misleading).

*Third,* Plaintiffs do not allege how any omission of this uninterpretable secondary trial data rendered the statement that "Binimetinib significantly extended median progression-free survival (PFS), the study's primary endpoint, as compared with dacarbazine," (*see, e.g.*, Compl. ¶¶ 68, 70, 72 ,74, 76), false or misleading. 15 U.S.C. § 78u-4(b)(1).  Nothing in that disclosure addressed whether binimetinib showed clinical benefits other than an extended PFS, or that an extended PFS meant that secondary outcomes like "quality of life" and "performance status" were also positive.  Put simply, "no reasonable investor could have understood [this statement] to mean anything other than the positive [PFS] results."  *Kleinman*, 706 F.3d at 153 (dismissing complaint alleging securities fraud and holding that company had no duty to disclose

that its drug showed no short term improvement during study trial because nothing in the company's press release announcing the accurately described positive results suggested that the drug had any positive short term effect).

### 2. Plaintiffs' Allegations About Array's Purported Attempt To Modify Binimetinib's Indication Are Unsupported By Particularized Facts

Plaintiffs also allege that Defendants' statements that Array anticipated FDA approval based on the NEMO study meeting its primary endpoint of PFS (*see e.g.*, Compl. ¶¶ 66, 70, 76, 82, 88) were false or misleading because Defendants concealed from investors that it was purportedly seeking approval for binimetinib based on a modified indication, *i.e.*, patients who had received prior immunotherapy before taking binimetinib and who had showed a greater improvement in PFS.  (*See, e.g.*, *id.* ¶¶ 6,  67, 69, 71, 73, 77.)  Based on this unsupported premise, Plaintiffs make the sweeping claim that Array's alleged attempt to change the indication in the NDA "all but guaranteed that the FDA would reject the NDA."  (*Id.* ¶ 11.)  Those allegations also fail to state a claim.

### (a) There Are No Particularized Allegations Supporting Plaintiffs' Conclusion That Array Concealed An Attempt To Modify The Indication

Despite repeatedly claiming that Defendants failed to disclose to investors that it had attempted to change the NDA's indication, the Complaint never identifies *when* Defendants allegedly made this attempt or if the alleged change was done on the FDA's recommendation to do so.  Plaintiffs provide no contemporaneous facts that lead to a reasonable inference that Defendants sought to "informally change the indication of binimetinib" *before* they made any statement about the anticipated basis for FDA approval during the putative class period.  (Compl.

¶ 8)  This defect alone is fatal to Plaintiffs' claims.  *See In re Amarin Corp. PLC Sec. Litig.*, No. 13-6663 (FLW) (TJB), 2016 WL 1644623, at *18 (D.N.J. Apr. 26, 2016), *aff'd*, 689 F. App'x 124 (3d Cir. 2017) (finding allegations that company's discussions with the FDA "likely" took place between two dates was insufficient to satisfy Rule 9(b) and PSLRA because they failed to provide the "essential factual background that would accompany the first paragraph of a newspaper story that is, the 'who, what, when, where and how' of the events at issue") (citations omitted).

Plaintiffs instead primarily rely on a single statement made in Array's March 19, 2017 press release announcing the NDA withdrawal to support their unsubstantiated theory (Compl. ¶¶ 108(c),(e).)  Plaintiffs speculate that Defendants' statement that "[t]his action was based on thorough discussions and communications with the FDA, ***including exploration of various paths to approval***, and followed the late cycle review meeting held with the FDA on Friday, March 17, 2017" means that Array "altered the NDA to change the indication and focus on the post-IO subgroup data"  in some "informal" manner by some unstated means at some unidentified time.  (*Id.* (emphasis in original).)  But Plaintiffs' attempt to establish falsity by relying on assumptions and conjecture is precisely the type of pleading that the PSLRA forbids and that courts in similar circumstances have rejected.  *See Bauer v. Eagle Pharm., Inc.*, No. 16-3091(JLL), 2017 WL 2213147, at *7 (D.N.J. May 19, 2017) (rejecting plaintiffs' argument that a pharmaceutical company's *post-class* period statements that they "engaged in discussions with the FDA regarding conducting human clinical trials" meant that *during* the class period the

company must have been aware of the need for human trials).[9]

> **(b)     Defendants' Disclosures About**
> **The Use Of Binimetinib In Patients**
> **Who Had Received Prior Immunotherapy**
> **<u>Undermines Any Claim That Investors Were Misled</u>**

Even if the Court were to credit Plaintiffs' unsubstantiated allegations that Array sought to secretly and "informally" modify the indication for the binimetinib NDA -- and it should not -- Plaintiffs' allegations fail to demonstrate that this omission somehow misled investors "to believe that the NDA would be based on the full dataset" and not "on a cherry-picked subpopulation of the study who had received prior treatment with IO."  (*See, e.g.*, Compl. ¶¶ 71, 73, 79, 91.)  Where, as here, Plaintiffs allege that a "defendant failed to disclose a material fact necessary to make its statement not misleading, the concealed information must be information known to the defendants that is not otherwise available to the investing public." *Chipman v. Aspenbio Pharma, Inc.*, No. 11-cv-00163-REB-KMT, 2012 WL 4069353, at *5 (D. Colo. Sept. 17, 2012) *aff'd*, 587 F. App'x 493 (10th Cir. 2014) (dismissing securities fraud claim where pharmaceutical company disclosed information allegedly omitted).

