IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02789-KLM (Consolidated with Civil Action No. 17-cv-02848-STV)

PETER VOULGARIS,
WENDELL ROSE, and
ROBERT NAUMAN,

      Plaintiffs,

v.

ARRAY BIOPHARMA INC.,
RON SQUARER,
VICTOR SANDOR, and
JASON HADDOCK,

      Defendants.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on **Defendants' Motion to Dismiss the Consolidated Class Action Complaint** [#32][1] (the "Motion"). The Court has reviewed the Motion [#32], the Response [#35], the Reply [#38], the Appendices [#33, #36], the Notices of Supplemental Authorities and the Response thereto [#37, #41, #42], the case file and the applicable law, and is sufficiently advised in the premises. For the reasons stated below, the Motion [#32] is **DENIED**.

---

[1] [#32] is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

## I.  Introduction

This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Array Biopharma Inc. ("Array") common stock between December 16, 2015, and March 17, 2017, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  *Consolidated Class Action Compl. for Violations of the Federal Securities Law ("Compl.")* [#27] ¶ 1.  Plaintiffs assert that Array intentionally misled investors about one of its cancer drugs, binimetinib, and the likelihood of binemetinib's approval by the Food and Drug Administration.  *Id.* ¶ 13.

The Motion [#32] seeks to dismiss this case on the basis that Plaintiffs do not allege a material misstatement or omission or specific facts giving rise to a strong inference of scienter.  The Motion [#32] also seek to dismiss the claim alleging control person liability because there is no predicate Exchange Act violation.  Defendants argue that this case "involves an all too common scenario: (i) a pharmaceutical company submits a New Drug Application ('NDA') seeking Food and Drug Administration ('FDA') approval of a promising drug to treat a debilitating disease, (ii) the drug does not get approved, (iii) the company's stock price declines following non-approval, and (iv) a plaintiff reflexively files a securities class action claiming 'fraud' based on nothing more than speculation and hindsight."  *Id.* at 1.[2]  Defendants further assert that Plaintiffs rely on information that became available later in time, but argue that this information was known earlier by company executives who conspired to withhold that information from the market.  *Id.*  The Motion [#32] concludes that this case is baseless and should be dismissed with prejudice.  *Id.*

---

[2]  The page numbers cited to are those in the filed documents, not the page numbers as stated in CM/ECF.

Plaintiffs respond that the fundamental purpose of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 is to protect public investors by requiring companies and individuals to provide "full disclosure" when selling securities. *Response* [#35] at 1. According to Plaintiffs, Defendants violated these laws by making materially misleading statements/omissions about data from a clinical trial of binemetinib, providing the public with only the positive data and not the negative data. *Id.* This alleged fraud permitted Array to raise $132 million from the public, "funds that were critical for Array's survival as well as the careers of the individual Defendants." *Id.* When full disclosure was belatedly made about the results of the clinical trial, Plaintiffs allege that they and other Array investors lost more than $240 million. *Id.* Had Array investors been given the full information about the clinical trial, Plaintiffs contend that they would have had the opportunity to make a fully informed decision about investing in Array as intended by Congress when it enacted the Exchange Act and the SEC when it promulgated Rule 10b-5. *Id.* More specifically, Plaintiffs assert that Defendants engaged in a scheme that "(i) deceive[d] the investing public, including Plaintiffs" as alleged in the Complaint; "(ii) artificially inflate[d] and maintain[ed] the market price of Array securities; and (iii) cause[d] Plaintiffs and other members of the Class to purchase Array securities at artificially inflated prices." *Compl.* [#27] ¶ 133. Plaintiffs aver that Defendants should be held liable for the losses suffered as a result. *Response* [#35] at 1.

## II.  Factual Background

Array is a biopharmaceutical company focused on the discovery, development, and commercialization of targeted small molecule drugs to treat patients afflicted with melanoma skin cancer. *Compl.* [#27] ¶ 2. The cancer drug binimetinib was Array's lead

drug candidate during the Class Period at issue, and was integral to several of Array's clinical trials. *Id.* ¶¶ 32, 33. Binimetinib is a late-stage small molecule inhibitor, designed to treat certain cancers by disrupting their cellular activities, including cancer cell proliferation. *Motion* [#32], Tab 9, June 30, 2016 Form 8-K.[3]

Specifically at issue in this case are statements that Array made to the public about a Phase 3 clinical trial of binemetinib, referred to as "NEMO" (**N**RAS M**E**LANOMA AND **M**EK INHIBIT**O**R). *See Compl.* [#27] ¶ 34. The Phase 3 NEMO trial was "designed to compare the efficacy of binimetinib with dacarbazine[4] in patients (either treatment-naïve or having received previous immunotherapy)." *Id.* "The primary endpoint [of the NEMO trial] was progression-free survival ('PFS') (defined as time from randomization until progression according to blinded independent central review or death)." *Id.* In addition to the PFS data, Plaintiffs assert that Array designed the NEMO study to record "secondary endpoint" data. *See Response* [#35] at 5. Secondary end-points are metrics used in a

---

[3] Documents that may be considered on a Rule 12(b)(6) motion without converting the motion to a summary judgment motion include: "(1) documents that the complaint incorporates by reference, . . .; (2) 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the document's authenticity,' . . .; and (3) 'matters of which a court may take judicial notice[.]'" *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (citation omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (applying this rule in a securities fraud case). The documents and materials the Court considers in this Order, including filings with the SEC and documents published by the FDA, fall within this rule. Courts have taken judicial notice of such documents on a motion to dismiss a securities fraud claim. *See, e.g., Sciortino v. Pepsico, Inc.*, 108 F. Supp. 3d 780, 791 n. 2 (N.D. Cal. 2015) (citing cases); *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, No. 04-CV-1030-RPM, 2005 WL 4161977, at \*2 (D. Colo. Oct. 20, 2005). Nevertheless, various courts have held that when the FDA documents "to be noticed contain disputed facts, a court should notice the documents for their existence, not for the truth of the disputed facts." *Sciortino*, 108 F. Supp.3d at 791 n. 2 (citing cases).

[4] Dacarbazine, as a chemotherapy drug already approved and used by the medical community, provided a baseline against which Array was able to measure binimetinib's efficacy. *See Response* [#35] at 5.

study to collect evidence showing the "clinical benefit" of a drug. *Id.* Studies involving cancer drugs have standard secondary end-points, per FDA guidance. *See id.* (citing *Addendum* [#33], Tab 1).[5] Overall survival was a secondary endpoint (defined as time from randomization until death from any cause). *Compl.* [#27] ¶39. Other secondary endpoints included such things as ECOG performance status (or ECOG PS),[6] deterioration-free survival (DFS),[7] and quality of life. *See Compl.* [#27] ¶ 54; *Response* [#35] at 6.

Array and Defendant Ron Squarer ("Squarer"), Array's Chief Executive Officer ("CEO"), discussed the NEMO study data on several occasions during the Class Period in presentations, conferences, and public documents, allegedly touting the NEMO trial "as 'the first trial to ever meet a PFS endpoint in patients with advanced NRAS-mutant melanoma.'" *Compl.* [#27] ¶ 41; *see also* ¶¶ 40, 101.[8] According to Array, the study found binimetinib extended median progression-free survival, the study's primary endpoint, to 2.8 months, as compared with 1.5 months observed with dacarbazine. *Id.* ¶41. Array also "noted that, in a pre-specified subset of patients who received prior treatment with immunotherapy,

---

[5] Guidance for Industry Clinical Trial Endpoints for the Approval of Cancer Drugs and Biologics.

[6] Defendants note that this term refers to standard criteria for measuring how a disease is progressing and affecting a patient's daily living activities. *Motion* [#32] at 10 (citing ECOG-ACRIN Cancer Research Group, ECOG Performance Status *available at* http://ecog-acrin.org/resources/ecog-performance-status (last visited June 11, 2018)). Plaintiffs state that this measures a patient's functional status. *Response* [#38] at 6. The Court finds this is a distinction without a difference for purposes of the Motion [#32].

[7] According to Plaintiff, DFS was the time between the first dose and death due to any cause or a decrease in ECOG PS by at least one category point. *Response* [#35] at 6.

[8] This occurred, for example, at a January 14, 2016 JPMorgan Healthcare Conference; in a February 2, 2016 press release; in a February 2, 2016 Second Quarter Earnings Conference Call; a May 3, 2016 press release; a May 3, 2016 Third Quarter Earnings Conference Call; and a June 9, 2016 Jefferies Healthcare Conference. *Id.* ¶ 43.

patients who received binimetinib experienced 5.5 months of median PFS, compared with 1.6 months for those receiving treatment with dacarbazine." *Id.* Plaintiffs allege from the foregoing "that Array represented to the public that NEMO had proven binimetinib to be a success." *Id.*

Based upon the "top-line" results from the NEMO trial, which Squarer referred to as "positive[,]" Array stated in a press release on December 16, 2015 that it would be proceeding with a New Drug Application ("NDA") for binimetinib. *Compl.* [#27] ¶¶ 42, 101. After the announcement that it would proceed with the NDA, Array's stock price jumped from $3.83 on December 15, 2015 to close at $4.62 on December 16, 2015 on exceptionally high trading. *Id.* ¶ 43.

Array submitted the NDA to the FDA on June 30, 2016. *Compl.* [#27] ¶ 4. On September 28, 2016, Array filed a Prospectus Supplement on Form 424B5 with the SEC announcing a public offering of 18,400,000 shares of its common stock at a public offering price of $6.25 per share. *Id.* ¶ 82. Plaintiffs allege that the money Array raised from the offering ($132.25 million) allowed it to generate enough capital to maintain operations while its other late-stage drug candidate advanced towards FDA-approval. *See Response* [#35] at 13; *Compl.* ¶¶ 84, 112.

The Prospectus Supplement referenced in the previous paragraph told investors, among other things, that Array had submitted its NDA for binimetinib "based on results of the NEMO study[,]" and that the FDA had accepted Array's NDA on September 1, 2016. *Compl.* [#27] ¶ 82. Array again described the NEMO study data, telling investors that the NEMO data showed that "binimetinib extended median PFS at 2.8 months, as compared with 1.5 months observed with dacarbazine." *Id.* The Prospectus Supplement also

-6-

provided information about some of the NEMO study's secondary end-point data, including: (i) the PFS results in the "pre-specified subset of patients who received prior treatment with immunotherapy" (5.5 months of median PFS in binimetinib arm compared with 1.6 months in dacarbazine arm); (ii) the "Confirmed ORR [objective response rate]" of 15% in binimetinib patients compared with 7% in dacarbazine patients; "DCR [disease control rate] of 58% in binimetinib patients compared with 25% in dacarbazine patients; and (iii) "mOS [median overall survival]" of 11 months in binimetinib patients compared with 10.1 months in dacarbazine patients. *Id.* Additionally, Array represented that: (i) binimetinib was "generally well-tolerated and the adverse events reported were consistent with previous results in NRAS-mutant melanoma patients[,]" and (ii) binimetinib demonstrated significant improvement in the secondary endpoints of ORR and disease control rate, or DCR, and the "numerical trend in median overall survival, or mOS, favored the binemetinib arm." *Id.*

Plaintiffs aver that Defendants' statements to the public, including the statements in the Prospectus Supplement, were materially false and/or misleading because they concealed the true nature of the NEMO data from investors. *Compl.* [#27] ¶ 83. Thus, despite the fact that binimetinib met its primary endpoint as to PFS and Array's discussion of both primary and secondary study data, the Prospectus Supplement did not include any discussion of the negative secondary data concerning ECOG PS, DFS, and quality of life. *See id.* According to Plaintiffs, the NEMO data showed decreases in performance status and that long-term prognosis for binimetinib was worse than for dacarbazine. *Id.* Further, this data allegedly showed that binimetinib was barely more effective versus approved drugs already on the market, and that the quality of life during the brief period of "progression free survival" was drastically poor. *Id.* ¶ 5. This information severely

undermined (if not outweighed) the benefits associated with the slight increase in PFS (the primary endpoint).   *Id.* ¶¶ 83, 5.   In addition, the evidence allegedly showed that "binimetinib proved far more beneficial to patients who had received prior treatment with an immunotherapy ("IO") as opposed to those who had not (or were 'treatment naïve,' as Array referred to them)."   *Id.* ¶ 6.