---

[9]     Plaintiffs also attempt to rely on the FDA's March 29, 2017 Notice of Meeting announcing the cancellation of the ODAC meeting, which states that the proposed indication for binimetinib is for treatment of patients with "unresectable or metastatic melanoma, with NRAS Q61 mutation as detected by an FDA-approved test, who have received prior treatment with checkpoint inhibited therapy."  (Compl. ¶ 108(e); (*see also* Tab 22 (Mar. 29, 2017 FDA Notice at 2 ).)  But this FDA notice says nothing about any purported attempt by Array to amend the indication for binimetinib, including if it occurred, when it occurred, whether the change was solicited by the FDA or why the purported change was made.  The notice therefore cannot serve as the "scaffolding for any reasonable inference that the FDA had communicated anything to [Array] during the Class Period" that would make Array's statements about the basis for expected FDA approval false or misleading.  *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 58 (1st Cir. 2018).

Plaintiffs suggest that Defendants knew all along that the NEMO trial data was "not suitable for approval" and thus the only way to get binimetinib approved would be to "informally change the indication of binimetinib from a broad patient population to a more narrow one defined by prior immunotherapy treatment." (Compl. ¶¶ 8, 11.) Yet Plaintiffs acknowledge that Defendants repeatedly disclosed that the subgroup of patients who had received prior immunotherapy demonstrated a higher median PFS than those who did not, and further disclosed that (i) such data may be relevant (although not dispositive) to FDA approval and (ii) if approved, binimetinib would be primarily used as a therapy for those patients who had received prior immunotherapy consistent with the emergent standard of care -- an issue requiring FDA discussion:

- "[W]e find that immunotherapy has been very effective and will commonly be used in the first line. *So we do expect to be used after immunotherapy in most cases if we are approved and on the market. So it is really that population that is likely to be most relevant*." (See Tab 8 (June 9, 2016 Tr. at 3) (emphasis added).)

- "*And so what we would assume is that many patients are going to receive prior immunotherapy before considering using a MEK and this isn't necessarily going to be driven by a label but by practice. So we'll negotiate the label that's perfect for the drug with the FDA, but we think that in practice a lot of patients are going to try immunotherapy first.*" (*Compl*. ¶ 78 (bold and italics in the original; other emphasis added); *see also* Tab 14 (Sept. 7, 2016 Tr. at 4).)

- "So as I mentioned earlier, *emergent standard of care for NRAS melanoma is immunotherapy,* . . . they really have no good treatment options, *which is why this could be quite important*." (See Tab 17 (Nov. 1, 2016 Tr. at 16) (emphasis added).)

- "*And that's one of the topics of course that we expect to cover at our ODAC, is the line of therapy, given that we studied most patients in first-line, and since then, I/O has become standard of care.*" (*Compl*. ¶ 92 (bold and italics in the original; underlining added); *see also* Tab 20 (Mar. 8, 2017 Tr. at 7).)

In context, those disclosures informed investors that (i) the NEMO trial data showed better results in patients who received prior immunotherapy; (ii) that the standard of care has evolved such that, if approved, binimetinib would primarily be used in patients who had previously received immunotherapy; (iii) Defendants expected the FDA to consider the totality of the NEMO data (including the subset data) in determining whether to approve the binimetinib NDA; and (iv) Defendants intended to discuss the intended indication with the FDA, which could include an indication that was narrowed to the patient subgroup who had prior immunotherapy. Plaintiffs therefore cannot plausibly allege that disclosure of Array's alleged attempt to "informally" change the NDA's indication to the subset of patients with prior immunotherapy would have altered the total mix of information available to investors.

> **(c)  Plaintiffs Do Not Plausibly Allege That The Likelihood Of FDA Approval Based On A More Narrow Indication Was "Exceedingly Low"**

Plaintiffs claim that "Defendants knew that FDA-approval for an NDA is extremely unlikely when based upon a subgroup of patient data, and even more unlikely when the sponsor attempts to alter the drug's indication through a major amendment to the NDA." (Compl. ¶ 106.) That too is wrong.