In support of the allegations in the previous paragraph, Plaintiffs rely on a report by the European Medical Agency ("EMA"),[9] addressing an application based on the same NEMO data from one of Array's collaborators, a European company named Pierre Fabre. *Compl.* [#27] ¶¶ 5, 55.[10]   Plaintiffs aver that the processes used by the EMA to approve drugs in the European Union are largely identical to those of the FDA.   *Compl.* [#27] ¶ 56. The EMA findings, published in a November 9, 2017 Assessment Report, concluded that the negative data relating to functionality and rate of deterioration was so detrimental that it essentially eliminated the clinical benefit of the drug.   *See id.* ¶ 63.   Further, the EMA stated that "[b]ased on the review of the data on quality, safety and efficacy," Pierre's Fabre's application "is not approvable since *'major objections' have been identified, which preclude a recommendation for marketing authorisation at the present time."*   *Id.* ¶ 58. Given these findings, which Plaintiffs assert were essentially a rejection of the application, Pierre Fabre withdrew the application.   *Id.*; *see also Response* [#35] at 7 n. 1.   While the EMA report was issued after the relevant Class Period and after Array withdrew the NDA

---

[9]   The Court considers the EMA Report as it is referenced in the Complaint and is central to Plaintiff's claims.   *Gee*, 627 F.3d at 1186.

[10]   Pierre Fabre owned the European license for binemetinib, but submitted the application under the name Mektovi.   *Id.* ¶¶ 55, 58.  The EMA noted that the international non-proprietary name for the drug being evaluated was binemetinib (*Appendix* [#33],Tab 25 at 1), and the data analyzed by the EMA was the data from the NEMO study for that drug.

for binemetinib, Plaintiffs allege that Defendants and the FDA had access to the same data that the EMA did (including the negative secondary data), and that Defendants presented the NEMO trial data, showing that they had knowledge of it, on multiple occasions within the Class Period. *See Compl.* ¶¶ 64, 101-02. The EMA report and Plaintiffs' arguments regarding the materiality of Defendants' omissions regarding the negative NEMO data that it evaluated are discussed in more detail in Section IV.A, *infra.*

Additionally, Plaintiffs aver that Array's and Squarer's statements were misleading in that they concealed the fact that Array was attempting to have the FDA approve binimetinib for a different indication from the one submitted on Array's NDA: an indication for post-immunotherapy patients only based on the more favorable data obtained from this patient stratum during the NEMO study. *Compl.* [#27] ¶ 83. According to Plaintiffs, Defendants changed the indication to the narrower subset of post-immunotherapy patients because they knew that the NEMO data presented an obstacle for FDA approval of binimetinib, at least when considering the entire patient population data (and despite meeting the study's primary endpoint of PFS). *Id.* ¶¶ 5, 8, 53. Plaintiffs assert that this meant that Defendants were improperly attempting to obtain approval of binimetinib for a patient indication different from what was initially stated in the NDA. *Id.* ¶¶ 11, 83. This change allegedly substantially increased the risk of the FDA rejecting the NDA, and made chances of approval of the NDA "exceeding low." *Id.* ¶¶ 10, 83; *see also* ¶ 11 ("This tactic [of changing the indication] was highly improper under FDA regulations and all but guaranteed that the FDA would reject the NDA.").

The Complaint alleges that "[i]n light of the truth behind the NEMO data and the binimetinib NDA, Defendants' statements during the Class Period were materially

misleading." *Compl.* [#27] ¶ 11.  Plaintiffs aver on this issue:

> Throughout the Class Period, Defendants told the public that the NDA for binimetinib had been submitted with the support of complete NEMO data for both the treatment naïve and post-IO subgroups. However, these statements concealed the truth that Defendants either: (i) did not intend for the NDA to be approved when they submitted it to the FDA; or (ii) they were hoping that the FDA would approve the NDA for an indication that was different than the one initially stated (based upon a review of the prior immunotherapy subgroup).  ***In either event, Defendants' statements about the binimetinib NDA were materially misleading because they concealed from investors a number of then-existing facts that all suggested that the risk of FDA disapproval was much greater than they let on*.**  Given the implications of this strategy, Plaintiffs had a right to know this information so that they could have accurately evaluated the risks associated with Array's NDA and buying Array's stock in general.

*Id.* ¶ 13.  Again, the statements and omissions that are alleged to be materially misleading are discussed in more detail in Section IV.A, *infra*.

After meeting with the FDA to discuss the NDA on March 17, 2017, Array announced in a press release that it was withdrawing the NDA on March 19, 2017. *Compl.* [#27] ¶ 10. Plaintiffs allege that the public discovered on that date what Array had attempted to do and, importantly, that Defendants had been lying to them over the course of the Class Period. *Id.* ¶ 14.  Thereafter, and in response to disclosures and criticisms by analysts from major investment banks, the price of Array's common stock fell precipitously from $10.56 per share to $9.13 per share over the course of two trading days between March 17 and March 21, 2017. *Compl.* [#27], ¶¶ 15-16, 94-99.  Array lost more than $240 million in market capitalization during this short period. *Id.* ¶¶ 15-16.  Moreover, Plaintiffs allege that they and other similarly situated investors lost significant amounts of money by buying their shares at artificially inflated prices during the Class Period. *Id.* ¶ 17.  Had the public known

the truth about the binimetinib NDA, Plaintiffs aver that the price of Array's stock would have been less and, as a result, the investors would not have overpaid for their shares. *Id.*

In addition to Array, the other Defendants are CEO Squarer, Victor Sandor ("Sandor") (Array's Chief Medical Officer ("CMO")), and Jason Haddock ("Haddock") (Array's Chief Financial Officer ("CFO")) (the "Individual Defendants"). *Compl.* [#27] ¶¶ 1, 26-28. Plaintiffs allege that Defendants "engaged in a plan, scheme, conspiracy and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit. . .; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities." *Id.* ¶ 133.

The Complaint [#27] further alleges that each Individual Defendant was provided with copies of Array's reports and press releases alleged to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. *Id.* ¶¶ 29, 134. Plaintiffs assert that because of the Individual Defendants' positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified in the Complaint [#27] had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading. *See, e.g., id.* at ¶¶ 29, 133-137, 142-145. Thus, the Individual Defendants are alleged to be liable for the false statements pleaded in the Complaint. Plaintiffs allege that Array is liable for the acts of the Individual Defendants under the doctrine of respondeat

superior and common law principles of agency "as all the wrongful acts complained of. . . were carried out within the scope of their employment with authorization."  *Id.* ¶ 30.

### III.  Standard of Review

### A.    Rule 12(b)(6)

Rule 12(b)(6) tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).  To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations."  *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[P]lausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiff[ ] [has] not nudged [his] claims across the line from conceivable to plausible."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (internal quotations and citations omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  However, "[a] pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do.  Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (citation omitted).  That said, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests;" the 12(b)(6) standard does not "require that the complaint

include all facts necessary to carry the plaintiff's burden."  *Khalik*, 671 F.3d at 1192.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (citation omitted).  As the Tenth Circuit has explained, "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (citation omitted).

## B.    Rule 9(b), the Private Securities Litigation Reform Act ("PSLRA"), Section 10(b) of the Exchange Act and Rule 10b-5

Securities fraud claims are also subject to the heightened pleading requirements of both Rule 9(b) and the PSLRA.  Fed. R. Civ. P. 9(b) states, "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity."  The Tenth Circuit has held that "Rule 9(b) does not require that a complaint set forth detailed evidentiary matter as to why particular defendants are responsible for particular statements, or that the allegations be factually or legally valid.  Instead, Rule 9(b) requires that the pleadings give notice to the defendants of the fraudulent statements for which they are alleged to be responsible."  *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1253 (10th Cir. 1997).  Thus, "a complaint must identify the time, place, and content of each allegedly fraudulent representation or omission, identify the person responsible for

it, and identify the consequences thereof[,]" i.e., "'the   what, when, where and how.'" *Caprin v. Simon Transp. Servs., Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997).

As to a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must plead: (1) a misrepresentation or omission of material fact; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; and (5) loss causation and economic loss.  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997).  Prior to 1995, Rule 9(b) "set the standard for the level of particularity required when pleading the elements of a securities fraud claim."  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).  "In 1995, Congress "heightened the pleading standard for federal securities fraud with the passage of the PSLRA."  *Id.*

The PSLRA requires the complaint in a securities fraud action under Rule 10b-5 to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement is made on information or belief, the complaint shall state with particularity all facts on which that belief is stated."  15 U.S.C. § 78u-4(b)(1).  According to the Tenth Circuit,  "the PSLRA increased the burden on a plaintiff's pleading of the first element of a securities fraud action: the allegation that the defendant made a false statement, or failed to state a material fact necessary to make statements made not misleading."  *Adams*, 340 F.3d at 1095.  Second, the Tenth Circuit heightened the standard for pleading the scienter element of a securities fraud claim.  *Id.*  While Rule 9(b) permits malice, intent, knowledge, and other conditions of mind to be averred generally, the PSLRA imposes a "more stringent requirement" with respect to state of mind.  It requires that "[i]n any private action arising under this chapter

-14-

in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2); *see also Ellis v. Spectranetics Corp.*, No. 15-CV-01857-KLM, 2018 WL 1583837, at *7 (D. Colo. Apr. 2, 2018) (dismissing securities fraud complaint that failed to allege sufficient facts to create an inference of scienter that was at least as strong as any opposing inference).

## IV.  Analysis

The Court now turns to whether Plaintiffs have satisfied the elements of their securities frauds claims and met the heightened pleading requirements of both Rule 9(b) and the PSLRA.  Defendants challenge Plaintiffs' allegations with regard to the first and third elements only, *i.e.,* whether Plaintiffs have plausibly plead a misrepresentation or omission of material fact (also referred to as the falsity element) and scienter.  *See Motion* [#32] at 11.  The Court thus finds for purposes of the Motion [#32] that Defendants have conceded the other elements, and does not address those elements in this Order.

### A.    The Materiality Element

The gravamen of the Complaint [#27] as to the materiality element is that, first, Defendants made materially false and/or misleading statements and/or omissions about the NEMO study and the clinical benefits by disclosing only positive data from the NEMO study and failing to disclose negative material information.  *See id.* ¶ 65.  Second, Plaintiffs aver that because the negative data did not support the broad indication stated on Array's NDA, Array concealed that Defendants intended to seek approval for a more narrow indication (post-immunotherapy only).  *Id.*  Defendants argue that neither of Plaintiffs'

contentions support a claim under Section 10(b).  *See Motion* [#32] at 19.  The Court thus turns to that issue.