*First,* Plaintiffs incorrectly assert that "FDA regulations prohibit changing the indication of a drug after submission of an NDA" and as a result Array's attempt to do so "all but guaranteed that the FDA would reject the NDA." (Compl. ¶¶ 11-12, 86 (citing 21 C.F.R 314.60).) Plaintiffs selectively quote 21 C.F.R. 314.60 to conclude that "amendments are not permitted to change the intended indication for a drug after the NDA is submitted," (Compl. ¶ 9), but ignore the section of that regulation that *permits* an amendment to "include data to support a

minor modification of an indication or claim that was included in the original NDA, supplement, or resubmission."  21 C.F.R. 314.60(b)(6).  Plaintiffs also ignore the FDA's own guidance reflecting that a NDA may be approved with an indication that either mirrors the studied population, is broader than the studied population, or is *narrower than the studied population:*



(*See* Tab 24 (FDA Guidance at 12).)[10]

   *Second*, Plaintiffs' sweeping assertions that "the FDA has never approved a drug on the basis of a subgroup analysis" and "past studies show that the FDA would reject any attempt to reframe the NDA around a post-IO indication" are mistaken.  (Compl. ¶¶ 12, 106.)  Contrary to Plaintiffs' assertions, the FDA approves NDAs with a narrower indication than originally proposed based on the positive results in a predefined subgroup of patients (just like the alleged circumstance here).  For example, among recent oncology drug approvals:

---

[10]  *See* FDA Guidance on Considerations for Developing the INDICATIONS AND USAGE Section of Prescription Drug Labeling, November 2017 *available at* https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/LawsA ctsandRules/UCM584737.pdf.

- **Keytruda.**  The proposed indication was for metastatic non-small cell lung cancer (NSCLC).  The FDA approved *Keytruda* for a narrower indication of use in patients whose metastatic NSCLC has progressed following previous treatment and where there is no satisfactory alternative therapy.  (*See* Tab 4 (Sept. 4, 2014 Summary Review at 18, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2014/125514Orig1s000 SumR.pdf).)

- **Farydak.**  The proposed indication was for use in all patients with relapsed multiple myeloma and who had received at least one prior therapy.  The FDA approved *Farydak* for a narrower indication of patients who have relapsed multiple myeloma and have received at least two prior treatments.  (*See* Tab 5 (Feb. 20, 2015 Summary Review at 1, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/205353Orig1s000 SumR.pdf).)

This publicly-available information directly refutes Plaintiffs' conclusory allegations that any alleged attempt by Array to seek a narrower indication than originally proposed based on predefined subgroup of patients was "entirely unorthodox and exceedingly unlikely to occur."  (Compl. ¶ 109.)

**B.     The Challenged Affirmative Statements Are Not Actionable As A Matter Of Law**

In addition to the dispositive failure to allege a material omission, each challenged statement is also not actionable as a matter of law.  *First*, all of the challenged statements about the anticipated basis for FDA approval are forward-looking and protected by the PSLRA's safe harbor provision and are also not actionable statements of corporate optimism.  *Second*, the remaining challenged statements interpreting the Phase 3 NEMO trial are either true statements of fact or not adequately alleged to be false or misleading.

23

**1.      All Of The Challenged Statements About The Anticipated
Basis For FDA Approval Are Protected Forward-Looking Statements**

Plaintiffs allege that Defendants' statements that they anticipated that primary

consideration for FDA approval would be the results of the primary endpoint of PFS being met

were false or misleading.  (*See* Compl. ¶¶ 66, 68, 70, 76, 78, 80, 82, 85, 88, 92.)  But those

statements are not actionable because they are protected under the PSLRA's "safe harbor"

provision.  15 U.S.C. § 78u–5(i)(1).

Under the PSLRA's "safe harbor," Defendants cannot be held liable for any

forward-looking statement, whether written or oral, that is "identified as a forward-looking

statement, and is accompanied by meaningful cautionary statements identifying important factors

that could cause actual results to differ materially from those in the forward-looking statement"

*or* the forward-looking statement is "immaterial" *or* if Plaintiffs fail to adequately allege that the

forward-looking statements were made with "actual knowledge" of their falsity.  15 U.S.C. §

78u–5(c)(1); *see also Noble Asset Mgmt.*, 2005 WL 4161977, at *9.

**(a)      The Challenged Statements Are Forward Looking**

The PSLRA defines "forward-looking" statements broadly and includes

statements related to the "plans and objectives of management for future operations, including

plans or objectives relating to the products or services of the issuer" and the "assumptions

underlying" those future plans or objectives.  15 U.S.C. §§ 78u–5(i)(1)(B), (D).  Here, Plaintiffs

challenge Defendants' statements about their expectation that the FDA would primarily consider

the NEMO trial results showing that the primary endpoint of PFS was met when determining

whether to approve the binimetinib NDA:

- *"Array __anticipates__ that the primary consideration for marketing approval will be the results for the primary endpoint of the trial."* (Compl. ¶¶ 66, 70, 76, 82, 88 (bold and italics in the original; underlining added).)