### 1.    The NEMO Study Data and Defendants' Alleged Omission of Negative Data

As noted previously, Plaintiffs contend that Defendants discussed positive data from the NEMO Study, and in particular, PFS data, while omitting material negative information about secondary data such as ECOG performance status, DFS, quality of life, tolerability, and toxicity which would have alerted investors that binemetinib did not have a "clinical benefit" and was unlikely to be approved by the FDA.  *Compare Compl.* [#27] ¶¶ 40-42 (public statements about PFS data) *with* ¶¶ 58-64 (EMA's description of negative secondary data).  Plaintiffs aver that the FDA's decision to approve binimetinib depended upon the drug's "clinical benefit," i.e., whether the benefits it provided to patients outweighed the risks.  Thus, Plaintiffs allege that an NDA must show "substantial evidence" that the drug is safe and effective at treating the condition it purports to treat.  *Id.* ¶¶ 45-46, 52.  In the case of binimetinib, Plaintiffs aver that the NEMO study data showed that the drug's clinical benefit was insufficient.

More specifically, Plaintiffs allege that the analysis of the NEMO study data by the EMA revealed that the secondary, patient-reported data "severely undermined (if not outweighed) the benefits associated with the statistically significant increase in PFS.*"* *Compl.* ¶¶ 54, 67.  On one hand, the data showed that binimetinib provided patients with 1.3 months of additional "progression-free survival" or "PFS" compared to a traditional chemotherapy treatment, dacarbazine.  On the other hand, the data showed that treatment with binimetinib resulted in faster deterioration of functionality, poorer quality of life, and

shorter overall survival.  *See Resp.* [#35] at 2; *Compl.* [#27] ¶¶ 58-63.  The EMA concluded on that issue:

> The currently observed 1.32-month prolongation in median PFS over dacarbazine, without an improvement in overall survival, is not considered sufficient evidence of benefit in the proposed patient population. The observed benefit does not override concerns regarding the tolerability of binimetinib in the proposed patient population and the possible negative impact on the health (+/- quality of life) of these patients.

*Compl.* [#27] ¶ 63.  Again, while Plaintiffs acknowledge that the EMA report post-dated the Class Period by several months, they note that the EMA analyzed the same NEMO data that Array submitted to the FDA during the Class Period (*id.* ¶ 55).

Plaintiffs aver that, as Array completed the NEMO study prior to the start of the Class Period and discussed the NEMO study data during analyst presentations and investor conference calls (*Compl.* [#27 ¶¶ 42, 43, 101), it can plausibly be inferred that Defendants knew what the study data showed—both the positive data and negative data—at the time of the alleged misleading statements.  As such, Plaintiffs allege that Defendants knew that the NEMO data posed a significant and grave risk that the FDA would not approve the NDA (despite meeting PFS, the study's primary endpoint.)  *Compl.* [#27] ¶¶ 4-5.

Defendants assert, on the other hand, that the alleged omission of the negative NEMO study data does not meet the requirement of a misrepresentation or omission of material fact for several reasons.  *See Motion* [#32] at 13-17.  First, they argue that Plaintiffs fail to allege any particularized facts as to how any omitted information about secondary data such as "quality of life" or "performance status" was material.  *Id.* at 13-15.  In fact, Defendants assert that the omitted information was not material as a matter of law based on the FDA's Guidance Documents.  *Id.* at 14.  Next, Defendants argue that Plaintiffs'

allegations about the materiality of this omitted secondary data rely exclusively on selected portions of a report issued by the EMA, and that the report does not support their claim because the EMA disclaimed any reliance on the data as conclusive or interpretable. *Id.* at 15-16; *see also* Tab 25, EMA Assessment Report. Finally, Defendants argue that Plaintiffs do not allege how any omission of this secondary trial data rendered false or misleading the statement that "[b]inimetinib significantly extended median progression-free survival (PFS), the study's primary endpoint, as compared with dacarbazine," or other statements made by Array about the study as alleged in the Complaint [#27] (*see, e.g.*, ¶¶ 68, 70, 72,74, 76). *Motion* [#32] at 16-17. Related to that argument, Defendants argue that they had no duty to disclose such information because they did not put it into "play." *See Reply* [#38] at 6. The Court now turns to these arguments.

### a.   Whether Plaintiffs Have Stated Particularized Facts Showing that the Omitted Information was Material

The Court first addresses Defendants' argument that Plaintiffs have not pled any particularized facts demonstrating that Defendants omitted any material facts about the binimetinib trial data or that such omissions undermined Defendants' optimism about FDA approval. *Motion* [#32] at 3. The Court reiterates that to state a claim for securities fraud based on purported omissions, Plaintiffs must allege an omission of a material fact that was necessary to make a particular statement not misleading in light of the circumstances in which it was made. 15 U.S.C. § 78u-4(b)(1). Further, a defendant must have a duty to disclose the information, and the undisclosed information must be material. *Employees' Ret. Sys. of Rhode Island v. Williams Cos, Inc.*, 889 F.3d 1153, 1164 (10th Cir. 2018). Thus, "Rule 10b-5 does 'not create an affirmative duty to disclose any and all material

information.    Disclosure is required under [the Rule] only when necessary to make statements made, in the light of the circumstances in which they were made, not misleading.'"  *Id.* (quotation omitted); *see also McDonald v. Kinder–Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (a duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement).

An omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted information would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quotations omitted).  In other words, "the test for whether a statement is misleading is not whether in retrospect an investor might have wanted to know the omitted information, but whether additional material information was necessary at the time to make a statement reflect the true state of affairs."  *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1201 (10th Cir. 2013).  Materiality is a "mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  "Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law . . . ."  *Id.*; *see also Garcia v. Cordova*, 930 F.2d 826, 829 (10th Cir. 1991).

Defendants assert that while Plaintiffs characterize the negative secondary outcomes such as "quality of life" and"performance" status as important (*Compl.* [#27] ¶ 54), and assert that "the FDA would undoubtedly address" those issues when evaluating Array's NDA (*id.* ¶¶ 53, 73), missing from the Complaint are particularized *facts* supporting Plaintiffs'

claims of materiality of this information to both the FDA and investors. *Motion* [#32] at 14. These arguments are rejected. Contrary to Defendants' argument, the Court finds that the Complaint [#27] in this case contains particularized facts supporting Plaintiffs' assertion as to the materiality of the secondary data that was omitted in Defendants' statements about the NEMO study. Plaintiffs have alleged that the negative (secondary) NEMO study data was so important that it led the EMA to find that the application of Array's partner/collaborator Pierre Fabre for binimetinib "was not approvable" due to the identification of "major objections . . . which preclude a recommendation for marketing authorisation. . . ." *Compl.* [#27] ¶ 58. Thus, the EMA, which Plaintiffs have alleged evaluates and supervises medicines and drugs within Europe, analyzed the NEMO study data and concluded that the negative data relating to functionality and rate of deterioration was so detrimental that it eliminated the clinical benefit of binimetinib. *See id.* ¶¶ 58-64; *Response* [#35] at 8.

While the Complaint does not provide information about what specific issues or concerns the FDA addressed with Array before it withdrew the NDA, it can plausibly be inferred from the Complaint [#27] that the FDA also found that the clinical benefit of binimetinib was insufficient for approval. The Complaint [#27] references Array's statement in a press release of March 19, 2017 that "*based on thorough discussions and communications with the FDA*" and *"based on feedback with the agency*, Array concluded that the clinical benefit demonstrated in the Phase 3 NEMO clinical trial would not be found sufficient to support approval" of the binimetinib NDA. *Id.* ¶ 94 (emphasis added). This shows, contrary to Defendants' argument, that Plaintiffs have pled allegations as to what the FDA believed or told Array. *See Reply* [#38] at 10. It can plainly be inferred from the

above allegation that Array determined to withdraw the binimetinib NDA based on the fact that the FDA communicated to it that the clinical benefit of the NEMO study was not sufficient for approval of the NDA. Moreover, given the fact that the FDA had the same data from the NEMO trial that the EMA later analyzed, it can plausibly be inferred that the FDA's concerns regarding the insufficiency of the clinical benefit were based on the same negative secondary data that the EMA's report discussed.

The Court additionally notes that materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 45 U.S. 224, 240 (1988). The Court finds for purposes of the Motion [#32] that "'disclosure of the omitted [secondary outcomes as discussed by the EMA in its Assessment Report] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available'" about the likelihood of the FDA approving the NDA. *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, No. 04-CV-1030-RPM, 2005 WL 4161977, at *7 (D. Colo. Oct. 20, 2005) (quoting *Levinson*, 485 U.S. at 231-32).

Defendants argue that Judge Matsch's decision in *Noble* supports, rather than detracts from, their position. *Reply* [#38] at 10 n. 4. The Court disagrees, finding the case distinguishable. In that securities fraud case, as in this one, a drug company submitted an NDA to the FDA after phase 3 testing of a drug. 2005 WL 411977, at *1. The plaintiff asserted that a press release issued by the defendants and other statements the defendants made "falsely portrayed the results of the clinical trials and thereby created a perception in the stock market that the FDA would approve [the drug] in the near future." *Id.* As to materiality, the plaintiff asserted that the defendants misled the public by describing the clinical trial results as "compelling," "consistent," "significant," "strong," and "positive." *Id.* at

-21-

*11. Judge Matsch noted that statements of "corporate optimism" or "mere puffing" are not considered to be material. *Id.* Moreover, he stated that the defendants' positive statements were made in the context of a situation where they fully disclosed the results of the clinical trial, warned the investors that it was uncertain whether regulatory approval would be obtained, and the FDA's unpublished guide documents stated that the type of analysis submitted for approval in most cases would not support a conclusion about efficacy. *Id.* at *12. In that context, the Court concluded that "the defendant's positive characterization of the test results . . . [was] not material in light of the total mix of information available to investors." *Id.*[11] Unlike the investors in *Noble*, Plaintiffs do not base their claims on the type of optimistic language at issue there and, more importantly, Plaintiffs aver they were not aware at the time of Defendants' misleading statements that FDA approval was unlikely. Instead, Plaintiffs allege that Defendants concealed material, negative data that directly contradicted the impression they created in terms of binimetinib's supposed "clinical benefit." *Compl.* [#27] ¶¶ 53-64.

Finally as to the issue of whether Plaintiffs supported their argument about how the omission of negative data was material with particularized facts, the Court finds helpful the factors the Tenth Circuit articulated in *Adams.* The *Adams* court stated that in determining whether, taken as a whole, the plaintiff's allegations "support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading," the Court should consider the following factors: "(1) the level of detail provided by the facts stated in a

---

[11] Given this clearly defined factual situation delineated by Judge Matsch, the Court rejects Defendants' argument that *Noble* should be construed more broadly as holding that a failure to disclose that a clinical trial did not meet its primary endpoint is not actionable as immaterial. *See Reply* [#38] at 15 n. 4.

complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading." 340 F.3d at 1099; *see also Ellis*, 2018 WL 1583837, at \*3 (analyzing these factors).