- *"We do __believe__ that the NDA filing will primarily – process will primarily focus on the primary endpoint of PFS . . . .__We believe__ that the focus with regulators will be on the overall PFS result."* (*Id.* ¶ 68 (bold and italics in the original; underlining added).)

- *Now again, subsets, __we think__ the FDA is going to focus on the overall population but it is an interesting guide."* (*Id.* ¶ 78 (bold and italics in the original; underlining added).)

- *Now with all the caution that it is a subset, although predefined, and that __we believe__ the FDA will consider the overall population in assessing provability.* (*Id.* ¶ 80 (bold and italics in the original; underlining added).)

- *"And while __we believe__ that the regulators will be looking at our primary endpoint and looking at the totality of the data, it's at least nice to have some guidance there."* (*Id.* ¶ 86 (bold and italics in the original; underlining added).)

- *"And that's one of the topics of course that __we expect__ to cover at our ODAC, is the line of therapy, given that we studied most patients in first-line, and since then, I/O has become standard of care."* (*Id.* ¶ 92 (bold and italics in the original; underlining added).)

Courts routinely hold that statements concerning predictions and expectations about FDA approval are classic forward-looking statements protected under the PSLRA. *Noble Asset Mgmt.*, 2005 WL 4161977, at *9 (dismissing case under PSLRA because "[p]rojections about the likelihood of FDA approval are forward-looking statements. They are assumptions related to the Company's plan for its product, and as such fall under the PSLRA's safe harbor rule"); *see also TransEnterix Investor Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 758 (E.D.N.C. 2017) (dismissing case under PSLRA where statements about a drug company's "expectations" that the FDA would approve its drug and the assumptions underlying the

objectives for the drug after approval were protected by the safe harbor); *Bauer*, 2017 WL 2213147, at *9-10 (dismissing case under PSLRA safe harbor because defendants' statements containing phrases such as "we expect," "we have every expectation" and "we believe" in the context of expected FDA approval were forward looking); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 543 (S.D.N.Y. 2015) (internal quotations marks and citations omitted), *aff'd sub nom Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (same).

### (b)   Defendants' Statements Were Accompanied By Specific Cautionary Language

All of Defendants' forward-looking statements were accompanied by meaningful, tailored and specific cautionary language.  *See Novell*, 120 F.3d at 1120 (holding that a forward-looking statement is protected under the safe harbor provision if it is accompanied by cautionary language that is "substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge") (internal quotation omitted).  For example, Array's press release announcing that it had submitted its NDA based on the NEMO trial results explicitly warned investors that actual results could differ because Array faced the risk that the FDA could determine "that results from clinical trials are not sufficient to support registration or marketing approval of binimetinib."  (*See* Tab 9 (Jun. 30, 2016 Form 8-K at 6 ).)  Array's June 30, 2016 Press Release also referred investors to the Risk Factors section of Array's SEC filings.[11] Those risk factors repeatedly and expressly cautioned investors about the possibility that the

---

[11]   Defendants made similar statements in each press release and at the outset of each conference call identified in the Complaint, specifically referring investors to the risk factors in Array's SEC filings. (*See* Tab 10 (July 12, 2016 Tr. at 1); Tab 11 (Aug 4, 2016 Tr. at 3); Tab 12 (Aug. 4, 2016 Form 8-K at 8); Tab 14 (Sept. 7, 2016 Tr. at 2); Tab 15 (Sept. 14, 2016 Tr. at 1); Tab 17 (Nov. 1, 2016 Tr. at 3); Tab 19 (Feb. 19, 2017 Tr. at 3); Tab 20 (Mar. 8, 2017 Tr. at 2).)

FDA may disagree with its interpretation of the NEMO Phase 3 trial data and deny its NDA based on the indication submitted for binimetinib:

> Clinical trials may not demonstrate sufficient safety and efficacy to obtain the requisite regulatory approvals or result in marketable products. Furthermore, ***data obtained from preclinical and clinical studies are susceptible to varying interpretations that may delay, limit or prevent regulatory approval***.
>
> For example, following our submission of an NDA for binimetinib in NRAS-mutant melanoma, we are planning for an ODAC meeting and preparing for an Application Orientation meeting with the FDA, which may result in requests for additional information from the FDA. ***We may also experience other delays in obtaining regulatory review or approval or receive a determination from the FDA not to approve binimetinib in this indication.***

(*See* Tab 13 (August 19, 2016 Form 10-K at 39) (emphasis added); *see also* Tab 16 (Sept. 28, 2016 Form 424B5); Tab 18 (Nov. 3, 2016 Form 10-Q).)