Here, as to factors one and two, the level of detail and number of facts provided, Plaintiffs support their allegations with numerous, precise clinical data from the NEMO study, specifying exact results concerning PFS, ECOG PS, and DFS, among other things, as well as explain how the negative data was so detrimental that it essentially eliminated the clinical benefit of binimetinib. *Compl.* [#27] ¶¶ 54-64. Thus, the first two *Adams* factors weigh in Plaintiffs' favor. The third, fourth, and fifth factors—coherence and plausibility, source of information, and reliability of sources—also favor Plaintiffs. Plaintiffs' source of information is the EMA, which had direct access to the NEMO study data, and Defendants have not disputed the reliability of the EMA's findings. Again, while Defendants challenge the timing of the EMA's report on the basis that it was released eight months after Defendants made the misleading statements at issue, they do not explain why the EMA's analysis of the NEMO study data should be discounted or ignored, and that argument is implausible given that the EMA's report contained the NEMO study data as it existed during the Class Period and was provided to the FDA. *See id.* ¶¶ 55-74. Finally, with regard to the sixth *Adams* factor—other indicia supporting the conclusion that a reasonable person would have been misled—Plaintiffs quote public reactions from analysts showing that people were, in fact, misled. *Id.* ¶ 96.

Based on the foregoing, the Court rejects Defendants' argument that Plaintiffs failed to state particularized facts showing that the omitted information about the negative secondary data was material.

### b.   The Relevance of the FDA Guidance Documents to the Materiality Issue

The Court next turns to Defendants' arguments that the secondary data is not material because the FDA would not consider the data in making its decision regarding approval of the NDA.  According to Defendants, the FDA's publicly-available guidance on the use of secondary outcomes to support drug approval confirms that the FDA would *not* have considered these secondary outcomes as "important" measures for approving binimetinib, as the FDA states that secondary outcomes such as "quality of life" have "not served as primary efficacy endpoints in oncology approvals" (see Appendix [#33], Tab 1-FDA Guidance[12] at 10), and are "too general and undefined to be considered appropriate for a medical product claim" (*id.*, Tab 2-FDA Guidance[13] at 33).  *Motion* [#32] at 14.  The Court also rejects this argument.

First, the Court questions the extent to which Defendants' reliance on the FDA Guidance Documents is proper, as the documents cited by Defendants in the Appendix [#33] at Tabs 1 and 2 expressly state that they do "not operate to bind" the FDA, and contain "[n]onbinding Recommendations."  *Id.* at 1.  The Court also disagrees with Defendants'

---

[12] FDA Guidance for Industry Clinical Trial Endpoints For the Approval of Cancer Drugs and Biologics, *available at* https://www.fda.gov/downloads/Drugs/Guidances/ucm071590.pdf.

[13] FDA, Guidance for Industry Patient-Reported Outcome Measures: Use in Medical Product Development to Support Labeling Claims, December 2009, *available at* https://www.fda.gov/downloads/drugs/guidances/ucm193282.pdf.

interpretation of the FDA Guidance Documents, finding that there are indications in those documents that secondary data would be considered.    *See Appendix* [#33], Tab 2 at 33 ("There are often multiple endpoints that would be of clinical interest . . . . It is important that the clinical trial protocol specify all primary and secondary endpoints"); Tab 1 at 10-14 (discussing end-points for studies involving cancer drugs and stating that "[s]ymptomatic improvement is considered a clinical benefit").   Moreover, the FDA Guidance Documents state explicitly that "[s]ymptomatic improvement is considered a clinical benefit," meaning that the FDA may consider such end-point data when deciding whether or not to approve a drug. *Id.*, Tab 1 at 10; *see also* Tab 3[14] at 74 (noting that secondary endpoints may "support additional conclusions and claims[,]" and even when "[f]ormal secondary analyses" are not used, secondary data from subset analyses "are used to suggest consistency or lack of it" when evaluating primary end-point data).   Ultimately, the proper interpretation of the FDA Guidance Documents, which contain language supporting both parties' arguments, is not something that can be resolved on a motion to dismiss.

Another basis for rejection of Defendants' reliance on the FDA Guidance Documents is that the statements relied on refer only to quality of life, *i.e,* "measures of global health-related quality of life (HRQL) have not served as primary efficacy endpoints in oncology drug approvals[,]" and the quality of life concept "is too general and undefined to be considered appropriate for a medical product claim[.]" *Appendix* [#33], Tab 1 at 14; Tab 2 at 38.  The statements do not relate to the other secondary outcomes at issue such as ECOG performance status and toxicity that led to the EMA's findings rejecting the efficacy of the

---

[14]  Good Review Practice: Clinical Review of Investigational New Drug Applications.

alleged clinical benefit of binimetinib. *See id.*

Finally, Defendants' argument is also undermined by the fact that FDA regulations require drug companies to provide all data to the FDA, including secondary data. 21 C.F.R. 314.50 ("NDA is required to contain reports of all investigations of the drug product . . . ."). And Defendants designed the NEMO study to collect secondary data such as ECOG PS and DFS data. To suggest that the FDA would then simply ignore the secondary data is implausible in light of the foregoing.

### c. The Alleged Disclaimer by the EPA as to Reliance on the NEMO Data

Defendants next argue that Plaintiffs' argument as to the materiality of the omitted results of the secondary data, which is based on the EMA study, does not support their argument. *Motion* [#32] at 15. Defendants assert that "Plaintiffs selectively reference statements made by the EMA about its interpretation of the 'quality of life' and 'ECOG performance status' outcomes to allege that the EMA 'ultimately conclud[ed] that the performance status and QoL was worse in the binimetinib arm of the study." *Id.* (quoting *Compl.* [#27] ¶¶ 61-63.) They argue, however, that Plaintiffs ignore the EMA's own statements in the report that repeatedly disclaim any reliance on this data as conclusive or interpretable. *Id.*

For example, Defendants refer to the EMA's statements that: (1) "The quality of life (QoL) results are *difficult to interpret* for methodological reasons" and "*using such an interpretation for a decision would be unfair. . .* .[;]" (2) "Patients in the open label dacarbazine arm were less compliant to report on patient-reported outcomes and therefore the QoL data may be *confounded and difficult to interpret*[;]" and (3) "Due to inherent

methodological problems in the collection of data, results of the *quality of life data should either not be regarded or only with caution . . . ."* *Motion* [#32] at 15-16 (quoting *Appendix* [#33], Tab 25, EMA Report at 46, 47, 65.)  Defendants argue that the EMA's inconclusive language in its Report, issued eight months after Array withdrew its NDA and which says nothing about the FDA's views, does not render any of Defendants' statements false or misleading.  *Id.*

The Court rejects this argument as well.  First, to the extent Defendants reference the fact that the EMA's report was issued eight months after Array withdrew the NDA, this does not impact Plaintiffs' claims as the EMA was studying the very data that Array studied in the NEMO trial and that Array provided to the FDA, as previously noted.  Second, the EMA's three statements referenced in the previous paragraph and relied on by Defendants  were discussing the quality of life data.  However, as Plaintiffs point out, the EMA did not base its opinion as to Pierre Fabre's application simply on the quality of life data, but on such things as ECOG PS, DFS data, and tolerability.

Thus, the EMA concluded that the ECOG PS and DFS data showed that patients taking binimetinib deteriorated in terms of functionality more often and quicker than patients taking dacarbazine.  This led to the conclusion that "even though the difference in PFS is statistically significant, the observed magnitude of improvement in PFS is considered clinically not relevant."  *See Appendix* [#33], Tab 25 at 46, *see also* 87 ("the higher proportion of deterioration in the ECOG PS in the binimetinib arm compared to the dacarbazine arm is a concern and raises issues regarding the tolerability of binimetinib in the proposed population"), 90 ("the detrimental effect on ECOG PS in the binimetinib arm, which does not correlate with the observed tumour responses - rather, contradicts (or is negatively correlated

with) the PFS . . . result - and the observed safety results, raises issues regarding the tolerability of binimetinib in the proposed patient population"); 91 ("The currently observed 1.32-month prolongation in median PFS over dacarbazine, without an improvement in overall survival, is not considered sufficient evidence of benefit in the proposed patient population. The observed benefit does not override concerns regarding the tolerability of binimetinib in the proposed patient population and the possible negative impact on the health (+/- quality of life) of these patients.").

While Plaintiffs argue from the foregoing that the EMA had no difficulty analyzing the decrease in ECOG performance status (Response [#35] at 22) versus quality of life, Defendants disagree. *See Reply* [#38] at 11. Defendants assert that because the ECOG performance status data in terms of "deterioration free survival" or DFS collected in the NEMO trial was difficult to interpret due to disease progression (Appendix [#33] Tab 25 at 39, 46), the EMA requested that Array perform *post hoc* analyses of DFS (*id.* at 40, 46). *Reply* [#38] at 11.[15] In response, the Court first notes that there appears to be a distinction between ECOG PS as a whole and DFS. *See Response* [#35] at 6 (discussing this distinction). Second, regardless of the EMA's statements relied on by Defendants, the EMA made other definitive statements regarding the detrimental effect on ECOG PS on the very pages of the report cited by Defendants. Thus, the EMA stated at page 39 of the Report:

> Comparison of **ECOG performance status** between the two arms (binimetinib versus dacarbazine) was, following the protocol, also one of the (efficacy) objects of the pivotal study. ECOG PS was used to assess the physical health of patients . . . . The fact that a higher proportion of patients on

---

[15] The EMA's request for additional information was for "an analysis of the median deterioration free survival (DFS)" since "death was not analyzed as a 'definitive deterioration of ECOG PS." *Appendix* [#33], Tab 25 at 41.

the binemetinib arm experienced physical health deterioration as an SAE because of disease progression is a major concern. This is even more important to consider when the demonstrated difference is 1.3-month in terms of PFS compared to dacarbazine . . . . The ECOG PS data . . . demonstrate early separation of the two treatment arms, favouring dacarbazine.

*Appendix* [#33], Tab 25. Page 46 cited by Defendants is part of a discussion of "[e]fficacy data and additional analyses[,]" and states that while "the QoL data may be confounded and difficult to interpret. . ., treatment with binemetinib has early and dramatic negative effects on ECOG PS." *Id.* Accordingly, Defendants' argument that the EMA was unable to analyze the decrease in ECOG performance status appears to be inaccurate.

Defendants also assert that the EMA acknowledged that the clinical significance of ECOG performance data in terms of DFS was difficult to assess because of the "lack of mature" overall survival ("OS") data and the DFS not reaching "statistical significance" (Reply [#38] at 11) (quoting *Appendix* [#33], Tab 25 at 47, 79); *see also Motion* [#32] at 16. Again, however, the EMA specifically stated that the clinical benefit of a 1.3 month improvement in PFS alone from binemetinib is "considered clinically not relevant" in light of the secondary data. *Appendix* [#33] at 47. While it went on to state that the lack of a clear benefit in overall survival was also a concern, and that the "lack of mature OS data makes the assessment of benefit difficult[,] *id.*, that statement related to OS does not appear to impact the overall finding of a lack of clinical benefit or the impact on ECOG performance status as a whole.[16]

---

[16] As a result, *Hoey v. Insmed, Inc.*, No. 16-4323 (FLW), 2018 WL 902266 (D.N.J. Feb. 15, 2018), which Defendants argue rejected nearly identical allegations regarding a later-filed EMA report as insufficient to support a claim of securities fraud, is inapposite. *See Motion* [#32] at 16. The *Hoey* court found that the relevant part of the EMA report relied on by the plaintiff to support an alleged fraudulent misrepresentation was insufficient to support the plaintiff's claim because of the "inconclusive language" by the EMA. 2018 WL 902266 at *17.