Defendants' cautionary statements are similar to the statements made in *Noble Asset Mgmt.,* which the court found to be "sufficient to inform a reasonable investor about the uncertainties surrounding FDA approval." 2005 WL 4161977, at *9. In *Noble Asset Mgmt.*, plaintiffs asserted that a drug company's risk disclosures were not sufficient because they did not caution investors about the specific risk that the FDA would not accept its subgroup analyses. *Id.* The court rejected that argument, reasoning that the company's cautionary statements -- like Defendants' statements here -- "addressed the possibilities that test data could be subject to varying interpretations, that the Company might not be able to demonstrate efficacy . . . and that FDA approval might be delayed or not obtained at all." *Id.* The court concluded that investors had "notice that a risk of investing was that the FDA might not approve [the drug] in the near term or ever." *Id.; see also Harrington v. Tetraphase Pharm. Inc.*, No. 16-10133-LTS, 2017 WL 1946305, at *9 (D. Mass. May 9, 2017) (reasoning that a company's risk factors disclosing a risk

that clinical trial results might differ and the possibility of the FDA not approving the drug were

"precisely what the law requires").  The same result is warranted here.

### (c)   Statements About Anticipated Basis For FDA Approval Are Immaterial Expressions Of Corporate Optimism

In addition to the dispositive failure of being protected forward-looking

statements, Defendants' statements about the anticipated basis for FDA approval are also

nonactionable statements of "corporate optimism" or "mere puffing."  *Novell*, 120 F.3d at 1119.

"Vague, optimistic statements are not actionable because investors do not rely on them in making

investment decisions."  *Id.* (finding statements about future expectations as "the sort of soft,

puffing statements, incapable of objective verification, that courts routinely dismiss as vague

statements of corporate optimism").  Here, Defendants' expressions of optimism about the

anticipated basis for FDA approval are precisely the sort of "generalized statements that are not

capable of objective verification."  *See Noble Asset Mgmt.*, 2005 WL 4161977, at *11 (holding

that pharmaceutical company's optimistic statements describing positive clinical trial results in

the context of expected FDA approval were immaterial).  For this independent reason,

Defendants' optimistic statements about anticipated FDA approval are not actionable.  (Compl.

¶¶ 66, 68, 70, 76, 78, 80, 82, 85, 88, 92.)

### 2.   The Remaining Challenged Statements Are True Statements Of Fact Or Not Adequately Alleged To Be False Or Misleading

For the remaining challenged statements about the results of the NEMO trial,

Plaintiffs fail to allege particularized facts showing *why* or *how* those statements were false or

misleading.  15 U.S.C. § 78u–4(b)(1); *Noble Asset Mgmt,* 2005 WL 4161977, at *5.

Plaintiffs' Complaint focuses on two statements about the NEMO trial results that Defendants repeated throughout the putative class period:  (i) that the "study met its primary endpoint of improving progression-free survival (PFS) compared with dacarbazine treatment"; and (ii) "[w]hile the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care."  (*See* Compl. ¶¶ 66, 68, 70, 72, 74, 76, 82, 85, 88, 90 (emphasis removed).)

Those statements are true statements of fact, and Plaintiffs do not allege any contemporaneous facts, much less particularized ones, that contradict any of those statements. For example, Plaintiffs do not cite any documents, emails, communications, or confidential witness statements suggesting that the "FDA ever explicitly or even implicitly indicated that" the study meeting its primary endpoint of PFS was flawed in some way, was insufficient for approval, or that approval of the NDA would be based on something other than the full dataset. *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 130 (3d Cir. 2017) (affirming dismissal of securities fraud claims where the FDA had agreed to the primary endpoint and there were no allegations that the FDA had changed its position during the approval process).  In fact, Defendants' cautious statements that the trial data for the subgroup should be interpreted with care were entirely consistent with the FDA's long-standing position that "[c]are must be taken to avoid specific efficacy claims based on such a subset analysis" and "[f]indings in such

subgroups cannot be given the same weight as primary analyses (and cannot overcome the failure of the primary endpoint to show a statistically significant result), but they are used to suggest consistency or lack of it."  (*See* Tab 3 (FDA Guidance at 46, 74).)[12]

In short, Plaintiffs' allegations about the NEMO trial are precisely the type of allegations that courts repeatedly reject as not actionable:  allegations challenging a pharmaceutical company's lawful disclosures interpreting its trial results.  *See Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (affirming dismissal of securities claims, and finding that plaintiffs' allegations were "little more than a dispute about the proper interpretation of data," which is not a basis for liability).[13]

## II.    THE COMPLAINT SHOULD BE DISMISSED FOR THE INDEPENDENT REASON THAT IT DOES NOT ALLEGE SPECIFIC FACTS GIVING RISE TO A "STRONG INFERENCE" OF SCIENTER

The Complaint should be dismissed for the independent reason that Plaintiffs fail to plead facts giving rise to a strong inference of scienter.  To plead scienter, Plaintiffs must

---

[12]    *See* FDA, Good Review Practice: Clinical Review of Investigational New Drug Applications (Dec. 2013), *available at* https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/UCM377108.pdf.