In conclusion, Defendants cite isolated pages of the EMA Report (*Appendix* [#33], Tab 25) in an attempt to assert that the Report as a whole is inconclusive.  This tactic is rejected, as it is not supported by the Court's review of the report or Plaintiffs' allegations as to the report that must, without evidence to the contrary, be accepted as true.

### d.    Whether the Data Rendered Defendants' Statements False or Misleading

Finally as to the omission of the NEMO study data, Defendants note that the Complaint [#27] focuses on two statements about the NEMO trial results that Defendants repeated throughout the putative class period: (i) that the "study met its primary endpoint of improving progression-free survival (PFS) compared with dacarbazine treatment[;]" and (ii) "[w]hile the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care." *Motion* [#32] at 16, 29; *Reply* [#38] at 18; *see also Compl.* [#27] ¶¶ 66, 68, 70, 72, 74, 76, 82, 85, 88, 90 (emphasis removed).  Defendants assert that Plaintiffs have not alleged that those statements are false, and do not allege any facts that contradict any of those statements.  For example, Plaintiffs do not allege how any omission of the secondary trial data rendered the statement that "Binimetinib significantly extended median progression-free survival (PFS), the study's primary endpoint, as compared with dacarbazine" (*see, e.g., Compl.* [#27] ¶¶ 68, 70, 72 ,74, 76), false or misleading as required by 15 U.S.C. § 78u-4(b)(1).  Defendants argue that nothing in the above statements addressed whether binimetinib showed clinical benefits other than an extended PFS, or that an extended PFS meant that secondary outcomes like "quality of life" and "performance status" were also positive.  *Motion* [#32] at 16.

Defendants expand on this in their Reply [#38], arguing that they had no duty to disclose any details about patient-reported outcomes because that information was never put into "play[,]" *i.e.*, Defendants never made any affirmative statements about the clinical benefits of binimetinib based on patient-reported outcomes, or characterized the results of the trial in such a manner that would have led investors to believe that patient-reported outcomes were also positive. *Reply* [#38] at 6 (citing *City of Edinburg Council v. Pfizer*, 754 F.3d 159, 172-174 (3d Cir. 2014) (finding no duty to disclose negative efficacy and safety data from clinical trial because the company did not place the strength or nature of the Phase 2 results "in play"); *Kleinman v. Elan Corp, PLC*, 706 F.3d 145, 154-55 (2d Cir. 2013) (finding that statements in a company's press release were not misleading by the omission of data that showed that patients taking a higher dose of the drug did not show a dose response and patients showed little or no improvement in the short term; nothing in the press release "discussed whether there was a dose response or whether one was expected" or "suggested that [the drug] had a short-term effect")).

The Court finds that Defendants' argument must be rejected. The fact that Defendants may not have made affirmative misrepresentations in connection with the two statements identified above does not excuse the alleged material omissions made about the negative study data that is at issue in this case. *See, e.g., Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 709 (9th Cir. 2016) (denying motion to dismiss regarding failure to disclose negative study, when the theory of fraud was not that the defendants "intentionally misled the market about the objective safety of [a drug], but whether the defendants "intentionally withheld information material to the market's assessment of whether and when the FDA would likely approve" the drug).

Moreover, contrary to Defendants' contention, the Court finds that Array did make statements that put the negative study data at play, i.e., that characterized the results of the NEMO trial in such a way that would have led investors to believe that patient-reported outcomes were also positive. Defendants affirmatively stated that binimetinib "was generally well tolerated[,]" and made other affirmative statements relevant to the secondary data. *See Compl.* [#27] ¶¶ 70, 72, 82. The statement that binimetinib was "generally well tolerated" appears to contradict the negative secondary data. Defendants further referred to an upcoming application orientation meeting with the FDA which Array "expect[ed] w[ould] include a discussion of the NDA package including clinical risk and benefit." *Id.* ¶72. These statements suggest to a reasonable investor that the FDA would be considering the clinical benefit of binimetinib and the full NDA package, contrary to Defendants' argument that they never made statements that indicated "approval of the NDA would be based on something other than the full dataset." *Motion* [#32] at 29.

In context, Plaintiffs have adequately alleged that the failure to disclose the secondary data that negatively impacted that benefit, while disclosing only that the study purportedly successfully met its endpoint (*see id.* ¶¶ 68, 72), was misleading. *See Schueneman*, 840 F.3d at 707 ("Defendants may not have had a duty to disclose the [negative] Rat Study had they not been representing that animal studies supported [the drug's] safety and therefore its likelihood of being approved[,]" but once the defendants referenced allegedly positive animal and preclinical studies, "they were bound to do so in a manner that wouldn't mislead investors as to [potentially negative information] within their possession"); *In Re PTC Therapeutics, Inc. Sec. Litig.*, No. 16-1124(KM)(MAH), 2017 WL 3705801, at *12-14 (D.N.J. Aug. 28, 2017) (denying motion to dismiss where plaintiffs alleged that the defendant knew

that a clinical study "had failed to meet its primary endpoints for most patients" but "stated or implied that the 'totality' and 'consistency' of the clinical data met the requirements for FDA approval[,]" while omitting to state "*that only a fraction of patients* reported a clinically meaningful and statistically significant benefit" and that the defendants were relying on data from a "subgroup" of patients; and holding that "once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make the disclosure misleading"); *In re Forest Labs. Sec. Litig.*, No. 05 Civ. 2827 (RMB), 2006 WL 5616712, at *7 (S.D.N.Y. July 19, 2006) (denying motion to dismiss where defendants provided public with positive attributes of drug while simultaneously concealing negative conclusions from study conducted by Danish Medicines Agency and by concealing negative clinical data).[17]  These facts distinguish this case from authorities relied on by Defendants such as *Kleinman*, 706 F.3d at 154-55 (2d Cir. 2013) (involving differing interpretations of disclosed data, rather than undisclosed data).

### e.      Conclusion as to Omissions Regarding Negative Secondary Data

In conclusion, the Court finds that Plaintiffs' omission allegations regarding the secondary data from the NEMO study meet the materiality element, i.e., they have plausibly pled that Defendants failed to state a material fact necessary to make statements not misleading.  Plaintiffs have averred particularized facts demonstrating that Defendants omitted material facts about the negative binimetinib trial data, while touting the fact that the

---

[17]  *See also In Re Delcath Sys. Inc. Sec. Litig.*, 36 F. Supp. 2d 320, 331-33 (S.D.N.Y. 2014) (denying motion to dismiss where defendants misled investors by providing data from "Drug Group" while omitting data from "Control Group" and omitted facts about the relative toxicity of Defendants' product which "were critical to the FDA's conclusion that the risk of harm outweighed the potential benefit of the Company's product, and that it should not be approved").

study successfully met its endpoint.  This was misleading as the negative data would have alerted investors that the clinical benefit of binimetinib might not be sufficient and called into question whether the FDA would approve the NDA.  The EMA report supports Plaintiffs' claims as to that issue as it concludes that the negative data relating to functionality and toxicity were so detrimental that it eliminated the clinical benefit of binimetinib.  Accordingly, Defendants' Motion [#32] is denied as to the argument that Plaintiffs' omission allegations regarding the secondary data are not actionable because they fail to demonstrate a material misstatement or omission.

### 2.    Omissions Regarding the Decision to Pursue a Narrower Subset of Data

The second basis for Plaintiffs' claim and their assertion that the materiality element is met is the contention that Defendants misled investors because Array secretly attempted to change the indication on the NDA to a subset of patients who had previously received immunotherapy and who had observed a higher PFS outcome than the overall population. *See Compl.* [#27] ¶¶ 65, 67, 83.  Thus, Plaintiffs aver that Defendants misled investors "to believe that the NDA would be based on the full dataset" rather than "a cherry -picked subpopulation of the study who had received prior treatment with IO." *Id.* ¶¶ 71, 73, 79, 91. Plaintiffs aver that this change in the indication substantially increased the risk of the FDA rejecting the NDA. *Id.* ¶ 67.

Relevant to this argument, Plaintiffs aver that when Array began the NEMO study in July 2013, the standard of care for treating the type of melanoma that binimetinib was intended to treat was use as a first-line treatment (meaning that a patient could start treatment with binimetinib as opposed to another type of therapeutic). *See Response* [#35]

at 10. Accordingly, Array designed its NEMO study for data that could support approval as a first-line treatment indication (or use) from the FDA. However, during the course of the study, the standard of care changed to require immunotherapy (and not drugs like binimetinib) as the first-line treatment. *Id.* Unbeknownst to investors during the Class Period, Plaintiffs assert that Array attempted to use the NEMO study data to obtain approval of binimetinib as a secondline treatment following immunotherapy. *Id.* (citing *Compl.* [#27] ¶ 108(d)-(e) (analyst and FDA documents confirmed that Array changed its indication from both "treatment-naïve patients" and patients with prior immunotherapy patients to only patients "who have received prior treatment with checkpoint inhibitor therapy"). Plaintiffs assert that changing the indication for binimetinib after submitting the NDA had immense consequences, and meant that the prospects of binimetinib's approval dropped to virtually nil. *Response* [#35] at 10; *see also Compl.* [#27] ¶ 106.

Plaintiffs assert that the above facts are important in terms of understanding how Defendants misled Array's public investors. Each time Defendant Squarer mentioned the secondary PFS data, Plaintiffs aver he told investors that "interpretation beyond overall consistency with the primary result [PFS] should be made with care" because "the primary consideration for marketing approval will be the results for the primary endpoint of the trial [PFS]." *Compl.* [#27] ¶ 66, *see also*, *e.g.*, ¶ 68 (NDA process "will primarily focus on the primary endpoint of PFS"), ¶ 70 (interpretation of "sub-group" data "should be made with care"), ¶ 76 ("primary consideration for marketing approval will be the results for the primary endpoint of the trial"), ¶ 78 ("FDA is going to focus on the overall population"). Plaintiffs aver that these statements obscured and concealed the truth about what Defendants were in fact trying to do with respect to binimetinib and the FDA, *i.e.*, use the secondary PFS data to

obtain approval for a modified indication.  *See Response* [#35] at 11.  In other words, Plaintiffs assert that while Defendant Squarer told the public not to rely on the secondary PFS data, he was doing just that in an effort to obtain approval from the FDA while actively concealing it.  *Id.*; *see also Compl.* [#27] ¶¶ 67, 69, 75, 77, 79, 81, 83, 87.  Plaintiffs contend that the truth concerning Squarer's actions was undoubtedly material, as the ramifications of his actions meant that binimetinib's NDA was all but certain to be denied by the FDA. *Response* [#35] at 11; *Compl.* [#27] ¶106.

Defendants argue that Plaintiffs have not provided any factual basis supporting their speculative theory that Array attempted to secretly and "informally" modify the patient population that would receive binimetinib treatment to a subset of patients who previously received cancer treatment. *Motion* [#32] at 4, 17-23.  Thus, Defendants assert that there are no particularized allegations supporting this contention.  *Id.* at 17-19.  Related to that, Defendants argue that: (1) Array's disclosures about the use of binemetinib in patients who had received prior immunotherapy  ("IO") undermine any claim that investors were misled; (2) Plaintiffs' assertions that the FDA cannot, and does not, approve drug candidates based on patient subgroups is wrong, and Plaintiffs do not plausibly allege that the likelihood of FDA approval based on a more narrow indication was "exceedingly low."  *Id.* at 19-23. Defendants additionally argue that Plaintiffs do not adequately allege an actionable misstatement as the statements are either true statements, forward-looking statements protected by the PSLRA's safe harbor provision, or are statements that Plaintiffs have not adequately alleged to be false or misleading.  *Id.* at 23-30.  The Court finds that Defendants' Motion [#32] should also be **denied** as to this portion of Plaintiffs' claim.