[13]    Plaintiffs also allege that Defendants' statements that there was an "unmet need" for binimetinib in patients with NRAS-mutant melanoma (*see, e.g.*, Compl. ¶¶ 70, 78) were false or misleading because they led "investors to believe that NRAS-mutant melanoma was a uniquely aggressive disease requiring unique treatment and that binimetinib would be meeting an unmet need, thus easing the path for NDA approval when in fact NRAS-mutant melanoma was not unique and many treatments were available."  (Compl. ¶¶ 71, 79).  But Defendants' statements, when read in context, show that Defendants were referring to the unmet need for a second-line therapy -- like binimetinib -- used *after* patients receive immunotherapy or a checkpoint inhibitor. (*E.g.*, Compl. ¶ 78 ("But you're in a population there where ***after immunotherapy*** and after a MEK if approved, ***there really is no good alternative treatment for these patients*** and we live in a world now where in a lot of tumors you have many, many options and lines of therapy.  ***So certainly a very high unmet need***." (emphasis added)).)

"state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind" with respect to each act or omission alleged.  15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).  "In a securities fraud case, the appropriate level of scienter is a mental state embracing intent to deceive, manipulate or defraud, or recklessness."  *Ellis*, 2018 WL 1583837, at *4 (citations omitted).  Recklessness "is a particularly high standard" under the PSLRA (*id.* at 13) and involves "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *City of Philadelphia v. Fleming Cos. Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (internal quotation marks omitted).  "It is something closer to a state of mind approximating actual intent."  *Ellis*, 2018 WL 1583837, at *13 (citations omitted).  A strong inference must be more than reasonable or plausible; it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  A court assessing scienter must look to the totality of the pleadings to determine whether Plaintiffs allegations permit such an inference.  *Ellis*, 2018 WL 1583837, at *4 (citations omitted).

### A.   Plaintiffs Fail To Plead A Strong Inference That Defendants Acted With Actual Knowledge Or Recklessness

Plaintiffs' scienter allegations fall into four broad categories:  (1) Defendants "must have known" that the likelihood of FDA approval based on the primary data was low because they had "access" to all of the "good data and the bad data" from the NEMO trial; (2) Array intended to mislead investors because they "knowingly or recklessly violated FDA regulations" when they attempted to modify the indication; (3) binimetinib was Array's core product so it is reasonable to infer that Defendants were aware of the alleged falsities associated

with binimetinib; and (4) Defendants had a motive to commit fraud in order to raise capital for Array's operations and keep investors' interest in binimetinib high because binimetinib was integral to other trials.  (Compl. ¶¶ 101-111.)  None of those allegations -- either individually or collectively -- support the requisite strong inference of scienter.

> **1.     Plaintiffs' Allegations That Defendants Had Access To All Of The Trial Data Are Conclusory And Non-Specific, And Thus Fail To Support A Strong Inference Of Scienter**

Plaintiffs allege that Defendants had "first-hand knowledge" of both "the good data and the bad data," so they must have known that "approval from the FDA was exceedingly unlikely." (Compl. ¶¶ 102-103.)  But the Tenth Circuit has long held that mere "allegations that the defendant possessed knowledge of facts . . . without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud." *Fleming*, 264 F.3d at 1260.

There are no particularized facts supporting *any* inference that Defendants believed that the FDA viewed the NEMO data unfavorably or that FDA approval based on the study meeting the primary endpoint of PFS being met was "exceedingly unlikely."  Rather, Plaintiffs rely exclusively on the EMA report -- which was issued in November 2017 and long after any of the challenged statements were made -- to suggest that Defendants "knew" that the NEMO data would present an obstacle to FDA approval.  But Plaintiffs fail to explain how the EMA's post-putative-class-period interpretation of the NEMO trial data (even if relevant) provides a strong inference that Defendants knew about those alleged issues when the challenged statements were made.  Plaintiffs' allegations based on Defendants' access to the NEMO trial

data is speculative and relies on the same "fraud by hindsight" method of pleading that courts routinely reject as insufficient to demonstrate scienter. *See Noble Asset Mgmt.*, 2005 WL 4161977, at *13 (finding allegations that defendant had access to bad trial data "does not support an inference that the defendants knew how the FDA would rule on its pending NDA"); *Columbia Labs., Inc. Sec. Litig.*, No. 12-614 (FSH)(PS), 2013 WL 10914123, at *3 (D.N.J. June 11, 2013) (finding no strong inference of scienter where the complaint did not allege contemporaneous facts establishing that Defendants knew about the FDA's concerns). (*See also supra* at Section I.A.)