### a.    Alleged Lack of Particularized Allegations

First, the Court rejects Defendants' argument that Plaintiffs have not plead particularized facts as required by Rule 9(b) and the PSLRA to support their assertion that Array secretly modified binimetinib's indication to a narrower subgroup or that Defendants "in fact, changed the label for binemetinib from a first-time treatment to a second-line treatment for patients who had received prior immunotherapy." *See Response* [#35] at 27. It is true that Plaintiffs allege no specific facts as to when the indication was actually changed, but the Court agrees with Plaintiffs that they do not have to "identify the precise moment when Squarer [or the other Defendants] first decided to seek approval for binemetinib on the basis of a modified indication[,]" or plead "all of the evidence and proof" of their claim. *Response* [#35] at 26. What matters is that Plaintiffs plead facts from which it can be inferred that the change in indication occurred during the putative Class Period while Defendants were discussing with the public the anticipated basis for FDA approval (based on the overall population of the patients being included) but not informing investors of the change to a narrower subset.

Thus, Plaintiffs cite to a March 21, 2017 ODAC Committee Meeting Notice which indicates that Array was planning to submit at a meeting on March 27, 2017, a proposed indication for binimetinib for treatment of patients with "unresectable or metastatic melanoma, with NRAS Q61 mutation as detected by an FDA-approved test, who have received prior treatment with checkpoint inhibited therapy." *Compl.* [#27] ¶ 108(e); *see also Appendix* [#33] Tab 22. This is obviously different from the initial indication which did not limit the NDA to people who had received such prior treatment, and means that the majority of NEMO patients, who received binimetinib as first-line therapy, would be ignored for purposes of the

-37-

NDA.  Consistent with the fact that Array withdrew the NDA on March 17, 2017, the Notice

of Meeting announces the cancellation of that portion of the ODAC meeting as "no longer

needed."  *Compl.* [#27] ¶ 108(e).

While the Court acknowledges that this Notice is dated a few days after the end of the

March 17, 2017 Class Period, it is reasonable to infer that Array must have changed the

indication *within* the Class Period to give the FDA time to set up a meeting to explore the

indication.  This finding is also consistent with other statements that Defendants made during

the Class Period.

Thus, on September 7, 2016, Squarer stated:

And so what we would assume is that ***many patients are going to receive
prior immunotherapy before considering using a MEK and this isn't
necessarily going to be driven by a label but by practice.  So we'll
negotiate the label that's perfect for the drug with the FDA, but we think
that in practice a lot of patients are going to try immunotherapy first***.

*Id.* ¶ 108(a) (emphasis in original).  Similarly, on March 8, 2017, Squarer stated:

NRAS is a little simpler. First line is clearly immunotherapy. We'd expect
targeted agents to be used afterwards, potentially in combination as Roche is
exploring right now. ***And that's one of the topics of course that we expect
to cover at our ODAC, is the line of therapy, given that we studied most
patients in first-line, and since then, I/O has become standard of care***.

*Id.* ¶ 108(b) (emphasis in original).  Finally, Defendants stated in a March 19, 2017 press

release that Array had "thorough discussions and communications with the FDA, ***including***

***exploration of various paths to approval***."  *Id.* ¶ 108(c).

Construing these statements in the light most favorable to Plaintiffs, the Court agrees

with Plaintiffs that it can be inferred that Defendants knew that the full data would likely not

be enough to support the original indication as "I/O has become standard of care[,]" that the

-38-

market was moving towards IO therapy first, and that Defendants were thus exploring other options with the FDA, including the more optimistic data from the post-IO subgroup. Defendants wanted to "negotiate" for a "label that's perfect for the drug[,]" which would be based on the post-IO indication. Consistent with this, Plaintiffs allege that Array modified the patient inclusion criteria as the study progressed so as to allow more patients with prior immunotherapy treatment to participate in the NEMO study. *Compl.* ¶ 35. Finally, Plaintiffs note an analyst's comments after the March 19, 2017 press release taking note of the label change by the FDA and sample size (*id.* ¶ 108(c)), which indicates that the label was actual changed by the FDA. *Id.* ¶ 108(d). It is reasonable to assume that the FDA would only have changed the label if the original indication had been modified. Accordingly, the Court finds that Plaintiffs have pled particularized allegations that support their claim that Defendants secretly modified the NDA without informing investors.

### b.    The Impact of Defendants' Disclosures

Defendants next argue that their disclosures undermine any claim that investors were misled in connection with the subset of patients who had previously received immunotherapy, relevant to Plaintiffs' argument about a change in the NDA's indication to this subset. Where, as here, Plaintiffs allege that a "defendant failed to disclose a material fact necessary to make its statement not misleading, the concealed information must be information known to the defendants that is not otherwise available to the investing public." *Chipman v. Aspenbio Pharma, Inc.*, No. 11-cv-00163-REB-KMT, 2012 WL 4069353, at *5 (D. Colo. Sept. 17, 2012), *aff'd*, 587 F. App'x 493 (10th Cir. 2014).

Here, Defendants made disclosures that the subgroup of patients who had received prior immunotherapy demonstrated a higher median PFS than those who did not, and further

disclosed that (i) such data may be relevant to FDA approval and (ii) if approved, binimetinib would be primarily used as a therapy for those patients who had received prior immunotherapy consistent with the emergent standard of care, an issue requiring FDA discussion. Squarer stated as to those issues:

> "[W]e find that immunotherapy has been very effective and will commonly be used in the first line. *So we do expect to be used after immunotherapy in most cases if we are approved and on the market. So it is really that population that is likely to be most relevant.*" *See Appendix* [#33], Tab 8, June 9, 2016 Tr. of Array at Jefferies Healthcare Conference at 3 (emphasis added);

> "***And so what we would assume is that many patients are going to receive prior immunotherapy before considering using a MEK and this isn't necessarily going to be driven by a label but by practice. So we'll negotiate the label that's perfect for the drug with the FDA, but we think that in practice a lot of patients are going to try immunotherapy first.***" *Compl.* ¶ 78 (emphasis in original); *see also* Tab 14, Sept. 7, 2016 Tr. of Wells Fargo Securities Healthcare Conference at 4;

> "So as I mentioned earlier, *emergent standard of care for NRAS melanoma is immunotherapy,* . . . they really have no good treatment options, *which is why this could be quite important.*" *Appendix* [#33], Tab 17, Nov. 1, 2016 Tr. of Array Earnings Call at 16 (emphasis added);

> "***And that's one of the topics of course that we expect to cover at our ODAC, is the line of therapy, given that we studied most patients in first-line, and since then, I/O has become standard of care.***" *Compl.* ¶ 92; *see also* Tab 20, Mar. 8, 2017 Tr. of Cowen Health Care Conference at 7.

*See also Appendix* [#33], Tab 8, June 9, 2016 Tr. of Array at Jefferies Healthcare Conference at 3 (Squarer stating, "[s]o we do expect to be used after immunotherapy in most cases if we are approved and on the market. *So it is really that population that is likely to be most relevant.*") (emphasis added).

Defendants argue that, in context, those disclosures informed investors that (i) the NEMO trial data showed better results in patients who received prior immunotherapy; (ii) that

-40-

the standard of care had evolved such that, if approved, binimetinib would primarily be used in patients who had previously received immunotherapy; (iii) Defendants expected the FDA to consider the totality of the NEMO data (including the subset data) in determining whether to approve the binimetinib NDA; and (iv) Defendants intended to discuss the intended indication with the FDA, which could plausibly be inferred to include an indication that was narrowed to the patient subgroup who had prior immunotherapy. Plaintiffs do not specifically dispute this.

Plaintiffs argue, however, that Squarer's statements led investors to believe one thing even though he knew it to be false (*i.e.*, the secondary PFS data from the prior-immunotherapy subgroup would be of limited importance in terms of securing approval for binimetinib), while Defendants were actually seeking a modified indication based on that subset. *See Response* [#35] at 29. The Court agrees with Plaintiffs. While the information from Defendants discussed in the previous paragraph arguably allowed investors to infer that the secondary PFS data from the prior-immunotherapy subgroup was important to approval of the NDA, it did not provide notice that Defendants had actually secretly changed the indication to that subgroup. That is significant as Plaintiffs allege that it was very unlikely that the NDA would be approved with such a modified indication. *Compl.* ¶¶ 8-11. As previously noted, amendments are not generally permitted to change the intended indication for a drug after submission of the NDA. 21 C.F.R. § 314.60. Accordingly, Defendants' argument based on the adequacy of its disclosures is rejected.

      **c.**     **Plaintiffs' Allegations that the Likelihood of FDA Approval Was Low**

The Court also denies the Motion [#32] as to the argument that Plaintiffs do not plausibly allege that the likelihood of FDA approval based on a more narrow indication was

-41-

"exceeding low[.]"   *See id.* at 21-23.   Again, Plaintiffs correctly note that 21 C.F.R. § 314.60(b)(6) states that "amendments are not permitted to change the intended indication for a drug after the NDA is submitted."   While the regulation does permit an amendment to "include data to support a minor modification of an indication or claim that was included in the original NDA, supplement, or resubmission[,]" Plaintiffs allege that the modification was not minor, calling into question whether the exception would apply.   Certainly, this is something that cannot be decided in Defendants' favor on a motion to dismiss.

Moreover, Defendants' argument relies on evidence that the Court declines to consider on this Rule 12(b)(6) Motion [#32].   *See id.* at 22, 23.   The FDA document Defendants cite (*Appendix* [#32], Tab 24) is merely an outline from a Prescription Drug Labeling Conference, and there is no indication that this is a published FDA document.   And the parties dispute the meaning of the Summary Reviews regarding recent oncology drug approvals (*id.* Tabs 4 and 5).

### d.   Statements That Are Not Actionable

Finally, Defendants argue that some of the challenged statements relevant to Plaintiffs' claim about the change in indication are not actionable as a matter of law. Defendants first assert that their statements anticipating that the main consideration for FDA approval would be the results of the primary endpoint of PFS being met, which Plaintiffs allege were false or misleading, are not actionable because they are forward-looking and are protected under the PSLRA's "safe harbor" provision.   *Motion* [#32] at 24-26 (citing 15 U.S.C. § 78u–5(i)(1)); *see Compl.* [#27] ¶¶ 66, 68, 70, 76, 78, 80, 82, 85, 88, 92).   Specifically, Defendants argue that the following statements are forward-looking statements:

> **"Array <u>anticipates</u> that the primary consideration for marketing approval will be the results for the primary endpoint of the trial."** (Compl. ¶¶ 66, 70, 76, 82, 88 (underlining added);
>
> **"*We do <u>believe</u> that the NDA filing will primarily – process will primarily focus on the primary endpoint of PFS . . . .<u>We believe</u> that the focus with regulators will be on the overall PFS result.*"** (*Id.* ¶ 68) (underlining added);
>
> **"*Now again, subsets, <u>we think</u> the FDA is going to focus on the overall population but it is an interesting guide.*"** (*Id.* ¶ 78) (underlining added); **"Now with all the caution that it is a subset, although predefined, and that <u>we believe</u> the FDA will consider the overall population in assessing provability."** (*Id.* ¶ 80) (underlining added);
>
> **"And while <u>we believe</u> that the regulators will be looking at our primary endpoint and looking at the totality of the data, it's at least nice to have some guidance there."** (*Id.* ¶ 86) (underlining added); and
>
> **"And that's one of the topics of course that <u>we expect</u> to cover at our ODAC, is the line of therapy, given that we studied most patients in first-line, and since then, I/O has become standard of care."** (*Id.* ¶ 92) (underlining added).