### 2.   Plaintiffs' Allegations Of Purported Noncompliance With FDA Regulations Are Insufficient To Plead Scienter

Equally insufficient is the allegation that Defendants "knowingly or recklessly" violated FDA regulations by seeking to change the binimetinib indication after the NDA was submitted. For the reasons discussed above, Plaintiffs have not -- and cannot -- allege particularized facts about *when* the alleged change in indication occurred or *why* it occurred if at all. (*See supra* at Section I.A.2.) In any event, even if Plaintiffs could allege those facts, such an attempt to change the indication to a narrower population does not violate any FDA regulation. (*See supra* at Section I.A.2(c); *see also In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1113-14 (10th Cir. 2015) (finding an alleged GAAP violation insufficient to raise a strong inference of scienter where there were no other particularized facts tending to suggest the defendants intended to mislead investors).

### 3.    Plaintiffs' "Core Product" Allegations Are Routinely Rejected As Insufficient To Plead Scienter

Plaintiffs also allege that "[b]inimetinib was the single most important product for Array" and the drug in "Array's most advanced clinical trial" and that Defendants "were hyper-focused on the FDA approval-process for [b]inimetinib and not for instance, less distracted by any other less advanced product trials." (Compl. ¶ 104.) This so-called "core product" theory also fails. Indeed, the Tenth Circuit expressly rejects core product allegations, without more, as probative of scienter. *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1246 (10th Cir. 2016) (rejecting as insufficient to support a strong inference of scienter plaintiffs' allegations of the defendants' involvement in the company's core operations, without additional particularized facts that defendants knew their forecasts were unachievable); *see also Bauer*, 2017 WL 2213147, at *11 (finding that "there is no basis from which to conclude that the Company's on-going discussions with the FDA, coupled with the core operations doctrine, supports an inference that Defendants knew that the Product's NDA would not be approved"). The same result is warranted here. Absent other particularized facts supporting an inference of scienter -- and there are none -- Plaintiffs' "core product" theory fails.

### 4.    Plaintiffs' Allegations Of Motive Also Fail To Support A Strong Inference Of Scienter

Plaintiffs' "'[c]atch-all allegations that defendants stood to benefit from wrongdoing'" also miss the mark. *Kader*, 887 F.3d at 60.

*First,* Plaintiffs allege that Defendants had a motive to commit fraud because binimetinib was "integral to several of Array's ongoing clinical trials" and Defendants wanted to "maintain investor interest in Binimetinib." (Compl. ¶¶ 110-111.) Defendants' alleged motives

about Array's other ongoing trials do not support a strong inference of scienter concerning statements made about the *NEMO trial* -- the alleged subject of Defendants' purported misstatements or omissions.  *See Ellis*, 2018 WL 1583837, at *6.  In any event, Plaintiffs' assertions that Array desired to keep investors' interests high are nothing more than "general motives for management to further the interests of the corporation [which] fail to raise an inference of scienter."  *Fleming*, 264 F.3d at 1269 (reasoning that "generalized motives shared by all companies and which are not specifically and uniquely related to [the defendants] in particular, are unavailing"); *Spirit Aerosystems*, 827 F.3d at 1239 (rejecting plaintiffs' argument that defendants were motivated to mislead investors during a difficult financial situation, because it would at most suggest a generalized corporate motive that alone does not raise an inference of scienter).

       *Second*, similarly deficient is Plaintiffs' allegation that Defendants were motivated to make overly optimistic statements about binimetinib because Array needed to raise money to fund its operations.  (Compl. ¶ 112.)  "A strong inference of fraud does not arise merely from seeking capital . . . .  Indeed, the motivation[] to raise capital . . . [is] common to every company and thus add[s] little to an inference of fraud."  *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008).  Such allegations are uniformly rejected as insufficient to raise a strong inference of scienter.  *See Noble Asset Mgmt.*, 2005 WL 4161977 at *13 (finding that "the fact that a corporation engaged in financing activities during the alleged class period does not create a strong inference of fraudulent intent"); *Anderson v. Peregrine Pharm., Inc.*, No. SACV 12-1647-PSG (FMOx), 2013 WL 12122423, at *10 (C.D. Cal. Aug. 23, 2013), *aff'd*, 654 F. App'x 281 (9th Cir. 2016) (dismissing securities fraud claim and finding allegations that a pharmaceutical

company made misrepresentations about its core drug to obtain financing insufficient because "allegations that a company was seeking to acquire capital through sale of stock, loans, or other routine business activities is not probative of scienter").