Defendants also argue that the statements about the anticipated basis for FDA approval are not actionable statements of corporate optimism.

Under the PSLRA's "safe harbor" position, a defendant "shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that . . . the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ meaningfully from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A). The statute defines the term "forward-looking statement" in § 78-u(5)(i)(1), which includes "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78-u(5)(i)(1)(B). This Court has held that "[p]rojections about the likelihood of FDA approval

are forward-looking statements" as they "are assumptions related to the Company's plan for its product*." Noble Asset Mgmt.*, 2005 WL 4161977, at *9; *see also TransEnterix Investor Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 758 (E.D.N.C. 2017) (dismissing case under the PSLRA where statements about a drug company's "expectations" that the FDA would approve its drug and the assumptions underlying the objectives for the drug after approval were protected by the safe harbor provision).

Plaintiffs argue, however, that these statements are not protected as forward-looking because the alleged falsity of those statements—that Defendants omitted that Array had "secretly" changed binimetinib's indication—"does not depend on a future contingency." *Response* [#35] at 37 (citing *In re Quality Sys.*, 865 F.3d 1130 (9th Cir. 2017)). The Court agrees that the statements relied on by Defendants are not forward-looking. The Ninth Circuit in *Quality Systems* analyzed circuit court case law regarding "mixed statements" of present and future facts, and held that the safe harbor does not apply when the defendants "knowingly make a materially false or misleading statement about current or past facts, and combine that statement with a forward- looking statement." *Id.* at 1142. Similarly, courts hold that statements that are rendered misleading due to omissions of existing facts or circumstances do not constitute forward-looking statements protected by the safe harbor provision. *See, e.g., Heinz v. Tesco Corp.*, 971 F.3d 475, 483 (5th Cir. 2020); *AES Corp. v. Dow Chemical Co.*, No. Civ.A 990673-JJF, 2001 WL 34357296, at *4 (D. Del. Jan. 19, 2001); *In Re Mobile Media Sec. Litig.*, 28 F. Supp. 2d 901, 930 (D.N.J. 1998); *see also Re Nationsmart Corp. Sec. Litig.*, 130 F.3d 309, 318 (8th Cir. 1997).[18]

---

[18] This is not a situation where a present or historical fact that is directly related to, or forms the underlying basis for, the forward-looking statement is at issue. *See, e.g., TransEnterix*, 272 F.

Based on the foregoing, the Court **denies** the Motion [#32] as to the argument that the statements identified in this section are not actionable because they are forward-looking.[19]

### e. Conclusion as to Plaintiffs' Claim Based on the Omission of a Secret Change in the Indication

In conclusion, the Court **denies** the Motion [#32] to the extent it argues that Plaintiffs' claim based on the alleged omission of the alleged "secret" modification to the NDA indication should be dismissed.  First, Plaintiffs have pled particularized facts supporting this claim.  Second,  Defendants' disclosures do not undermine this claim.  Third, Plaintiffs have plausibly pled that the likelihood of FDA approval based on a more narrow indication was exceedingly low.  Finally, the affirmative statements relied on by Plaintiffs are actionable and are not protected by the safe harbor provision.

## B.    The Scienter Element

Finally, Defendants argue that the Complaint [#27] should be dismissed for the independent reason that Plaintiffs fail to plead facts giving rise to a strong inference of scienter.  Plaintiffs argue, on the other hand, that their theory of scienter is straight-forward and supported by particular factual allegations.  They assert that Defendants knew that the

---

Supp. 3d at 758.  Instead, Defendants omitted any reference to the alleged change in the indication. This alleged omission also defeats Defendants' argument that the safe harbor provision applies because they could not have verified at the time the statements were made whether the FDA would have principally based its approval on the primary PFS data or the results of the subgroup (or both). *See Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999).  Again, the issue is the omission of the fact that the indication had allegedly been changed to only the subgroup.

[19]  Based on the alleged omission of the change in indication, the Court also denies the argument that Defendants' statements are not actionable because they are "statements of "corporate optimism" or "mere puffing" about a product. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).

NEMO study data contained both positive data and negative data, yet provided only the positive results to the public while holding back the negative results. *See Response* [#35] at 31. Plaintiffs further assert that the NEMO study was completed and the data was analyzed and submitted to the FDA as of June 30, 2016 (the date Array filed the binimetinib NDA), which is within the Class Period. *Id.* at 31, 4. *Id.*

To establish scienter in a securities fraud case alleging non-disclosure of material facts, the Tenth Circuit holds that "the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001). The Court finds for purposes of the Motion [#32] that Plaintiffs have adequately plead scienter.

### 1.  Knowledge of the Potentially Material Facts

As to the first requirement for scienter, Plaintiffs allege that the individual Defendants, Array's CEO, CFO, and CMO, were directly involved in the management and day-to-day operations of Array at the highest levels, and privy to confidential proprietary information concerning Array's business and operations. *Compl.* [#27] ¶ 29. While Plaintiffs' averment that because of their position within the company, the Individual Defendants must have known the statements or omissions were false or misleading is not sufficient, in and of itself, to satisfy the knowledge requirement, *see Fleming*, 264 F.3d at 1263-64, Plaintiffs also allege that Defendants directly discussed the NEMO study data and were thus aware of the results.

On that issue, Plaintiffs aver that the individual Defendants were "directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information[,]" and "were aware of or recklessly disregarded the fact that the

false and misleading statements were being issued." *Compl.* [#27] ¶ 29.  Moreover, Plaintiffs have identified statements made or signed by the Defendants wherein the NEMO study data was discussed and the negative secondary data was withheld.  The Court has previously addressed Defendant Squarer's many statements.[20]  As to Defendant Haddock, the Court notes Plaintiffs' allegation that Array's quarterly report dated November 3, 2016, which discussed the NEMO study data, was signed and certified by both Defendants Haddock and Squarer.  *See Compl.* [#27] ¶¶ 88-89.  Similarly, as to Defendant Sandor, Plaintiffs allege statements by him relevant to these issues in, among other things, a press release announcing that the FDA accepted the NDA for binimetinib in patients with advanced *NRAS*-mutant melanoma and an earnings conference call.  *See id.* ¶¶ 72, 76.

According to Plaintiffs, the frequency with which the NEMO study data was discussed shows that Defendants knew what the data revealed, including both the positive PFS data and the negative secondary data.  The Court agrees.  Given the statements that Defendants made about the NEMO trial and its results, as well as the fact that the trial was studying not only PFS, the primary endpoint, but also the secondary endpoints, it is simply not plausible that Defendants did not know the results of both the positive and negative data regarding these endpoints.  And this finding is supported by numerous authorities.  *See Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (holding that defendant had "access to the corrosion data[,]" both negative and positive, based upon defendant's discussion of it in public statements; officer "'bridge[d] the scienter gap' herself by referencing the data directly.

---

[20] Plaintiffs note that Defendant Squarer, in particular, discussed the study data in detail on no less than *five* occasions *prior to* the start of the Class Period and continued to discuss the data during the Class Period.  *Response* [#35] at 31 (citing *Compl.* [#27] ¶¶ 66, 101).

. . . It is unclear what further facts plaintiffs would need to plead to create a stronger inference that she had access to information she discussed publicly") (quotation omitted), *overruled on other grounds*, *City of Dearborn Heights v. Align Tech., Inc.*, 856 F.3d 604 (9th Cir. 2017); *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1125 (D. Colo. 2017) (defendants' admission that study data was "unblinded" and "fully available" supported conclusion that defendants "had access to all data" including "inconsistent data" that contradicted public statements); *In re Forest Labs. Sec. Litig.*, 2006 WL 5616712, at \*10 (scienter adequately pled where plaintiffs alleged that defendants had "access to information" based upon receipt of study data); *see also Schueneman*, 840 F.3d at 707.  And Defendants have not specifically argued a lack of knowledge of the data regarding the secondary endpoints at issue or that it was contrary to the positive PFS data they disclosed publicly.

Defendants argue, however, that the Tenth Circuit has long held that mere "allegations that the defendant possessed knowledge of facts . . . without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud."  *See Motion* [#32] at 32 (citing *Fleming*, 264 F.3d at 1260). According to Defendants, there are no particularized facts supporting *any* inference that Defendants believed that the FDA viewed the NEMO data unfavorably or that otherwise demonstrate that the second element of scienter.  *Id.*  The Court now turns to that issue.

### 2. Knowledge that Failure to Reveal the Potentially Material Facts Would be Misleading to Investors

This element requires that Plaintiffs "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind" with respect to each act

or omission alleged.  15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).  "In a securities fraud case, the appropriate level of scienter is a mental state embracing intent to deceive, manipulate or defraud, or recklessness."  *Ellis v. Spectranetics Corp.*, No. 15-CV-01857-KLM, 2018 WL 1583837, at *4 (D. Colo. Apr. 2, 2018).  Recklessness "is a particularly high standard" under the PSLRA.  *Id.* at *13.  It is "defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *Fleming*, 264 F.3d at 1260 (quotation omitted).

The recklessness standard can thus be satisfied "by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors."  *Fleming*, 264 F.3d at 1261.  "It is something closer to a state of mind approximating actual intent."  *Ellis*, 2018 WL 1583837, at *13 (citations omitted).  The issue is not merely whether the defendants knew the underlying facts, but whether the defendants knew that not disclosing the facts "posed a substantial likelihood of misleading a reasonable investor."  *Fleming*, 264 F.3d at 1264.

A strong inference that the defendant acted with the required state of mind" with respect to each act or omission alleged must be more than reasonable or plausible; it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, *Inc.*, 551 U.S. at 314.  The Court must look to the totality of the pleadings to determine whether a plaintiff's allegations permit such an inference.  *Ellis*, 2018 WL 1583837, at *4 (citations omitted).  "Allegations of motive and opportunity may be important to that totality, but are typically not sufficient in themselves to establish a 'strong inference' of scienter."  *Fleming*, 264 F.3d at 1262.  However, "'they can be catalysts to fraud and so serve

-49-

as external markers to the required state of mind.'" *Id.* (quotation omitted).

The Court finds that Plaintiffs "present factual allegations supporting a 'strong inference,' . . . 'that adverse circumstances existed at the time of the offering [to investors], and were known and deliberately or recklessly disregarded by defendants[.]'" *Fleming*, 246 F.3d at 1262 (quotation omitted). As discussed previously, during the Class Period, and during the period of the public offering of stock to investors, Plaintiffs allege that Defendants knew that the NEMO study data contained both positive data and negative data, yet provided only the positive results to the public while holding back the negative results.

Moreover, Plaintiffs aver that "[u]nbeknownst to investors, . . .Defendants knew that the [negative] NEMO trial data posed a significant and grave risk that the FDA would not approve the NDA (despite meeting the study's primary endpoint)." *Compl.* [#27] ¶ 5; *see also* ¶ 53. Plaintiffs aver that the trial data showed that binimetinib was barely more effective versus approved drugs already on the market, and that the quality of life during the brief period of "progression free survival" was drastically poor. *Id.* ¶ 5. Yet Defendants characterized the results of the NEMO trial in such a way that would have led investors to believe that patient-reported outcomes were also positive, stating repeatedly that binimetinib "was generally well tolerated." *See Compl.* [#27] ¶¶ 70, 72.