       *Third*, Plaintiffs' allegations that "Array had an accumulated deficit of $801.4 million" and "Array's only near-term prospect for generating revenue was commercialization of Binimetinib" also do not support an inference of scienter.  (Compl. ¶ 112.)  Array has been in existence for nearly twenty years and "has [had] an accumulated deficit as a result of ongoing research and development spending *since inception*."  (*See* Tab 13 (Aug. 19, 2016 Form 10-K at F-9) (emphasis added).)  Array also has "historically funded [its] operations from up-front fees and license and milestone payments received under [its] drug collaborations and license agreements," all of which have resulted in $277.7 million in payments received since 2009.  (*Id*. at 70, F-9.)  And at the time Array submitted its NDA, it had more than $56 million in cash and cash equivalents on its balance sheet.  (*Id.* at F-5.)  "Lacking are any allegations suggesting that such capital was insufficient for continued operations, much less that [Array] would shutter its doors unless it padded earnings by deceiving investors."  *Corban v. Sarepta Therapeutics*, Inc., 868 F.3d 31, 42 (1st Cir. 2017).

       *Fourth*, Plaintiffs' failure to allege facts indicating a motive as to the individual defendants also "mitigates an inference of scienter from the plaintiffs' other factual allegations." *Spirit Aerosystems*, 827 F.3d at 1239.  For example, Plaintiffs do not -- and cannot -- allege that any individual defendant sold a single share of stock during the putative class period.  The lack of individual stock sales further undermines any inference of scienter.  *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1117 (10th Cir. 2015) (finding that the lack of allegations that defendants

sold stock during the class period "cuts the other way"); *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (finding no inference of scienter because the individual defendants "shared the pain" when the stock dropped).

### B. A Nonculpable Inference Under *Tellabs* Is More Compelling Than Fraud

The court must decide if a reasonable person construing Plaintiffs' threadbare allegations "as a whole would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Ellis*, 2018 WL 1583837, at *12. Plaintiffs' scienter allegations amount to the implausible inference that "Defendants did not intend for the NDA to be approved when they submitted it to the FDA or they hoped that the NDA would be approved based upon a review of the prior immunotherapy subgroup." (Compl. ¶ 109.) Plaintiffs' do not explain *why* Array would make the substantial investment necessary to submit an NDA to the FDA only to hope that it would be rejected. That theory is, of course, implausible on its face. *See Harrington*, 2017 WL 1946305, at *6 (finding no strong inference of scienter because "when a pharmaceutical company 'ma[kes] the investment necessary to design and perform a study," the company 'must have thought that positive results were possible, even if not probable'") (citations omitted). And Plaintiffs allege *no* particularized facts indicating that Defendants did not in fact expect FDA approval for binimetinib based on the NEMO trial results meeting its primary endpoint.

More plausible is the opposing nonculpable inference that Array honestly believed that the FDA would approve the binimetinib NDA based on the primary endpoint of PFS being met in the broader population, while at the same time cautioning investors to interpret the better outcomes shown in the prior immunotherapy subgroup with care. That cautious

statement was consistent with publicly-available FDA guidance stating that the FDA would consider this secondary data in the context of demonstrating consistency with the results in the overall study population.  Array's inability to accurately predict the FDA's view of that data -- and ultimately its decision to withdraw the NDA -- is not securities fraud.  *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d at 546 (finding nonculpable inference that defendants believed their interpretation of the data and did not anticipate that the FDA would adopt a different view more compelling than inference of fraud).

### III.   COUNT II ALLEGING CONTROL PERSON LIABILITY SHOULD BE DISMISSED BECAUSE THERE IS NO PREDICATE EXCHANGE ACT VIOLATION

Because Plaintiffs fail to allege "a primary violation of the securities laws," as demonstrated above, "their Section 20(a) claim is also not viable."  *Ellis*, 2018 WL 1583837, at *14 (*citing Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998).)

### CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss should be granted in its entirety, and the Complaint should be dismissed with prejudice.

Dated:  June 11, 2018

Respectfully submitted,

*/s/* Holly Stein Sollod

Holly Stein Sollod
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, Colorado 80202-3979
Telephone: (303) 295-8085
Facsimile: (303) 975-5395
hsteinsollod@hollandhart.com

/s/ James R. Carroll

James R. Carroll
Michael S. Hines
Rene H. DuBois
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800
Facsimile: (617) 573-4822
james.carroll@skadden.com
michael.hines@skadden.com
rene.dubois@skadden.com

Counsel for Defendants
Array BioPharma, Inc., Ron Squarer,
Victor Sandor and Jason Haddock

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 11, 2018, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF systems which will send notification of

such filing to the following e-mail addresses:

> jeff@jberenslaw.com
> nporritt@zlk.com
> mgruesbeck@zlk.com

> > */s/* James R. Carroll
> > James R. Carroll
> > SKADDEN, ARPS, SLATE,
> >    MEAGHER & FLOM LLP
> > 500 Boylston Street
> > Boston, Massachusetts 02116
> > Telephone: (617) 573-4800
> > Facsimile: (617) 573-4822
> > james.carroll@skadden.com
> >
> > Counsel for Defendants
> > Array BioPharma, Inc., Ron Squarer,
> > Victor Sandor and Jason Haddock