Plaintiffs further aver that the data showed that "binimetinib proved far more beneficial to patients who had received prior treatment with an immunotherapy ("IO") as opposed to those who had not (Compl. [#27] ¶ 6), which impacted the study as submitted being approved. Yet Defendants downplayed those results, telling investors that they should interpret the better outcomes shown in the prior immunotherapy subgroup "with care." *Id.* The Court reiterates, for the reasons previously discussed, that the omitted information would

-50-

have been viewed by the reasonable investor as having significantly altered the total mix of information made available. *Basic, Inc.*, 485 U.S. at 231-32. Moreover, Plaintiffs have alleged that Defendants omitted to tell investors that they changed the indication to a narrower subset, something that would have been material for investors to know given the fact that it is averred that doing so substantially diminished (or even eliminated ) the chance of getting FDA approval for the NDA.

As Defendants themselves note, cases have held that scienter is adequately alleged where a plaintiff has alleged contemporaneous and particularized allegations that defendants had access to data that contradicted earlier statements to investors. *See Reply* [#38] at 19 n. 2 (citing cases). *See Schueneman*, 840 F.3d at 707-10 (finding scienter was pled with sufficient particularity to survive a motion to dismiss where defendant had access to negative animal studies data that was found to have rendered earlier statements touting positive animal studies false); *Reese*, 747 F.3d at 572 (defendant had access to data indicating high corrosion levels that contradicted earlier statements that corrosion rates were low; "'[b]y making detailed factual statement, contradicting important data to which [officer of company] had access, a strong inference arises that she knowingly misled the public as to its clear meaning") (citation omitted); *Medina*, 215 F. Supp. 3d at 1125 (defendants had access to all the trial data and the complaint had adequately alleged that defendants had a duty to disclose that data; if the undisclosed facts about the trial data were true, "and if the Clovis Defendants knew of this information, then this could be a strong factor in favor of scienter, i.e., that the Clovis Defendants knowingly misled plaintiffs"). While Defendants deny that Plaintiffs have pled such allegations, the Court disagrees. The negative secondary data that the Defendants had access to would appear to contradict Defendants' statements that

binimetinib was "well tolerated." *See Compl.* [#27] ¶¶ 70, 72, 82 (negative data relating to functionality and rate of deterioration was so detrimental that it essentially eliminated the clinical benefit of the drug).

Defendants also argue that Plaintiffs' allegations based on Defendants' access to the NEMO trial data are speculative and rely on the "fraud by hindsight" method of pleading that courts routinely reject as sufficient to demonstrate scienter. *See Motion* [#32] at 33; *Fleming*, 264 F.3d at 1260. "'Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.'" *Fleming*, 264 F.3d 1260 (quotation omitted). Moreover, "allegations that the defendant possessed knowledge of facts that are later determined by the court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud." *Id.*; *see, e.g., Noble Asset Mgmt.*, 2005 WL 4161977, at *13 (finding allegations that defendant had access to bad trial data "does not support an inference that the defendants knew how the FDA would rule on its pending NDA"); *Columbia Labs., Inc. Sec. Litig.*, No. 12-614 (FSH)(PS), 2013 WL 10914123, at *3 (D.N.J. June 11, 2013) (finding no strong inference of scienter where the complaint did not allege contemporaneous facts establishing that Defendants knew about the FDA's concerns).

Yet there are allegations from which it can be inferred that Defendants knew that the FDA would likely not approve the NDA as submitted, and changed the indication to a narrower subset of patients. *See Compl.* [#27] ¶ 108(a) and (b) ("we'll negotiate the label that's perfect for the drug with the FDA but we think that in practice a lot of patients are going

to try immunotherapy first" and "that's one of the topics of course that we expect to cover at our ODAC, is the line of therapy, given that we studied most patients in first-line, and since then, I/O has become standard of care"); ¶ 108(c) (Defendants were "exploring various paths to approval" with the FDA). Indeed, according to an FDA meeting notice, it appears that the indication was actually changed, likely due to those concerns. *Id.* ¶ 108(e); *see also* ¶ 108(f). The alleged change in indication meant, according to Plaintiffs' allegations, that the likelihood of getting approval was exceedingly low "and all but guaranteed that the FDA would reject the NDA." *See id.* ¶¶ 11, 109. This is relevant to the scienter element and, specifically, Defendants' knowledge that (1) the NDA based on the NEMO data as a whole might not be approved despite telling investors to the contrary; and (2) that even with a secret change in indication, it likely would not get approved. *See id.* ¶¶ 11-13; see also ¶¶ 80, 82 (telling investors that Array believed the FDA would consider the overall population in assessing provability; that "[w]hile the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care[;]" and that "Array anticipates that the primary consideration for marketing approval will be the results for the primary endpoint of the trial").

Defendants argue a nonculpable explanation for their conduct, asserting that "Array honestly believed that the FDA would approve the binimetinib NDA based on the primary endpoint of PFS being met in the broader population." *Motion* [#32] at 37. That does not, however, explain why they failed to disclose the negative data that a reasonable investor would find significant. Defendants' explanation is also not consistent with the fact that Defendants allegedly changed the indication to the narrower subset, rather than relying on

-53-

the data from the broader population.

Moreover, an equally compelling and cogent explanation is Plaintiffs' assertion that Defendants intended to deceive or recklessly deceive investors by not providing the negative data because they knew that it might impact the public offering and the price of the stock, meaning that Array would not be able to raise the money it needed from this offering. *See Compl.* [#27] ¶111 (Array's offering price was $6.25 per share compared to previous market trading prices of between $3 per share and $4 per share, enabling them to rake in gross profits). Plaintiffs aver that the money Array raised from the offering allowed Array to generate enough capital to maintain operations while another late-stage drug candidate advanced towards FDA-approval. *Id.* ¶112.

Thus, in addition to seeking approval for binimetinib as a standalone treatment based on the NEMO study data, Plaintiffs aver that Array was in the final stages of its COLUMBUS clinical study. *Compl.* [#27] ¶ 33. Array allegedly intended to use the COLUMBUS study data to support a second NDA for the use of binimetinib in combination with another component, encorafenib. In fact, Array announced on September 26, 2016 that the COLUMBUS study met its primary endpoint. *Id.* ¶ 111. Defendants allegedly capitalized on the good news by selling 21,600,000 shares of Array stock to the public the very next day on September 27, 2016 for proceeds of $132.25 million. ¶¶ 84, 111. Plaintiffs aver that had Defendants disclosed negative data about binimetinib from the NEMO study at any point prior to or during Array's public offering, the stock sale would likely been far less successful as the negative NEMO data would have cast a dark cloud over binimetinib's prospects (in standalone or combination form). *Id.* ¶¶ 110-11.

The success of the offering was, according to Plaintiffs, critical to Array because by that point in time Array had already amassed an accumulated deficit of $801.4 million and needed additional operating capital to ensure its ability to continue operations until the COLUMBUS study was completed and the FDA had an opportunity to approve binimetinib in combination form (with another component, encorafenib). *Compl.* [#27] ¶ 112; *Response* [#35] at 34. Array's accumulated deficit was over $800 million at that point in time, and Plaintiffs aver that Array's only near-term prospect for generating revenue was the commercialization of binemetinib, as FDA-approval of Array's combination therapeutic was still several months away. *Id.* Thus, Plaintiffs assert that Array needed additional operating capital to ensure its ability to continue operations until the COLUMBUS study was completed and the FDA had an opportunity to approve binemetinib in combination form. *Id.*; *see Response* [#35] at 34.

A similar issue was addressed by Judge Raymond P. Moore of this Court in the *Medina* case. The plaintiffs there alleged that "the Clovis Defendants were motivated to conceal negative trial data in order to maintain Clovis' ability to finance pipeline products, such as the other drugs it had under development." *Medina*, 215 F. Supp. 3d at 1129. Citing *Fleming*, the defendants argued that this was "not a compelling motive because it is a generalized motive shared by all businesses." *Id.* Judge Moore disagreed, holding that the allegations were sufficient to support the plaintiffs' theory of scienter because they were "tied to specific needs and circumstances of Clovis' business: notably, the alleged facts that Clovis had no sales revenue, Clovis was heavily dependent upon investor capital, Clovis had only three drugs under development, and Clovis' most important drug was the drug at issue in the case. *Id.* Judge Moore found that those facts are not shared by all businesses, and that

while the Tenth Circuit found generalized motives (of facilitating a notes offering and protecting the value of stock) to be insufficient, "that is not the situation here." *Id.* at 1128-29 (citing *Fleming*, 264 F.3d at 1269-70).

Here, as in *Medina*, binimetinib is alleged to be Defendants' most important clinical product. *Compl.* [#27] ¶¶33, 110. Whether used as a standalone product (NEMO) or in combination with another component (COLUMBUS), Plaintiffs have averred that any news concerning binimetinib's safety or efficacy had the potential to create significant effects on Array's finances and operations. *Id.* ¶110; *see also Response* [#35] at 35. Plaintiffs assert that this was especially so considering Array's deficit and lack of revenue. *Id.* ¶ 112; *Response* [#35] at 35.[21] Given this deficit, Plaintiffs aver that Defendants filed the NDA even knowing that the negative data meant approval was unlikely given the lack of a clinical benefit, while making its public offering to raise money to finance its combination therapeutic. In fact, Plaintiffs allege that by concealing the truth about the NEMO data for as long as they did, Array was able to: (i) maintain investor interest in binimetinib; (ii) successfully announce on September 26, 2016 that the COLUMBUS trial met its primary endpoint amid much fanfare; and (iii) conduct a secondary public offering on September 27, 2016 in which it sold 18.4 million shares of common stock at $6.25 per share for total proceeds (before expenses) of $108 million. *Compl.* ¶ 111. These allegations separate Plaintiffs' case from the

---

[21] The Court recognizes Defendants' assertion that their collaborations and agreements with large pharmaceutical companies "have generated hundreds of millions of dollars in revenue for Array's operations" in the last ten years, and that "during the putative class period, Array had upwards of $50 million in cash and cash equivalents on its balance sheet." *Reply* [#38] at 20 (citing *Appendix* [#33], Tab 13, Excerpt of Form 10-K). However, the 10-K notes on that same page that with the exception of the 2015 fiscal year, Array "incurred operating losses and an accumulated deficit as a result of ongoing research and development spending since inception[,]" and substantiates Plaintiffs' averments regarding the large accumulated deficit.

"generalized corporate motive" cases relied upon by Defendants in their Motion [#32].  *See id.* at 35 (citing, *e.g.*, *Anderson v. Spirit AeroSystems Holdings, Inc.*, 827 F.3d 1229, 1239 (10th Cir. 2016), and *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008)). At this early stage of the litigation, the Court finds that Plaintiffs' allegations raise an inference of scienter that is "cogent and at least as compelling as to any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.

### C.     Whether Count II Alleging Control Person Liability Should Be Dismissed

Finally, Defendants assert that because Plaintiffs fail to adequately allege a primary violation of the securities laws, "their Section 20(a) claim is also not viable."  *Motion* [#32] at 38 (citing *Ellis*, 2018 WL 1583837, at *14.  This argument must be denied given the Court's finding of a viable claim under Section 20(a).

### V.  Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that the Motion to Dismiss [#32] is **DENIED**.

Dated:  November 24, 2020

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge